UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| TECHTRONIC INDUSTRIES COMPANY LIMITED and TECHTRONIC INDUSTRIES FACTORY OUTLETS, INC. | Case No. 8:23-cv-01734-CEH-AEP |
| Plaintiffs, | |
| v. | |
| VICTOR BONILLA and JUSTIN ROBERTS, | |
| Defendants. | |

## MOTION OF DEFENDANT VICTOR BONILLA TO DISMISS COMPLAINT

Defendants Victor Bonilla ("Bonilla"), pursuant to Fed. R. Civ. P. 12(b)(6), moves for entry of an order dismissing Plaintiff's Complaint:

## I.    INTRODUCTION

Defendant Victor Bonilla, a financial journalist, has been sued for defamation by Plaintiffs Techtronic Industries Co. and Techtronic Industries Factory Outlets, Inc. (collectively, "Techtronic"), a multi-billion dollar multi-national corporation and its U.S. subsidiary, for two written reports by Bonilla containing lively hyperbole and opinions about Techtronic's finances that are fully protected by the First Amendment. This is a classic SLAPP suit—an attempt by a large, famous, publicly traded corporation, with a market capitalization of twenty billion dollars, to silence a critic and serve

notice to anyone else who might attempt to inform the markets about Techtronic. It must not be allowed to proceed.

Techtronic's suit fails to state a cause of action for several reasons:

1.    Techtronic is a public figure, and must plausibly plead "actual malice," *i.e.*, specific facts that show that Bonilla published statements he knew had a high degree of probable falsity. Techtronic does not do so.

2.    Independent of the actual malice issue, Bonilla's statements regarding Techtronic were opinions and rhetorical hyperbole, such as "[Techtronic's] balance sheet has become a vast, toxic graveyard where the accounting bodies are buried" (hyperbole) and Bonilla saying "[w]e aren't so sure" whether Techtronic improperly sells new merchandise in its factory outlets (opinion).

3.    Independent of those two issues, Techtronic fails to plead a false statement. While Techtronic includes rote denials of Bonilla's claims in its Complaint, Bonilla's claims are backed up by over 130 pages of careful analysis, financial calculations, illustrations, and photographs. Techtronic denies none of these facts at any level of detail.

4.    Independent of those three issues, the Complaint also fails under the fair comment rule, which requires a public figure plaintiff to plead common law malice, *i.e.*, spite or ill will, when suing over a fair comment. Techtronic alleges no facts that Bonilla was motivated by spite or ill will.

5.     Independent of the actual malice, opinion/rhetorical hyperbole, falsity, and fair comment issues, Techtronic also fails to sufficiently plead that it suffered any damage. Techtronic emphasizes that Bonilla's reports affected its market capitalization, but that would be an injury to Techtronic's **shareholders**, not Techtronic. Further, Techtronic claims it had to spend money correcting supposedly defamatory statements, but does not allege any specific such expenditures or what facts necessitated doing this.

This is an outrageous lawsuit, an attack on the legitimate, colorful journalism of a small financial newsletter by a rich and famous company seeking to silence criticism. In short, this is a threat to the First Amendment. This Court should see through Techtronic's tactics and dismiss the case. In addition, because there are no facts Techtronic could plead that would establish that Bonilla's statements were outside the protections of opinion, rhetorical hyperbole, and fair comment, amendment will be futile, and leave to amend should be denied.[1]

---

[1] Florida has an anti-SLAPP statute. Fla. Stat. § 768.925. Bonilla reads Eleventh Circuit precedent as holding such statutes do not apply in federal court, and on that basis alone does not seek to recover attorneys' fees. *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345 (11th Cir. 2018). Bonilla believes that the Eleventh Circuit *en banc*, or the Supreme Court, should rule that the Florida statute is applicable in federal court, and expressly reserves that argument for proceedings in those courts.

## II.     SUMMARY OF PLEADED FACTS[2]

### A. Techtronic's Status As a Major Public Figure

Plaintiff Techtronic Industries Co. is a Hong Kong publicly traded corporation, and Plaintiff Techtronic Industries Factory Outlets, Inc. is its subsidiary. *Complaint* [Dkt. 1] ¶¶ 5–6. Techtronic publishes financial results twice per year. *Id.* ¶ 22. Techtronic manufactures power tools, outdoor power equipment, hand tools, vacuum cleaners, and lithium ion batteries. *Id.* ¶¶ 14, 17. It is a global leader in battery research and development, one of the largest manufacturers of batteries in the world, and calls itself a "technological leader and innovator." *Id.* ¶ 17. Techtronic began as a manufacturer for globally recognized brands including Craftsman. *Id.* ¶ 15. Its lines of products include numerous famous brands including Ryobi, Milwaukee, Hoover, Oreck and Dirt Devil. *Id.* ¶ 19. Techtronic has an exclusive contract to supply Home Depot. *Id.* ¶ 23.

Techtronic's market capitalization is nearly $20 billion. *Id.* ¶ 16. Techtronic earns approximately $13 billion in annual revenue and over $1 billion in operating profit. *Id.* ¶¶ 20–21. Techtronic's stock was selected as

---

[2] The facts as pleaded in the Complaint (so long as they are plausible), along with any judicially noticeable material, are assumed to be true solely for the purposes of this motion to dismiss proceeding. *Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 706 (11th Cir. 1998). Bonilla's recitation of facts as pleaded in the Complaint is solely for the purpose of this motion and should in no way be taken as any sort of concession or admission in any other proceeding in this or any other case that any such alleged facts are true.

one of fifty companies included in the Hang Seng Index, the Hong Kong analog to the Dow Jones Industrial Average. *Id.* ¶ 18.

Techtronic issues frequent press releases regarding its activities and financial results, and posts them on its website. https://www.ttigroup.com/investors/financial-results.

## B. Victor Bonilla's Publishing Enterprise, and His Alleged Motive of Publishing for the Purpose of Profiting Off Short Positions in Stocks

Defendant Victor Bonilla does business as Jehoshaphat Research (a trade name, not incorporated; hereinafter "Jehoshaphat") and publishes reports regarding fraud at publicly traded companies. *Complaint* ¶ 9. Jehoshaphat has 4,000 twitter followers. *Id.* ¶ 33. Bonilla's reports are allegedly intended to lower the stock prices of the companies so that Bonilla can profit off short positions in the stocks. *Id.* ¶¶ 1, 9, 32, 57. Bonilla owns hedge funds that make stock trades concerning companies reported on by Jehoshaphat. *Id.* ¶¶ 35–36.

## C. Techtronic's Contract With Home Depot

In the United States, Techtronic sells its Ryobi products through a contract with Home Depot, which has the exclusive right to purchase and resell Ryobi products in the United States. *Id.* Home Depot places orders for specific quantities of product, based on customer demand. *Id.* Techtronic

manufactures sufficient quantities to fulfill all orders based on Home Depot's forecasts. *Id.* ¶ 24.

When customer demand does not meet Home Depot's forecasts, Techtronic is left with excess product. *Id.* ¶ 25. Techtronic retains the right to sell certain limited categories of Ryobi products, including reconditioned products, blemished products, and excess and obsolete products that Home Depot forecasted it would require but did not need. *Id.* ¶ 26. Techtronic sells these products through a system of factory outlet stores. *Id.* ¶ 27. In 2022, Techtronic earned $91.3 million in factory outlet revenue. *Id.* ¶ 29. Of that, $22.9 million was from reconditioned products and $68.4 million was from blemished and excess or obsolete products. *Id.* ¶ 30. Techtronic incurred an operating loss of $9.3 mill. from its factory outlet program in 2022. *Id.* ¶ 31.

### D. Jehoshaphat's First Report

On February 22, 2023, Jehoshaphat published a research report regarding Techtronic ("First Report"). *Id.* ¶ 39.[3] The First Report contained a

---

[3] The First Report expressed the following opinions regarding Techtronic: (1) that it had been "inflating its profits", Dkt. 1-1 at 2; (2) that it used "manipulative accounting", *id.*; (3) that it was suspicious that Techtronic's gross profit margin had gone up every half year for 10 years, unlike any other comparable company, *id.*; (4) that Jehoshaphat believed that Techtronic "stuff[ed] billions of dollars' worth of routine expenses into various asset accounts, year after year", *id.*; (5) that Techtronic's "balance sheet has become a vast, toxic graveyard where the accounting bodies get buried", *id.*; (6) that "we find that the company is both behind on its payments and conducting massive layoffs", *id.*; and (7) that based on all of this, that "we believe this stock has 60%-80% downside", *id.* The Introduction Page was headed "These Profits Don't Occur In Nature, So How'd They Happen?" *Id.*

The First Report contained 22 pages of charts, data, and analysis, and four pages of endnotes with citations to documents, to back up those opinions. *Id.* at 3–24, 26–29. This

disclaimer, labeled in bold and in capitalized letters and underlined (*i.e.*, "**DISCLAIMER**"). Dkt. 1-1 [Exhibit 1 to *Complaint*] at 53. The disclaimer included the following: (1) "You... agree to do your own research and due diligence, consult your own financial, legal, and tax advisors before making any investment decision with respect to transacting in any securities covered herein"; (2) "This content is not investment advice"; (3) the "information is presented 'as is,' without warranty of any kind – whether express or implied"; (4) "Jehoshaphat Research makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use." *Id.*[4]

### E. Alleged False Statements in First Report

Techtronic alleges the following supposedly false and defamatory statements in the First Report: (1) Techtronic's financial statements are a

---

included (1) evidence Techtronic disposes of large amounts of tangible assets at near total losses, *id.* at 4; (2) evidence Techtronic reported defaulted accounts receivable as assets (Jehoshaphat hyperbolically described this as "[i]f committing outright financial fraud is the 'hard stuff,' would defying one's accountants be a 'gateway drug'?", and quoted a former Techtronic board member describing this as "bulls**t"), *id.* at 4–5; (3) evidence Techtronic overproduced inventory, *id.* at 5; (4) comparing Techtronic to another company with similarly improbable results, which later settled with the SEC, *id.*; (5) evidence Techtronic was laying off employees and making late payments, *id.*; and (6) evidence Techtronic's CEO had made false or overoptimistic public statements and had been forced out of other firms, *id.* at 6–7. Despite all this substantive content, Techtronic only identifies a small number of statements in the First Report it contends are defamatory. *See, e.g., Compl.* ¶¶ 41–45, 52.

[4] Importantly, the disclaimer **twice** states that Jehoshaphat's analyses of Techtronic are **opinions**. *Id.* ("All expressions of opinion are subject to change without notice"; "We believe that any investor who takes financial action based on the opinions of someone else must take responsibility for his or her own trading. We do our own research, and you should too."). *Id.; see also, e.g.,* Dkt. 1-1 at n.2 ("This report consists of <u>our opinions only</u> . . . ")).

7

"web of deceit"; (2) Techtronic's financial success is the result of accounting trickery; (3) Techtronic's operating income is overstated by 40-70% due to "accounting games"; (4) Techtronic's "financials are littered with evidence of costs being deceptively managed downward" through capitalization of costs and under-depreciation of assets; (5) Techtronic's "balance sheet has become a vast, toxic graveyard where the accounting bodies are buried"; (6) Techtronic pushes costs into the future where it eventually is forced to write off capital assets for excessive losses; (6) Techtronic refuses to write down certain overdue debts owed to it despite accountants stating that such overdue accounts receivable should be discounted or written off entirely; (7) "If committing outright financial fraud is the 'hard stuff,' would defying one's accountants be a 'gateway drug?'"; (8) Techtronic is "literally struggling to pay its bills on time" and "failing to pay [its suppliers and vendors] within existing [payment] terms"; (9) Jehoshaphat assesses the "personality or behavioral traits" of Techtronic's CEO based only on media reports and out-of-context quotes from him and surmises that his traits were similar to "notorious fraudster CEOs"[5]; and (10) the First Report chides Techtronic for not following generally accepted accounting procedures without mentioning

---

[5] Notably, Techtronic's CEO, Joseph Galli, is not a plaintiff herein and Techtronic does not explain how it could have standing to assert claims that Bonilla allegedly defamed Galli.

such procedures supposedly do not apply to a Hong Kong company. *Complaint* ¶¶ 41–45, 52.

Techtronic alleges that each of these statements is false, but does not plead specific information rebutting them. *E.g., id.* ¶ 50 (generic statement that Techtronic makes its payments), ¶ 44; *see* Dkt. 1-1 at 33, 41 (detailing evidence from Techtronic's own financial statements that it is not meeting payment terms).

Techtronic alleges that the statements in the First Report were made with reckless disregard for the truth but does not provide any facts whatsoever as to why Bonilla had a high degree of awareness of probable falsity. *Complaint* ¶ 53.

### F. Jehoshaphat's Second Report

On June 5, 2023, Jehoshaphat issued a second report on Techtronic ("Second Report"). *Id.* ¶ 65.[6]

---

[6] The Second Report contains what are obviously Jehoshaphat's opinions. It is titled with a question, "Is [Techtronic] Making Hundreds of Millions in Profit By Systematically Defrauding Home Depot?" Dkt. 1-2 at 2. The topline conclusion is stated as explicit opinion: "We believe that Techtronic has been defrauding Home Depot on a massive scale for at least four years." *Id.* The fraudulent scheme that the Second Report opines on involves the sale of unblemished merchandise as "blemished" in Techtronic's factory outlets, which Jehoshaphat believes could violate its agreements with Home Depot. *Id.*

The Second Report discloses 63 pages of extensive factual backing for the expressed opinion, including (1) statements from a former Home Depot executive; (2) evidence that items ordered from Techtronic's factory outlet website were not blemished; (3) statements from Internet users that the products they ordered were not blemished; (4) photos of products for sale in Techtronic's faculty outlets; (5) interviews with factory outlet employees; and (6) the sheer number of supposedly "blemished" products available (which

## G. Alleged False Statements In Second Report

Techtronic alleges generically that Bonilla's opinion in the Second Report is false, stating it "and Home Depot are trusted partners in a long-standing, mutually beneficial collaborative relationship. This relationship has, for more than a decade, involved trust and transparency and have resulted in the sale of billions of dollars of [Techtronic] products through Home Depot's stores and websites. Both companies profit." *Complaint* ¶ 69. This is a non-denial denial.

Just as with the First Report, Techtronic identifies hyperbolic statements as if they are factual statements. E.g., the Second Report refers to a "scam", *Id.* ¶ 91, and gives it the nickname "Blemishgate", *id.* ¶ 89.

Techtronic claims that Bonilla published with reckless disregard of the truth, *id.* ¶ 75, but pleads no facts supporting that allegation. For instance, Techtronic says that Jehoshaphat quotes a source saying that the source did not believe there was a deliberate strategy to take new products to a factory outlet, and then notes that Jehoshaphat opines it is not "so sure about that last sentence". *Id.* ¶ 77. This is a mere difference of opinion. Similarly, Techtronic alleges Bonilla was told by a source that some of the sales may be of obsolete products (which would not need to be blemished), but Bonilla

---

seem inconsistent with the number of actually blemished products one might expect Techtronic to produce). *Id.* at 2–3, 5-67. It also contains the same disclaimer as the First Report. *Id.* at 68.

concluded that this was unlikely because Techtronic's website did not contain a category for obsolete products. *Id.* ¶ 78. Thus, Bonilla reasonably reported what Techtronic's own website indicated.[7]

Techtronic argues actual malice based on the fact that Bonilla's calculations revealed an absurd amount of sales of "blemished" goods, *id.* ¶¶ 79–82, but that is precisely one of the facts upon which Bonilla grounded his suspicions of foul play. Finally, Techtronic alleges actual malice because Bonilla compared Techtronic's reported data about factory outlets with other companies. *Id.* ¶ 87. This is not evidence that Bonilla made statements with a high degree of probable falsity; rather, this is merely a classic dispute over methodology and interpretation of data.[8]

### H. Alleged Damages

Techtronic alleges the First Report resulted in the collapse of Techtronic's stock price. *Id.* ¶ 62. Techtronic does not allege any facts as to why it suffered this injury, which would instead have harmed its shareholders. Techtronic also alleges that it was "forced to incur expenses, including legal fees, to investigate and refute Defendants' false assertions

---

[7] Similarly, Techtronic admits its own website was mis-programmed and then says Bonilla's failure to detect what Techtronic admits it did not detect is somehow evidence Bonilla acted with reckless disregard for the truth. *Complaint* ¶¶ 83–85. This reasoning is nonsensical.

[8] Notably, Techtronic pleads that no reasonable person could rely on the comparison made by Bonilla to other websites. *Complaint* ¶ 87. If Techtronic were right that no reasonable person would rely on this comparison, then it underscores that Bonilla is expressing his opinions rather than making statements of fact that can be the basis of a defamation action.

and additional fees paid to the company's accounting firms to confirm the alleged accounting improprieties were false." *Id.* ¶ 63. However, it does not set forth what any of these expenses were, what it did either to investigate and refute Bonilla's allegations or to confirm that there were no accounting improprieties, or how much it spent.

Finally, Techtronic claims that on the same day as the First Report, one of Techtronic's lenders demanded it decrease its borrowing on a credit line by $300 million. *Id.* ¶ 64. However, Techtronic does not plead any plausible facts regarding this claim, such as (1) who the lender was, or (2) whether the lender expressly stated that this was due to any allegedly **defamatory** statements in the First Report.

Techtronic alleges "[t]his reduced access to credit, which was directly caused by Defendants' wrongful actions, forced [Techtronic] to deplete its cash reserves, reduce its available working capital, and seek credit from other sources on less favorable terms." *Id.* However, while it alleges **seeking** credit on less favorable terms, it does not allege that it obtained such a loan or paid more interest.

With respect to the Second Report, Techtronic's only allegations of damages are the cost to its shareholders (which is separate from injury to Techtronic) and unspecified legal and accounting fees. *Id.* ¶¶ 95, 97.

## III.   TECHTRONIC, A PUBLIC FIGURE, FAILS TO PLEAD PLAUSIBLE FACTS ESTABLISHING ACTUAL MALICE.[9]

Public figures are, under the First Amendment, not permitted to file defamation actions without very specific, strong factual showings that the defendant knowingly made statements with a high degree of probable falsehood. "Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures... may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). This is premised on the fact that "a private person has less likelihood 'of securing access to channels of communication sufficient to rebut falsehoods concerning him' than do public officials and public figures." *Id.* at 338.

### A.   Techtronic Is a Public Figure

Techtronic is obviously a public figure. It brags about its size and remarkable success in its own Complaint. It is a multinational corporation

---

[9] A Rule 12(b)(6) motion assumes the plausible factual allegations of a complaint to be true and tests the legal sufficiency of the claim. *Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, 634 F.3d 1352, 1359 (11th Cir. 2011). To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

with $20 billion in market capitalization, earns $13 billion in revenue per year, and is a leading manufacturer of lithium ion batteries that are key to many emerging technologies. Complaint ¶¶ 16–17, 20–21. Techtronic also has contracts with some of the biggest corporations in the world, including Home Depot. *Id.* ¶ 23. Techtronic has a sophisticated press operation, and is a publicly traded company that issues periodic reports to the investing public. *Id.* ¶¶ 5, 22. It has the means to secure access to channels of communication to rebut any falsehoods.

"Determining whether an individual is a public figure—and thus subject to the actual malice analysis—is a question of law for the court to decide." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (holding musician Prakazrel Michel was a public figure, relying on Michel's allegations in his Complaint: "He describes himself in his complaint as 'a two-time Grammy winning artist, a founding member of the famous music group, the Fugees, and ... an acclaimed philanthropist.' And in subsequent court documents, he describes himself as a 'world-renown[ed] philanthropist.'"). For the same reasons, Techtronic is obviously a public figure—a gigantic publicly traded corporation, an industry leader in key industries, a multi-billion dollar operation, and an organization that has extensive access to the media to rebut any falsehoods. The cases support this conclusion. *E.g., Mimedx Group v. Sparrow Fund Mgmt., L.P.*, 2018 WL 847014 at *6 (S.D.N.Y. Jan. 12, 2018)

(in defamation action against short seller, holding plaintiff was a public figure because it is a publicly traded company); *Borislow v. Canaccord Genuity Group*, 2014 WL 12580259 at *2 (S.D. Fla. Jun. 27, 2014) (executive who alleged in his complaint that he took a company to $2 billion in valuation and revolutionized long distance service was a public figure); *La Marca v. Capella University*, 2009 WL 10698387 at **6–7 (C.D. Cal. Jan. 6, 2009) (large corporation with $169 million in assets which issues frequent press releases is an all-purpose public figure); *Reliance Insurance Co. v. Barron's*, 442 F. Supp. 1341, 1348 (S.D.N.Y. 1977) (insurance company with over a billion dollars of assets a public figure); *see also Turner v. Wells*, 879 F.3d 1254, 1271–72 (11th Cir. 2018) (professional football coach public figure).[10]

### B.    Techtronic Does Not Plausibly Plead Actual Malice

Consequently, Techtronic must plausibly plead actual malice. *Centennial Bank v. Servisfirst Bank Inc.*, 2021 WL 915121, at *8 (M.D. Fla. Mar. 10, 2021). Actual malice means defendant either knew his statements were false or acted with "a high degree of awareness of probable falsity."

---

[10] In addition, Techtronic is in any event a limited public figure with respect to its own public activities. *See 100 Plus Animal Rescue, Inc. v. Butkus*, 2020 WL 5514404 at *6 (S.D. Fla. Aug. 15, 2020) (plaintiff which extensively alleged the accolades it had won and cited publications praising it was public figure with respect to its public activities). This case arises out of Techtronic's public actions as a publicly-traded company, which Bonilla investigated for the benefit of other investors. If Techtronic did the things Bonilla claims, it would be of great interest to the market, and indeed Techtronic specifically alleges that both of Bonilla's reports caused its stock price to drop, which shows investor interest. Techtronic is at least a limited purpose public figure.

*Gertz*, 418 U.S. at 332. The plausibility requirement of *Iqbal* and *Twombly* means Techtronic must plead **facts** sufficient to give rise to a reasonable inference of actual malice. *Michel*, 816 F.3d at 702. Techtronic's conclusory allegations that Bonilla published with reckless disregard of the truth are worthless. *Id.* at 704 ("Allegations such as these amount to little more than threadbare recitals of the elements of a cause of action") (citation and quotations omitted). Nor is alleging that Bonilla failed to contact Techtronic sufficient. *Id.* at 703 ("Actual malice requires more than a departure from reasonable journalistic standards. Thus, a failure to investigate, standing on its own, does not indicate the presence of actual malice.").

Additionally, Techtronic's allegation that Bonilla published with actual malice because he failed to correctly analyze the information in Techtronic's public reports is barred by Eleventh Circuit precedent. *Turner v. Wells*, 879 F.3d 1254, 1273–74 (11th Cir. 2018) ("Ultimately, many of Coach Turner's allegations center on the Defendants' failure to properly analyze certain information. But these allegations also fail to allege malice, because they do not give rise to a reasonable inference that the Defendants knowingly or with reckless disregard published a false statement of fact. If anything, these allegations attack the reliability of the Defendants' opinions, and we have explained... why these types of claims fall outside the scope of a defamation suit."); *Mosby v. City of Byron*, 2022 WL 1136835 at *4 (11th Cir.

16

Apr. 18, 2022) (allegation that defendant's statement was based on inaccurate information refutes claim of actual malice).

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252–53 (11th Cir. 2021), illustrates the pleading burdens for actual malice. In *Coral Ridge*, plaintiff claimed that designating it as a "hate group" was defamatory, because the defendant ignored its own definition of the term "hate group." However, the court held this did not satisfy the actual malice standard: "Coral Ridge pleaded no facts that would allow us to infer that SPLC seriously doubted the accuracy of designating Coral Ridge a hate group" and "bare-bone allegations are insufficient to show that SPLC doubted the truth of its designation." *Id.* at 1253; *see also*, *e.g.*, *Zimmerman v. Buttigieg*, 576 F.Supp.3d 1082 (M.D. Fla. 2021) (dismissing complaint for failure to state a claim because "Zimmerman has not plausibly alleged that Defendants knew or disregarded the falsity of what they inferred about him and Trayvon Martin's death in their tweets").

Techtronic alleges no facts showing Bonilla had a high degree of awareness his statements were probably false. The detail of Bonilla's reports negates actual malice. Bonilla shows his work, so the actual malice requirement cannot be met. *Jacoby v. Cable News Network, Inc.*, 2021 WL 5858569 at *5 (11th Cir. Dec. 10, 2021) ("Further, where the publisher includes information that 'gives readers sufficient information to weigh for

themselves the likelihood of an article's veracity,' this showing tends to undermine claims of actual malice.").

## IV.  INDEPENDENTLY, BONILLA'S STATEMENTS ARE OPINIONS AND RHETORICAL HYPERBOLE

Defamation law deals in statements of fact; opinions are protected under the First Amendment. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974); *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52, 56 (Fla. 1st DCA 1981).

> In determining whether an alleged libelous statement is pure opinion, the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication. The court must consider the context in which the statement was published and accord weight to cautionary terms used by the person publishing the statement. All of the circumstances surrounding the publication must be considered, including the medium by which it was disseminated and the audience to which it was published.

*Keller v. Miami Herald Publishing Co.*, 778 F.2d 711, 717 (11th Cir. 1985).

The opinion rule protects statements that disclose facts upon which an opinion is based. "[A] defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *From*, 400 So.2d at 57. Liability only attaches where a statement is "readily capable of being proven true or false." *Michel*, 816 F.3d at 697. The application of this rule is a question of law. *Keller*, 778 F.2d at 715.

Also, "rhetorical hyperbole" is not actionable as defamation. *Horsley v. Rivera*, 292 F.3d 695, 701–02 (11th Cir. 2002). Rhetorical hyperbole is loose, figurative language no reasonable person would believe presented facts. *Id.* at 702. Examples include: (1) accusing someone of being a "traitor"; (2) accusing someone of "blackmail"; (3) referring to a nursing home with the sobriquet "don't worry, we can always reopen it as a haunted house"; (4) characterizing an investigation's conclusions as "the equivalent of Jeffrey Dahmer complaining his victims got blood on the carpet"; and (5) saying an abortion doctor "had blood on his hands" and "was an accomplice to homicide." *Id.* (discussing cases in detail).

Everything Techtronic pleads as false is either opinion, rhetorical hyperbole, or both. Statements that Techtronic was running a "scam" and its balance sheet is a "vast, toxic graveyard" or that its CEO exhibits traits similar to those of "notorious fraudster CEOs" are rhetorical hyperbole. And when Bonilla makes substantive points, it is clear from the context that he is stating opinions. The disclaimer in both reports says this explicitly. Moreover, everything he says in both reports is backed up by extensive charts, data, photographs, and analysis. He tells you what he thinks, and he tells you why he thinks what he thinks. Techtronic has no valid cause of action for defamation.

19

## V.   INDEPENDENTLY, TECHTRONIC FAILS TO ALLEGE FALSITY.

Falsity is an essential element of a cause of action for defamation. *Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). This is subject to the *Iqbal/Twombly* standard and a defamation plaintiff must plead falsity with specific, plausible facts. *Geller v. Von Hagens*, 2010 WL 4867540 at *3 (M.D. Fla. Nov. 23, 2010). Techtronic fails to allege plausible facts that show falsity.

Techtronic pleads empty corporate-speak about how everything Techtronic does was ethical. However, this is not an actual denial of any fact. An illustrative example is the claim in the Second Report that Techtronic sells unblemished goods in breach of its Home Depot contract. Here is the denial: "[Techtronic] and Home Depot are trusted partners in a long-standing, mutually beneficial collaborative relationship. This relationship has, for more than a decade, involved trust and transparency and have resulted in the sale of billions of dollars of [Techtronic] products through Home Depot's stores and websites. Both companies profit." *Complaint* ¶ 69. That says nothing about whether Techtronic is selling unblemished goods in violation of its Home Depot contract.

Over and over again, Techtronic pleads vague corporate-speak:

a.    "[Techtronic's] decade of increasing gross margins is entirely accurate and is a result of [Techtronic's] strategic plan, growth and

innovation including its prescient investment in battery technology and pioneering position in the cordless power tools industry." *Id.* ¶ 47.

b.    Techtronic "depreciates its capital assets in accordance with accepted accounting standards. When it disposes of an asset at significantly below book value, it does so because it cannot sell the assets at full market and risk its proprietary intellectual property being put into the open market". *Id.* ¶ 48.

c.    Techtronic "accounting for aged accounts receivable is consistent with the historical payments that it has actually received from customers in those circumstances. Because of the high quality of TTI's customers, it consistently receives payments from all of its customers, including even those whose accounts become overdue for a period of time." *Id.* ¶ 49.

d.    Techtronic "accounts payable aging is entirely consistent with its financial position for years, including years during which TTI's business was growing rapidly. Far from 'struggling' to pay its bills or experiencing any financial stress, [its] financials are robust and healthy". *Id.* ¶ 50.

e.    "Mr. Galli is an experienced CEO with a proven track record of success both at [Techtronic] and other companies." *Id.* ¶ 51.

At no point does Techtronic simply plead what actually happened. Has it made late payments? Has its CEO been forced out at other firms? Are its outlets selling unblemished goods? These should be simple to plead

specifically. Instead, Techtronic's Complaint purports to plead defamation counts while not actually denying any of Bonilla's claims. The pleading fails for this independent reason.

## VI.   INDEPENDENTLY, BONILLA'S CLAIMS ABOUT TECHTRONIC ARE FAIR COMMENT, AND TECHTRONIC HAS FAILED TO ALLEGE COMMON LAW MALICE.

The fair comment privilege is a qualified privilege that protects defamation defendants who comment upon public figures engaged in a public enterprise who are attempting to influence public opinion. *Gibson v. Maloney*, 231 So. 2d 823, 824–25 (Fla. 1970). In this situation, plaintiff may only prevail if he establishes defendant acted with common law malice. *Id.* at 825. Common law malice means "ill will, hostility or an evil intention to defame and injure." *Hunt v. Liberty Lobby*, 720 F.2d 631, 650-51 (11th Cir. 1983).

Here, Techtronic has not pleaded any plausible facts that show that Bonilla acted with ill will, hostility, or an evil intention to defame and injure. Indeed, the motive that Techtronic actually alleges is entirely different from common law malice—Techtronic alleges that Bonilla wanted to drive down the price of Techtronic's stock (an injury that would be inflicted on Techtronic's shareholders, not Techtronic) to make a profit on short sales. *Complaint* ¶ 9, 32, 57, 104, 118. In other words, under Techtronic's theory, far from being motivated by ill will, Techtronic **itself** alleges this was strictly

business and not based on any personal vendetta. Techtronic simply cannot plead common law malice here.

## VII.   INDEPENDENTLY, TECHTRONIC HAS NOT SUFFICIENTLY PLEADED DAMAGES.

Actual damage is "an essential element of a defamation action." *Anheuser-Busch v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003). General damages, *i.e.*, damages to a plaintiff's amorphous "reputation," are only available where defamation *per se* is alleged. Defamation *per se* is limited to statements that are "'so obviously defamatory' and 'damaging to [one's] reputation' that they 'give[ ] rise to an absolute presumption both of malice and damage.'" *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1247 (S.D.Fla. 2014) (citation omitted). The conduct alleged must be "incompatible" with one's lawful profession or business. *Id.* This is a very narrow category: "Where courts have found conduct to be incompatible with one's profession, the conduct referred to in the defamatory statement went directly to a person's ability to perform duties essential to his or her employment, or was sufficiently related to skills required of the profession." *Id.*

While obviously the reports accused Techtronic of serious misconduct, they did not literally allege that Techtronic is unable to perform its essential duties in its business. Indeed, it is hard to imagine what sort of statement could allege such a thing about a company that has been so successful as to

achieve a market capitalization of $20 billion and have tens of billions of dollars of annual revenue.

Accordingly, Techtronic must plead and prove special damages, *i.e.*, actual loss resulting from the alleged defamation. *Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1343; Fed. R. Civ. Proc. 9(g) ("If an item of special damage is claimed, it must be specifically stated."). Techtronic's special damages allegations are inadequate.

First, any decrease of Techtronic's stock price due to alleged defamatory statements would be at best an injury to Techtronic's **shareholders** (assuming the stock price did not later rebound), not to Techtronic. Second, Techtronic alleges that it expended unspecified legal and accounting fees correcting the defamatory statements in the two reports, but gives no detail as to how much was spent, on what, and how such expenses were caused by the allegedly defamatory statements.

Finally, with respect to the First Report, Techtronic alleges that $300 million of its credit line was decreased on the same day the First Report came out. However, this is inadequate for several reasons. First, Techtronic does not actually connect the loss of its credit line to any **defamatory** statements—there were many statements in the First Report that even in this action Techtronic has not claimed to be defamatory; if those statements were the reason for the credit line decrease, there is no damage. Second,

24

Techtronic does not allege that the loss of this credit line actually hurt it; its pleading vaguely says the First Report affected cash reserves and working capital and that it had to "seek credit" on less favorable terms, but none of that answers the central question: did Techtronic actually borrow money and pay a higher interest rate because this credit line was pulled? Techtronic, once again, wants to skate without setting forth the specific allegations.[11]

## VIII. CONCLUSION

Techtronic's suit is a gross violation of the First Amendment, i.e., nothing more than an attempt to shut down a critic. It also suffers from a plethora of pleading defects. This Court should dismiss with prejudice.

### Local Rule 3.01(g) Certification

On August 28, 2023, counsel for Victor Bonilla conferred with counsel for Plaintiffs Techtronic Industries Co. and Techtronic Industries Factory Outlets, Inc. via videoconference regarding the relief sought in this motion. Plaintiffs oppose the motion.

---

[11] Normally, a plaintiff receives at least one chance to amend its complaint. However, no amendment should be permitted when amendment will be futile, *i.e.*, where the complaint as amended will still be dismissed. *Coventry First, LLC v.* McCarty, 605 F.3d 865, 869 (11th Cir. 2010). Though several of the grounds raised in this motion are pleading defects where Techtronic might conceivably allege more facts, the opinion and fair comment issues are substantive bars to Techtronic's claims. Bonilla's claims in his reports are clearly labeled as and contain nothing but opinions and rhetorical hyperbole, and Techtronic has committed itself to a theory of Bonilla's motive that is not based on common law malice (i.e., ill will). Thus, amendment will be futile; Techtronic will not be able to show that Bonilla's statements are not his opinions, and it will not be able to plead inconsistently with its admissions that Bonilla's motive was merely financial. Thus, the dismissal should be with prejudice and leave to amend should be denied.

Dated: August 29, 2023                    Respectfully submitted,

By: */s/ Dawn Siler-Nixon*
    Dawn Siler-Nixon
    Dsiler-nixon@fordharrison.com
    Viktoryia Johnson
    vjohnson@fordharrison.com
    FordHarrison, LLP
    401 E. Jackson St., Ste. 2500
    Tampa, FL 33602-5133
    Telephone (813) 261-7800
    Facsimile: 813-261-7899

Dilan A. Esper (*Pro Hac Vice Pending*)
desper@harderllp.com
Charles J. Harder (*Pro Hac Vice Pending*)
charder@harderllp.com
Harder Stonerock LLP
8383 Wilshire Blvd. #526
Beverly Hills, CA 90211
Telephone (424) 203-1600
*Attorneys for Defendant Victor Bonilla*

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on August 29, 2023, the foregoing document was electronically filed with the Clerk of Court using CM/ECF, which will electronically send a notice of electronic filing to Plaintiff's attorneys of record

Jason Sternberg
Quinn Emanuel Urquhart Sullivan LLP
2601 South Bayshore Dr., Ste 1550
Miami, FL 33133
jasonsternberg@quinnemanuel.com

Kristin Tahler (*pro hac vice*)
Quinn Emanuel Urquhart Sullivan LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
kristintahler@quinnemanuel.com

Nicholas Inns (*pro hac vice*)
Quinn Emanuel Urquhart Sullivan LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
nicholasinns@quinnemanuel.com

*/s/ Dawn Siler-Nixon*
Attorney