## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## Tampa Division

Techtronic Industries Company
Limited, and Techtronic Industries
Factory Outlets, Inc.

Plaintiffs,

- against-

Victor Bonilla,

Defendant.

Case No. 8:23-cv-01734-CEH-AEP

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Techtronic Industries Company Limited and Techtronic Industries Factory Outlets, Inc. (together, "TTI"), by and through their undersigned counsel, bring this Complaint against Defendant Victor Bonilla and allege as follows:

### NATURE OF THE CASE

1.     Defendant is a short seller.  He takes positions in publicly traded stocks that become more valuable if the price of the stock declines, and then sets about trying to reduce that price.  Twice now, Defendant has selected TTI, one of the largest tool manufacturers in the world and one of Hong Kong's most successful businesses, as the target of his scheme.  First in February 2023 and then again in June 2023, Defendant, operating under the fictitious name "Jehoshaphat Research" published lengthy, detailed, and utterly false reports asserting that TTI was engaged in corporate malfeasance.

2.     First, on February 22, 2023, Defendant falsely claimed that TTI was using a "web of deceit" and "manipulative accounting" to inflate their revenue and

hide expenses. Defendant's claims were knowingly false: TTI's financial records are properly maintained in accordance with all industry standards and accurately reflect the company's assets, liabilities, revenue and expenses. Nevertheless, the scheme succeeded: as a result of the false report, TTI's stock price dropped by nearly 20%, and Defendant, on information and belief, profited enormously from his short-selling. But he was greedy, unsatisfied with the harm he had inflicted on TTI and his ill-gotten gains. Just a few months later, he struck again.

3.    On June 5, 2023, Defendant released another "research report," this time falsely claiming that TTI was "systematically defrauding Home Depot," its single largest customer with whom it has had a collaborative and mutually beneficial relationship for more than a decade. This report was, again, rife with false claims including that TTI was intentionally deceiving Home Depot by falsely labeling hundreds of millions of dollars' worth of products as "blemished" so that it could sell them through its own network of factory outlets at, Defendant falsely claimed, a high profit margin. Again, each element of the report was devoid of truth: TTI was not deceiving Home Depot, and the "billions" of dollars of factory outlet sales and hundreds of millions of dollars of factory outlet profits Defendant falsely claimed were, in reality, less than $100 million in sales per year and, in 2022, a *loss* of several million dollars. But, again, the truth was irrelevant to Defendant's scheme. TTI's stock price dropped nearly 5% as a result of the second report, and Defendant, on information and belief, profited again.

4. TTI now brings an end to Defendant's unjust profiteering at its expense and seeks compensation for the substantial harm Defendant's falsehoods have caused to its reputation and business.

## PARTIES

5. Plaintiff Techtronic Industries Company Limited is organized under the laws of Hong Kong and has its principal place of business in Hong Kong. It is a publicly traded company whose stock is traded on the Hong Kong stock exchange.

6. Plaintiff Techtronic Industries Factory Outlets, Inc. is a corporation organized under the laws of Delaware and has its principal place of business in Anderson, South Carolina. It is a wholly owned subsidiary of Techtronic Industries Company Limited.

7. Defendant Victor Bonilla is a U.S. citizen and resident of Tampa, Florida.

8. Bonilla, along with additional unidentified co- conspirators, operates "Jehoshaphat Research." Jehoshaphat Research is, on information and belief, not a legal entity. Bonilla and his co- conspirators publish reports about publicly traded companies under the name of Jehoshaphat research on a website, www.jehoshaphatresearch.com, and a Twitter handle, @JehoshaphatRsch. These reports are intended to lower the stock prices of those companies so that Jehoshaphat Research, Bonilla, and his co- conspirators can profit from the short-selling of those companies' stocks.

**JURISDICTION AND VENUE**

9.     This Court has subject matter jurisdiction over this case pursuant to Section 1332(a)(3) of Title 28 of the U.S. Code because the suit is between citizens of different States in which a citizen of a foreign state is an additional party and the amount in controversy is in excess of $75,000.

10.     This Court has personal jurisdiction over Bonilla pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because he is a resident of Florida and is subject to the jurisdiction of a court of general jurisdiction of the State of Florida.

11.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District.

**FACTUAL BACKGROUND**

**I.     TECHTRONIC INDUSTRIES**

12.     TTI is a manufacturer of power tools, outdoor power equipment, hand tools, and vacuum cleaners.

13.     The company was founded in Hong Kong in 1985 by Horst Pudwill and Roy Chi Ping Chung.  It began as an original equipment manufacturer for globally recognized brands including Craftsman.

14.     In 1990, TTI made an initial public offering and its stock was listed on the Hong Kong Stock Exchange.  Since its initial public offering, TTI's revenue has grown from $63.1 million to more than $13 billion.  The company's market capitalization has likewise grown and is currently nearly $20 billion.

15.     Beginning in 2005 with its acquisition of Milwaukee Power Tools, TTI began investing heavily in lithium-ion battery technology.  Over the nearly two decades since then, TTI has become a global leader in battery research and development and is one of the largest manufacturers of batteries in the world, reflecting its status as not only a manufacturer of reliable tools but as a technological leader and innovator.

16.     In 2019, reflecting the great success and growth of the company, TTI's stock was selected as one of fifty companies included in the Hang Seng Index, the Hong Kong analog to the U.S. Dow Jones Industrial Average.

17.     Today, TTI's lines of products include numerous famous and respected brands including Ryobi, Milwaukee, Hoover, Oreck and Dirt Devil.

18.     In 2021, TTI earned $13.2 billion in revenue and $1.19 billion in gross profit.  Of its revenue, TTI earned $11.9 billion in sales of power tools and $1.2 billion in sales of vacuum cleaners.  Of the $11.9 billion in power tools, $6.8 billion was derived from sales of the Milwaukee line of power tools.  The remaining $5.1 billion in sales included all of TTI's other power tool product lines globally, including Ryobi.

19.     In 2022, TTI earned $13.3 billion in revenue and $1.2 billion in operating profit.  Of its revenue, TTI earned $12.3 billion in sales of power tools and $925 million in sales of vacuum cleaners.  Of the $12.3 billion in power tools, $8.1 billion was derived from sales of the Milwaukee line of power tools.  The

remaining $5.1 billion in sales included all of TTI's other power tool product lines globally, including Ryobi.

20.    As a publicly traded company, TTI publishes its financial results twice per year, including all of the information in paragraphs 20 and 21, above.

### A.    TTI, Home Depot, and the Direct Tools Factory Outlets

21.    In the United States, TTI sells its Ryobi products through a contract with Home Depot.  Pursuant to that contract, Home Depot has the exclusive right to purchase and resell Ryobi products in the United States.

22.    In implementing the contract, Home Depot provides forecasts of demand for each TTI product, which TTI then uses for its manufacturing.  Home Depot places orders for specific quantities of each product based on customer demand.  TTI manufactures sufficient quantities of products such that it can fulfill all orders based on Home Depot's forecasts; that is, TTI errs–and Home Depot prefers that it errs–on the side of manufacturing too many of each product based on Home Depot's forecasts so that Home Depot's orders never go unfulfilled and Home Depot never has to turn away customers.

23.    When customer demand does not meet Home Depot's forecasts, TTI is left with excess product that it must dispose of.

24.    Under the contract, TTI retains the right to sell certain limited categories of Ryobi products, including factory reconditioned products that TTI refurbishes after consumers return them due to a defect, factory blemished products that TTI cannot deliver to Home Depot due to imperfections in or damage

to the packaging of the products, and excess and obsolete products that Home Depot forecasted it would require but did not, in fact, need.

25.    TTI sells these products through a system of Direct Tool Factory Outlet ("DTFO") stores that it operates.

26.    DTFO operates more than three dozen physical stores in the United States, an e-commerce website, and occasional temporary pop-up stores at flea markets or other similar events.

27.    In 2022, TTI earned a total of $91.3 million in DTFO revenue, of which $48.5 million was derived from physical DTFO stores, $37.2 million was derived from the DTFO website, and $5.6 million was derived from temporary DTFO pop-up stores.

28.    Of the $91.3 million in DTFO sales, $22.9 million was from the sale of factory reconditioned products and $68.4 million was from a combination of factory blemished and excess or obsolete products.

29.    After the cost of the products sold through DTFO and operating expenses, TTI incurred an operating loss of $9.3 million from its DTFO program in 2022.

## II.    JEHOSHAPHAT RESEARCH

30.    Defendant is a short seller.  Under the name Jehoshaphat Research, Bonilla and his co-conspirators take short positions in the publicly traded stock of specific companies (that is, positions that become profitable if a stock price declines) and then publish "research" reports about those companies intended to

cause the stock price to decline.  On information and belief, Bonilla and his co-conspirators then cash out their short positions, reaping the profits from their "research."

31.    Defendant publishes "research" under the name Jehoshaphat Research on a website, www.jehoshaphatresearch.com, and on Twitter, using the handle @JehoshaphatRsch, which has more than 4,000 followers.  The published "research" reports purport to expose fraud by the target companies.  To the contrary, as detailed below, the TTI reports are rife with false allegations, false assertions of fact, and defamatory statements.

32.    Jehoshaphat Research operates anonymously and actively conceals the identities of its members, officers, employees, and agents.  Nevertheless, TTI has investigated and, on information and belief, identified Bonilla as one of the principals of Jehoshaphat Research.

33.    Bonilla is an investment analyst and manager.  In addition to his operation of Jehoshaphat Research, he is the principal of Carrollwood Capital Management, L.P., an investment advisory firm that manages at least five hedge funds:  Carrollwood SPV I, LP; Carrollwood SPV II, LP; Carrollwood SPV III, LP; Carrollwood SPV IV, LP; and Carrollwood SPV V, LP.  In aggregate, as of March 2023, these funds held gross assets of approximately $52 million.

34.    On information and belief, Bonilla uses these funds to make stock trades in order to profit from Defendant's "Jehoshaphat Research" publications.

35.    Bonilla operates Jehoshaphat Research and publishes its reports–including the two reports that are the subject of this Complaint–with an unknown number of other individuals who work as supposed investigators and analysts.  The reports specifically cite the purported work done by these individuals but do not identify them.

## III.    JEHOSHAPHAT'S FIRST FALSE SHORT REPORT

36.    On February 22, 2023, Jehoshaphat Research published a "research report" falsely asserting that TTI has "been inflating its profits dramatically for over a decade with manipulative accounting" (the "First Report").  A true and accurate copy of the First Report is attached as Exhibit 1 to this Complaint.

37.    The First Report is riddled with false assertions of fact that are detrimental and defamatory toward TTI.

38.    First, Defendant claimed that TTI's financial reports, which it makes regularly to the public and Hong Kong securities regulators, were a "web of deceit." Defendant then doubled down and inexplicably claimed that TTI's great success– its decade-long streak of increasing its gross margin each year–must, on its own, be evidence of some sort of accounting trickery and that TTI's operating income is "overstated by ~40-70% by accounting games."

39.    Second, Defendant falsely claimed that "TTI's financials are littered with evidence of costs being deceptively managed downward" through capitalization of costs and under-depreciation of capital assets and that, as a result, "TTI's balance sheet has become a vast, toxic graveyard where the accounting

bodies are buried." Because of the alleged under-depreciation, Defendant falsely claimed, TTI is pushing costs into the future where it eventually is forced to write off capital assets for excessive losses.

40.    Third, Defendant falsely claimed that TTI was improperly refusing to write down certain overdue debts owed to it despite, Defendant claimed, accountants stating that such overdue accounts receivable should be discounted or written off entirely.  Defendant implied without any basis that "If committing outright financial fraud is the 'hard stuff,' would defying one's accountants be a 'gateway drug?'"

41.    Fourth, Defendant falsely asserted that TTI is "literally struggling to pay its bills on time" and "failing to pay [its suppliers and vendors] within existing [payment] terms."

42.    Each of these assertions is false.  TTI's financial reports accurately reflect the company's financial position in accordance with industry accepted accounting practices and the requirements of Hong Kong securities regulators.

43.    First, TTI's decade of increasing gross margins is entirely accurate and is a result of TTI's strategic plan, growth and innovation including its prescient investment in battery technology and pioneering position in the cordless power tools industry.

44.    Second, TTI depreciates its capital assets in accordance with accepted accounting standards.  When it disposes of an asset at significantly below book value, it does so because it cannot sell the assets at full market and risk its

proprietary intellectual property being put into the open market. Instead, TTI is forced to sell such assets for scrap, resulting in the entirely correct accounting treatment Defendant falsely characterized as nefarious.

45.     Third, TTI's accounting for aged accounts receivable is consistent with the historical payments that it has *actually received* from customers in those circumstances. Because of the high quality of TTI's customers, it consistently receives payments from all of its customers, including even those whose accounts become overdue for a period of time.

46.     Fourth, TTI's accounts payable aging is entirely consistent with its financial position for years, including years during which TTI's business was growing rapidly. Far from "struggling" to pay its bills or experiencing any financial stress, TTI's financials are robust and healthy.

47.     The First Report also pervasively asserts that TTI's financial reports violate U.S. Generally Accepted Accounting Principles ("GAAP") even though TTI, as a Hong Kong company, does not follow GAAP but instead applies the Hong Kong Financial Reporting Standards, which differ materially. TTI clearly states that it uses the Hong Kong Financial Reporting Standards in its financial reports, which Defendant refers to in his false assertions. On information and belief, Defendant knew that TTI did not use GAAP but chose to make false allegations based on GAAP in order to falsely impugn the company.

48.    Defendant knew these statements were false and/or acted with a reckless disregard for the truth in publishing the First Report and its numerous falsehoods.

49.    Throughout the report, Defendant was not troubled by the truth, and made wildly speculative and false conclusions using intentionally inflammatory language and failed to gather–or even look for–any evidence supporting his outlandish conclusion that TTI was perpetrating a massive accounting fraud.  This indifference towards the truth reflects Defendant's malice toward TTI and single-minded pursuit of his own greed.

50.    In addition, Defendant made no effort to contact TTI or request any information from TTI in advance of the publication of the First Report, reflecting his lack of interest or care in the truth behind his false allegations, as well as his true profit motives behind the report.

51.    In the days following Defendant's publication of the First Report, he also ignored TTI's detailed refutations of the Report's claims, instead maintaining the Report on his website, where it remains–uncorrected–today.

52.    Defendant published the First Report, including its numerous false assertions, with the specific intent of harming TTI and causing its stock price to drop so Defendant could profit from his short selling strategy.

53.    Defendant specifically and falsely claimed that TTI's stock was properly valued–based on Defendant's false statements–at more than 70% less than its actual price on the date of the First Report's publication.

54.     Defendant published the First Report at approximately 9 p.m. Eastern Time on February 22, 2023, which was half an hour before the Hong Kong stock exchange opened at 9:30 a.m. Hong Kong time on February 23, 2023.

55.     On information and belief, Defendant chose to release the First Report on February 22, 2023 because he knew that TTI was scheduled to release their 2022 annual financial results on March 1, 2023 and intended his report to cause the maximum disruption possible to the company before this announcement.

56.     Simultaneous with the publication of the report on its website, Defendant, through Jehoshaphat Research, posted a series of Tweets making the same false assertions about TTI, including the false claim that TTI was engaged in "massively, persistently manipulated accounting." At least 32,200 Twitter users viewed these Tweets, of which at least 30 re-Tweeted the false claims, further propagating Defendant's malicious falsehoods.

57.     On the day the First Report was published, TTI's stock price declined from HKD 92.50 per share to HKD 74.95 per share, a reduction of nearly 20%. The losses were so severe that the Hong Kong Stock Exchange stopped trading in TTI's stock mid-way through the trading day on February 23, 2023. Reflecting the great reach of Defendant's lies, the trading volume of TTI's stock on February 23 was nearly six times higher than on the previous day, despite the early stop to trading. On this single day, Defendant's false assertions in the First Report caused TTI to lose $3.5 billion in market capitalization.

58.    The false First Report also caused severe reputational harm to TTI among investors, partner companies, and consumers, and caused the company to suffer additional damages, including being forced to incur expenses, including legal fees, to investigate and refute Defendant's false assertions and additional fees paid to the company's accounting firms to confirm the alleged accounting improprieties were false.

59.    In addition, the day after the First Report and as a direct result of that Report, one of TTI's lenders demanded that TTI decrease its utilization of a line of credit by $300 million.  This reduced access to credit, which was directly caused by Defendant's wrongful actions, forced TTI to deplete its cash reserves, reduce its available working capital, and seek credit from other sources on less favorable terms.  Each of these effects inflicted direct financial damage on TTI.

## IV.    JEHOSHAPHAT'S SECOND FALSE SHORT REPORT

60.    On June 5, 2023, Defendant struck again with newly fabricated false claims against TTI.  This time, instead of falsely alleging that TTI was engaged in "manipulative accounting," it alleged that TTI was "systematically defrauding Home Depot," the company's largest single customer which purchases billions of dollars of TTI's products each year and perpetrating a multi-billion dollar "scam" (the "Second Report").  A true and accurate copy of the Second Report is attached as Exhibit 2 to this complaint.

61.    Defendant's decision to attack TTI with false allegations for a second time manifests not only his greed but also his malicious intent toward TTI.

62.     In short, the Second Report falsely asserts that TTI fraudulently labels hundreds of thousands of its products as "factory blemished" so that it can sell them through its DTFO stores.  According to Defendant's false telling, DTFO maintains an inventory of more than $500 million of "factory blemished" products, its sales total up to $2 billion per year, and TTI reaped huge profits from DTFO sales, according to the Second Report's false claims, accounting for $400 million, or 37%, of TTI's operating profit.

63.     Each element of the Second Report's claims is demonstrably false.

64.     TTI is not defrauding and has never defrauded Home Depot.  As described above, TTI and Home Depot are trusted partners in a long-standing, mutually beneficial collaborative relationship.  This relationship has, for more than a decade, involved trust and transparency and have resulted in the sale of billions of dollars of TTI's products through Home Depot's stores and websites.  Both companies profit.

65.     TTI does not fraudulently label products as "factory blemished."

66.     TTI does not maintain $500 million of DTFO "factory blemished" inventory.

67.     TTI earned $91.3 **million-not** up to $2 billion-in revenue from DTFO in 2022.

68.     TTI ***lost*** $9.3 million in operating income from DTFO sales; it did not profit by more than $400 million as Defendant falsely asserts.

15

69.    Notwithstanding the falsity of Defendant's assertions, the Second Report recklessly advances them in caustic defamatory language, including:

a.    "What if TTI's insane profit margins aren't due simply to accounting games, but also to outright contractual and product diversion fraud against its biggest, and rather powerful, customer."

b.    "Interviews with former Home Depot & TTI executives confirm it:  TTI has successfully deceived Home Depot."

c.    "Multiple former TTI employees indicate that TTI has used the 'Factory Blemished' nomenclature specifically to deceive Home Depot."

70.    Defendant knew that the statements included in the Second Report were false or, at a minimum, acted with reckless disregard for the truth in publishing them.

71.    Indeed, at numerous points in the Second Report, Defendant tacitly admitted the plain absurdity of his assertions.  He nevertheless proceeded, fully aware of the falsity of his statements or, at the very least, recklessly disregarding the substantial risk that his statements were false.

72.    For example, when one of Defendant's own "sources" stated, "I'm 100% sure there's never a deliberate strategy to go to DTFO with a new product," Defendant flippantly dismissed this statement and recklessly disregarded the fact that it directly contradicted his entire report:  "We aren't so sure about that last sentence."

73.    Similarly, numerous "sources" told Defendant that DTFO is used to sell obsolete TTI products.  Defendant specifically noted that the DTFO website included no category for obsolete products, but refused to even consider that a "factory blemished" website label may also refer to those products, instead leaping to the conclusion that TTI must be committing fraud.

74.    As a final example, after purporting to calculate that TTI had more than $500 million in DTFO "factory blemished" inventory on hand, Defendant himself noted the outrageousness of this claim:  "Pause there for a second for a sanity check.  Half a billion dollars of retail value of 'Factory Blemished' goods should not pass the smell test."  Yet, despite not passing the smell test, Defendant went on to falsely assert that false inventory amount as true and to use that false amount to calculate the absurdly high revenue and profit figures included in the report.

75.    Defendant's decision to publish the Second Report and its numerous false statements despite the fact that his own sources expose its falsity reflects Defendant's reckless disregard for the truth and malice toward TTI.

76.    Defendant also willfully ignored extrinsic publicly available information that shows the falsity of his assertions.  For example, and as detailed above, TTI publicly reported to its shareholders that in both 2021 and 2022 it sold a total of $5.1 billion in non-Milwaukee power tools globally.  Notwithstanding this publicly announced number, Defendant used a variety of baseless and incorrect "methods" premised on website traffic and made up DTFO inventory figures to

17

purport to "calculate" that DTFO itself sells between $693 million and $2.5 billion worth of non-Milwaukee products in a year.  This figure ignores the implausibility that DTFO comprised up to half of all of TTI's global sales of non-Milwaukee power tools (as Defendant misleadingly stated their "calculation" had found).

77.    Defendant further relied on unreasonable methods to "calculate" the purported inventory values and revenue that form the basis for his outlandish claims.

78.    Specifically, Defendant used a previously undetected flaw in the coding of the DTFO website to access embedded information regarding product inventories.  This information did not actually reflect the DTFO inventory quantities and nothing on the DTFO website indicated it did.  Indeed, this information was not held out to the public to have any meaning because it was not intended for public consumption but for the internal operation of TTI.

79.    As Defendant himself noted, the inventory quantities accessed through this unauthorized access to DTFO's website are implausible as DTFO inventory quantities, as they purport to reflect tens of thousands of units of individual products in stock, which Defendant himself noted is "absurd." Nevertheless, Defendant reported the numbers as if they were true, recklessly disregarding the many indicia of falsity.

80.    In reality, however, the numbers Defendant accessed in the code of DTFO's website did not reflect, and were never intended to reflect actual DTFO

18

product inventory quantities.  As a result, Defendant's entire analysis lacks foundation.

81.    Defendant's purported "calculations" of DTFO revenue are likewise so fatally flawed that reliance on those calculations reveals an intentional disregard of truth.

82.    Specifically, Defendant selected unrelated websites (of six fashion retailers) and baselessly asserted that data related to those websites' sales was an apt proxy for DTFO's sales.  Defendant claimed that the six comparator websites had "similar web traffic to DTFO's" website, but even that basis fails.  Indeed, the purportedly "similar web traffic" Defendant touted is actually meaningless: ranging from less than one third of DTFO's monthly site visits up to nearly three times DTFO's site visits.  No reasonable person could rely on such dissimilar website traffic for "calculations," but that is exactly what Defendant did, further reflecting his reckless disregard for the truth.

83.    On information and belief, Defendant deliberately selected the six comparator websites not because of "similar web traffic" but because the sales and revenue information from those six websites allowed Defendant to self-servingly support the made up "massive" fraud alleged in the Second Report.

84.    Defendant's reckless attitude toward the truth is further reflected in the cavalier tone Defendant exhibited throughout the Second Report, including coining the glib nickname "Blemishgate" to describe the alleged scheme he falsely claimed to expose.

85.    Defendant further failed to contact TTI to request any information about the Second Report's allegations prior to publication, reflecting his disregard for the truth and desire merely to publish allegations, regardless of their falsity, for his own profit.

86.    At the same time as publishing the Second Report, Defendant posted numerous Tweets about the same subject matter, including referring to TTI as running a "scam," claiming that "TTI is earning hundreds of millions in profit by defrauding Home Depot," asserting that "DTFO is a massive operation, & gross margin on these direct-to-consumer sales is nearly 60%," stating that "TTI is falsely labeling [Home] Depot-exclusive product as 'Factory Blemished" to make it appear eligible for sale through a network of TTI-owned outlet stores," and summarily stating that it would be "laughable" to say that TTI was not perpetrating a largescale "fraud."

87.    Each of these Tweets, like **all** of the statements described above from the Second Report, are false.

88.    At least 37,600 Twitter users viewed these false Tweets including, on information and belief, numerous Twitter users in Florida.

89.    Defendant again released the Report immediately before the opening of the Hong Kong Stock Exchange at 9:30 a.m. Hong Kong time on June 6, 2023 to maximize its negative effect on TTI's stock price, and, conversely, the positive impact on his own profits.

90.    On that day, TTI's share price decreased 4.7%, eliminating another nearly $600 million of the company's market capitalization.  The trading volume of TTI's stock on June 6, 2023 was nearly three times larger than on the prior day.

91.    On information and belief, Defendant profited from this decline in TTI's share price through the short positions they took prior to the release of the Second Report.

92.    Despite its falsity, Defendant's Second Report–like the false First Report before it–caused significant damage to TTI's reputation and stock price and caused it to suffer financial harm by being forced to incur expenses to respond to the Report, including professional fees such as legal and accounting.

93.    TTI now seeks compensation for the great harm done to its reputation and the specific damages it has suffered as a result of Defendant's campaign of falsehoods against it.

94.    All conditions precedent to filing suit have been complied with and/or are waived.

## FIRST CLAIM FOR RELIEF
### Libel

95.    Plaintiffs repeat and reallege paragraphs 1 to 94 as if fully set forth herein.

96.    TTI is not a public figure or a limited public figure.

97.    Defendant is a non-media defendant.

98.   Defendant, acting through Jehoshaphat Research, does not publish disinterested and neutral commentary or editorializing as to matters of public interest.

99.   Defendant, acting through Jehoshaphat Research, published "research reports" intended to lower the stock prices of publicly traded companies so that Jehoshaphat Research, Defendant, and his co-conspirators could profit from the short-selling of those companies' stocks.

100.   Defendant published multiple malicious and defamatory statements disparaging TTI's business integrity and accusing TTI of fraudulent business practices in Defendant's First Report and Second Report and on Twitter.

101.   Defendant's statements about TTI are false.

102.   Defendant's false and defamatory statements exposed TTI to contempt and injury to its business reputation.

103.   Defendant published these false and defamatory statements about TTI to numerous third parties on the internet through the First Report and Second Report and Jehoshaphat Research's Twitter handle.

104.   Defendant knew the false and defamatory statements about TTI were false when he made them and/or acted with reckless disregard to the truth of the statements.

105.   Defendant's false and defamatory statements do not enjoy any absolute or qualified privilege.

106.    Defendant published these false and defamatory statements about TTI willfully and with malice, specifically with the purpose, desire, and effect of causing injury to TTI.

107.    Defendant's false and defamatory statements have adversely affected TTI's otherwise good business reputation.

108.    As a direct and proximate result of Defendant's actions, TTI suffered substantial damage, including reputational injury and financial harm, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### Libel Per Se

109.    Plaintiffs repeat and reallege paragraphs 1 to 94 as if fully set forth herein.

110.    TTI is not a public figure or a limited public figure.

111.    Defendant is a non-media defendant.

112.    Defendant, acting through Jehoshaphat Research, does not publish disinterested and neutral commentary or editorializing as to matters of public interest.

113.    Defendant, acting through Jehoshaphat Research, publishes "research reports" intended to lower the stock prices of publicly traded companies so that Jehoshaphat Research, Bonilla, and their co-conspirators can profit from the short-selling of those companies' stocks.

114.    Defendant published multiple malicious and defamatory statements disparaging TTI's business integrity and accusing TTI of fraudulent business practices in Defendant's First Report and Second Report and on Twitter.

115.    Defendant's statements about TTI are false.

116.    Defendant's false and defamatory statements exposed TTI to contempt and injury to its business reputation.

117.    Defendant's false statements are defamatory *per* se because, when considered alone without innuendo, these statements subject TTI to distrust, contempt, or disgrace and/or injure TTI in its trade or profession by accusing TTI of fraudulent or dishonest business practices.

118.    Defendant published these false and defamatory statements about TTI to numerous third parties on the internet through the First Report and Second Report and Jehoshaphat Research's Twitter handle.

119.    Defendant knew the statements about TTI were false when he made them and/or acted with reckless disregard to the truth of the statements.

120.    Defendant's false and defamatory statements do not enjoy any absolute or qualified privilege.

121.    Defendant published these false and defamatory statements about TTI willfully and with malice, specifically with the purpose, desire, and effect of causing injury to TTI.

122.    Defendant's false and defamatory statements have adversely affected TTI's otherwise good business reputation.

123.    As a direct and proximate result of Defendant's actions, TTI suffered substantial damage, including reputational injury and financial harm, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief against Defendant as follows:

a.    An award of actual, presumed, general and special damages as allowed by law and, as applicable, to be proven at trial;

b.    An award of punitive damages;

c.    Costs of this action, reasonable attorneys' fees, and pre- and post-judgment interest, to the maximum extent provided by law·

d.    An order requiring Defendant to retract all previously published defamatory statements; and

e.    Any other relief the Court deems just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedures, Plaintiffs respectfully demands a trial by jury of any issues so triable.

Dated:  July 1, 2024

/s/ Jason D. Sternberg

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Jason Sternberg (FL Bar 72887) (Lead Counsel)
Tara MacNeill (FL Bar 1028931)
David Nabors (FL Bar 1024722)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone:  (305) 402-4880
Facsimile:  (305) 901-2975
jasonsternberg@quinnemanuel.com
taramacneill@quinnemanuel.com
davidnabors@quinnemanuel.com

Kristin Tahler *(pro hac vice)*
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100
kristintahler@quinnemanuel.com

Nicholas Inns *(pro hac vice)*
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Facsimile:  (202) 538-8100
nicholasinns@quinnemanuel.com

*Attorneys for Techtronic Industries Company Limited and Techtronic Industries Factory Outlets, Inc.*