**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Tampa Division**

| |
|---|
| Techtronic Industries Company Limited, and Techtronic Industries Factory Outlets, Inc. |
| Plaintiffs, |
| – against – |
| Victor Bonilla, |
| Defendant. |

Case No. 8:23-cv-01734-CEH-AEP

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...........................2

I.    MR. BONILLA'S REPORTS...........................................................2

    A.    The First Report Accuses TTI of "Manipulative Accounting"............2

    B.    The Second Report Accuses TTI of Defrauding THD ......................4

II.   TTI'S ACCOUNTING PRACTICES ............................................... 4

    A.    TTI's Business Success Increases Its Gross Margin...........................5

    B.    Deferred Development Costs................................................... 6

    C.    Property, Plant & Equipment .................................................7

    D.    Accounts Receivable ............................................................ 8

    E.    Inventory.......................................................................... 9

    F.    Prepayments and Deposits ....................................................10

    G.    Audits and Reviews Confirm the Propriety of TTI's Accounting and Finances ..................................................................10

III.  THE DIRECT TOOLS FACTORY OUTLET BUSINESS............................ 11

    A.    TTI's Contract With THD Allows It To Sell Excess, Obsolete, and Reconditioned Products ............................................. 11

    B.    DTFO Inventory, Sales and Profit .................................... 12

    C.    THD Does Not Object to DTFO ........................................ 12

IV.   TTI'S LACK OF MEDIA ENGAGEMENT ................................13

LEGAL STANDARD ..........................................................................14

ARGUMENT.....................................................................................15

I.    BONILLA'S REPORTS ARE FALSE .......................................15

    A.    TTI Has Not Inflated Its Profits Using Manipulative Accounting or Accounting Games ..................................... 15

        1.    TTI's Accounting Practices are Fully In Accordance with the Applicable Accounting Standards.................................... 16

    B.    TTI Has Not Defrauded THD of Hundreds of Millions of Dollars .......................................................................... 20

        1.    TTI Has Neither Deceived nor Defrauded THD ................... 20

2.     DTFO Is Not Massive In Scale ................................................ 21

II.    TTI IS NOT A PUBLIC FIGURE ............................................................. 22

A.     TTI Is Not a General Purpose Public Figure .................................... 23

B.     TTI Is Not a Limited Purpose Public Figure ................................... 24

CONCLUSION ................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Berisha v. Lawson,*
   973 F.3d 1304 (11th Cir. 2020) ........................................................................23

*Computer Aid, Inc. v. Hewlett-Packard Co.,*
   56 F. Supp. 2d 526 (E.D. Pa. 1999) ..................................................................23

*Edwards Lewis Tobinick, MD v. Novella,*
   848 F.3d 935 (11th Cir. 2017) ....................................................................22, 23

*Enigma Software Grp. USA, LLC v. Bleeping Comp. LLC,*
   194 F. Supp. 3d 263 (S.D.N.Y. 2016) ............................................................. 24

*Gertz v. Robert Welch, Inc.,*
   418 U.S. 323 (1974) ...................................................................................23, 24

*In re Bausch & Lomb, Inc. Sec. Litig.,*
   No. 01-CV-6190-CJS, 2003 WL 23101782 (W.D.N.Y. Mar. 28,
   2003) ...............................................................................................................16

*In re Paincare Holdings Sec. Litig.,*
   541 F. Supp. 2d 1283 (M.D. Fla. 2008) ...........................................................16

*Jews for Jesus, Inc. v. Rapp,*
   997 So. 2d 1098 (Fla. 2008) ............................................................................15

*Kaether v. Armor Corr. Health Servs., Inc.,*
   2018 WL 1981133 (S.D. Fla. Apr. 26, 2018) ....................................................15

*Kieffer v. Atheists of Fla., Inc.,*
   269 So. 3d 656 (Fla. 2d DCA 2019) ................................................................ 15

*Michel v. NYP Holdings, Inc.,*
   816 F.3d 686 (11th Cir. 2016) ........................................................................ 22

*Mitre Sports Int'l Ltd. v. HBO, Inc.,*
   22 F. Supp. 3d 240 (S.D.N.Y. 2014) ...............................................................23

*One for Israel v. Reuven,*
   2022 WL 4465389 (S.D. Fla. Sept. 26, 2022) .................................................23

*Serefex Corp. v. Hickman Holdings, LP*,
    695 F. Supp. 2d 1331 (M.D. Fla. 2010) .......................................................... 20

*Tonkyro v. Sec'y, Dep't of Veterans Affs.*,
    2024 WL 2846356 (M.D. Fla. June 5, 2024)..................................................14

*Turner v. Wells*,
    879 F.3d 1254 (11th Cir. 2018)....................................................................... 24

*World Wrestling Fed'n Ent., Inc. v. Bozell*,
    142 F. Supp. 2d 514 (S.D.N.Y. 2001) ......................................................23, 24

## <u>Other Authorities</u>

Fed. R. Civ. P 56 ............................................................................................. 1, 15

17 CFR § 240.10b-5 ............................................................................................16

15 U.S.C. § 78j...................................................................................................16

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Techtronic Industries Company Limited and Techtronic Industries Factory Outlets, Inc. (together "TTI") move for partial summary judgment that (1) Defendant Victor Bonilla's short-seller reports are false and (2) TTI is not a public figure.

## PRELIMINARY STATEMENT

Bonilla published two short-seller Reports about TTI so that he could make a seven-figure profit from short positions in TTI's stock. These Reports stated that TTI, an inconspicuous Hong Kong company, was fraudulently inflating its earnings through "accounting manipulation" and "systematically defrauding" its biggest customer, The Home Depot, Inc. ("THD"). The undisputed evidence establishes that both Reports were false, so TTI moves for summary judgment on their falsity and its lack of public figure status.

Bonilla's First Report states that TTI engaged in fraudulent accounting practices. But TTI's accounting policies and practices align with the Hong Kong Financial Reporting Standards ("HKFRS"), which apply to TTI as a publicly traded company in Hong Kong, and TTI consistently applies these policies and issues its financial statements in compliance with them. Each year, after an exhaustive audit, Deloitte confirms that TTI's financial statements are "fair and true." Further, TTI conducted an extensive investigation of Bonilla's accusations and concluded that they were false, which it confirmed under oath in this proceeding. Bonilla's First Report is indisputably false.

Bonilla's Second Report states that TTI is defrauding THD by selling billions

of dollars of exclusive inventory through TTI outlet stores. But TTI's contract with THD allows it to do exactly what Bonilla asserts was fraudulent, and TTI does ***not*** sell a billion dollars' worth of goods through these factory outlets for a huge profit. Instead, TTI makes approved sales of less than $100 million per year through the outlets. This undisputed evidence, including deposition testimony, financial records, and the relevant contract confirm Bonilla's Second Report is false.

Beyond the falsity of the Reports, the undisputed evidence establishes that TTI—a Hong Kong company lacking public notoriety—is not a public figure with ready access to the media to rebut Bonilla's lies. TTI is relatively unknown and does not participate—let alone loudly—in public debates. Instead, it methodically went about its business in relative obscurity with little fanfare until Bonilla's falsehoods forced it to defend itself and clear its name. TTI indisputably has none of the hallmarks of a company known to the world or one that has thrust itself into the spotlight, so, as a matter of law, it is not a public figure.

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

**I.     MR. BONILLA'S REPORTS**

Bonilla admits that he published reports about TTI on February 22, 2023 ("First Report", ECF 69-1) and June 5, 2023 ("Second Report", ECF 69-2). ECF 72.

**A.     The First Report Accuses TTI of "Manipulative Accounting"**

The First Report asserts that TTI has "been inflating its profits dramatically for over a decade with manipulative accounting" and used "[a] broad 'toolbox of accounting games … to engineer" increases in its gross margins. ECF 69-1 at 1.

Bonilla states that TTI's "Operating Income [is] Overstated by ~40-70%" (*id.* at 2), and that "TTI's [Earnings] [are] Inflated by ~40-70% Through A Series Of Accounting Manipulations" (*id.* at 9). He details five asserted "manipulations":

1.     That TTI engaged in "excessive capitalization" of development costs to "massage[]" its earnings (*id.* at 11), which overstated TTI's income by more than $200 million. (ECF 69-1 at 12);

2.     That TTI "stuffed so much nonsense (e.g., costs)" into its property, plant and equipment assets ("PP&E") (*id.* at 14), that its PP&E assets were "overvalued" (*id.* at 17), resulting in TTI's earnings being "inflated by shifting expenses to later periods" (*id*)

3.     That TTI caused a "boost" to its earnings by treating "hundreds of millions of dollars of 90+ days past due [accounts receivable] that are in default according to TTI's own accounting policy" as "money-good" and not applying any reserve to these overdue balances (*id.* at 23-25);[1]

4.     That TTI was "[o]verproducing inventory which raises gross margin and pushes costs until later" (*id.* at 27); and

5.     That TTI was engaging in "accounting manipulation" by "allocating current costs into 'prepayments' to defer expense recognition until later, "(*id.* at 33-34).

Based on his these five "accounting manipulation[s]," Bonilla calculated what he stated was TTI's "true" earnings by subtracting what he stated were the overstated amounts resulting from each "manipulation" (*id.* at 2, 9, 14):

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | LTM 1H22 |
|---|---|---|---|---|---|---|---|---|---|---|
| Reported EBIT | $291 | $368 | $414 | $453 | $531 | $612 | $685 | $993 | $1,256 | $1,318 |
| Minus: Excessive Capitalization of R&D | ($84) | ($90) | ($101) | ($109) | ($123) | ($126) | ($148) | ($142) | ($289) | ($337) |
| (Add back: Associated Amortization) | $59 | $63 | $73 | $81 | $88 | $101 | $101 | $101 | $89 | $100 |
| Minus: Missing Depreciation | $0 | $0 | $0 | ($7) | ($7) | ($5) | ($20) | ($39) | ($63) | ($83) |
| Minus: Missing Bad Debt Reserves | $0 | $0 | $0 | $0 | $0 | ($76) | ($106) | ($89) | ($51) | ($78) |
| Minus: Allocation of Spending to Prepayments | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($235) |
| Minus: Gross Profit Benefit from Overproducing | ($62) | ($47) | ($63) | ($7) | ($1) | ($71) | ($106) | ($127) | ($555) | ($206) |
| "True" EBIT | $205 | $293 | $324 | $412 | $489 | $434 | $406 | $697 | $388 | $480 |
| *Shortfall* | *-30%* | *-20%* | *-22%* | *-9%* | *-8%* | *-29%* | *-41%* | *-30%* | *-69%* | *-64%* |

---

[1]     Bonilla also stated these receivables were not from THD because they were owed by "independent customers," and THD "is not an independent customer." *Id.* at 25.

3

### B.     The Second Report Accuses TTI of Defrauding THD

The Second Report asserts that TTI "has been defrauding [THD] on a massive scale for at least four years" by selling products through TTI's Direct Tools Factory Outlets ("DTFO") stores. ECF 69-2 at 1. Its asserted "scam involves TTI mislabeling [THD]-exclusive brands as 'Factory Blemished' in order to sell them through an outlet channel TTI owns." *Id.* As a result, "[THD] has missed out on billions in sales it was supposed to have to itself." *Id.* at 2. The Second Report asserts that TTI engaged in "outright contractual and product diversion fraud against" THD. *Id.* at 9. This fraud, Bonilla states, occurred through DTFO's internet sales and its physical stores where "TTI has actively taken steps to hide this fraud." *Id.* at 51.

The Second Report asserts that DTFO's website code revealed that it had 11,440,776 products in inventory with a value of more than $512 million. *Id.* at 29-30; 37. Based on these inventory numbers and other purported calculations, the Second Report asserted that DTFO sells somewhere between $693 million (a figure that likely "materially underestimates sales") to $2.46 billion in products annually. *Id.* at 56-58. Taking the low end of this range of asserted sales, Bonilla states that TTI "generat[ed] an annual gross profit of around $401 [million] per year." *Id.* The Report concluded that, "[t]o say the least, this is a material portion of TTI's total expected ... 2023 gross profit." *Id.*

## II.    TTI'S ACCOUNTING PRACTICES

TTI is a Hong Kong company whose stock is publicly traded on the Hong

Kong Stock Exchange ("HKSE"), mandating that the company's accounting and financial statements be done in accordance with the HKFRS, which mirror the International Financial Reporting Standards ("IFRS"). Ex. 59 ("Rubel Rep.") ¶¶ III.12-14; *see also, e.g.*, Ex. 8 at -2009 (2022 Annual Report); Ex. 61 ("Helf Tr.") at 115:4-5.[2] TTI's accounting and financial reporting disclosures and related policies—including as to each of the accounting metrics Bonilla stated were "manipulative"—are in full compliance with" HKFRS. Rubel Rep. ¶ II.1.

### A.    TTI's Business Success Increases Its Gross Margin

Contrary to the First Report's thesis that TTI's gross margins are the result of fraud, the steady growth of TTI's gross margin is not the result of fraud but "go[es] hand-in-hand with the success and growth of [its] Milwaukee [Tools] business." Helf Tr. 23:4-6. That business has grown from $500 million in sales in 2008 to $8.9 billion in 2023 by developing products that out-perform competitors. *Id.* at 97:17-98:18. Milwaukee's share of TTI's sales and gross margins have steadily increased in parallel for more than a decade. Ex. 12 at -7334. TTI drives growth by focusing on power tools with detachable batteries that create a network effect among customers, developing new products, and investing in "exceptional people." Helf Tr. 21:4-11, 115:22-117:16. "[TTI's] whole gross margin is based on this virtuous cycle of differentiated product being able to combine with our powerful brand, being able to command the max price." *Id.* at 97:1-11. Even with the scrutiny

---

[2]    All exhibit references are to the exhibits to the Declaration of Jason Sternberg filed contemporaneously with this Memorandum.

caused by the First Report's false assertions of fraud, TTI's strong business strategy continued to increase the company's gross margin in 2023. Ex. 9 at -10839.

### B.    Deferred Development Costs

There is no genuine dispute that TTI correctly deferred certain development costs under applicable accounting standards. The HKFRS provides that development costs "shall" be capitalized as an intangible asset if "it is probable that the expected future economic benefits that are attributable to the assets will flow to the entity; and (b) the cost of the assets can be measured reliably." Rubel Rep. ¶ III.18 (quoting IAS 38). TTI's accounting policy and practices tracks this: Of research and development costs, no "research" costs are capitalized because "it cannot be demonstrated that an intangible asset exists that will generate probable future economic benefits." Ex. 13 at -002; Ex. 14 at -0008. Development costs, however, are capitalized if, subject to TTI's internal controls, they meet specific criteria to comply with HKFRS. Ex. 13 at -002; Ex. 14 at -0008; Helf Tr. at 66:1-5. TTI amortizes the deferred development costs over a set period of time, according to published schedules based on the expected life cycle of the product developed. Helf Tr. 56:3-12; Ex. 4 at -0438 (amortization policy), -0452 (amortization schedule); Ex. 14 at -0008, -00012. "[I]f if at any point it is determined by the business or Controllership that an asset will no longer provide an economic benefit ... costs remaining on the balance sheet will be immediately expensed." Ex. 13 at -002; *see also* Ex. 4 at -0438 (similar). These policies and practices result in the publication of accurate financial statements in alignment with HKFRS. Helf Tr.

160:18-20; Rubel Rep. ¶ III.26.

## C.    Property, Plant & Equipment

There is no genuine dispute that TTI correctly accounts for PP&E. As a manufacturing company, TTI invests heavily in PP&E—that is, factories and tooling that it uses to manufacture its tools. *E.g.* Ex. 5 at -0640 (2019 annual report). In recent years, TTI has "increased [its] spend on assets with longer lives like buildings as [it was] building out and expanding [its] manufacturing footprint." Helf Tr. 78:10-16. HKFRS defines PP& E to include "tangible items … for use in the production of goods" and allows capitalization of the cost of those items "if and only if it is probable that future economic benefits associated with the item will flow to the entity, and the cost of the item can be measured reliably." Rubel Rep. ¶¶ III.28, 30 (summarizing HKAS and IAS 16). TTI's policy for accounting for PP&E tracks these requirements. Ex. 14 at -0007 to -0008; Ex. 5 at -0655(2019 PP&E policy).

PP&E is depreciated according to set schedules. Ex. 14 at -0010; Ex. 5 at -0667 (2019 depreciation schedule); Helf Tr. at 79:3-7. When certain PP&E is no longer useful, the company disposes of it. Ex. 14 at -0014; Helf Tr. 122:18-123:5. Among TTI's PP&E are certain proprietary tools and molds that TTI cannot sell on the market when they are no longer useful; instead, TTI sells these for scrap, sometimes resulting in recording a loss if that item was not yet fully depreciated and its scrap value was less than TTI valued it as a useful tool. Helf Tr. 69:15-70:5, 122:6-17; Ex. 14 at -0014. TTI's accounting for PP&E, including its disposal of those

items when no longer useful, is consistent with HKFRS. Rubel Rep. ¶¶ III.33, 35.

### D.    Accounts Receivable

There is no genuine dispute that TTI correctly accounts for its accounts receivable. HKFRS provides rules for accounts receivable, including that a company should estimate its credit losses using a "practical expedient" such as a matrix based on the number of days past due or the company's historical credit loss experience. Rubel Rep. ¶ III.40 (summarizing IAS 9). TTI reports its accounts receivable consistent with this standard. Ex. 15 (bad debts policy); Ex. 16 (similar).

TTI applies reserves to its accounts receivable balances based either on the specific customer or a general schedule. Ex. 15 at -0021; Ex. 16. TTI calculates this reserve "based on [a] historical metric of what [TTI] typically recovered." Helf Tr. at 150:20-21; *id.* at 50:2-5; Ex. 7 at -1564 (2021 "expected credit loss model" policy). TTI considers a customer and its associated accounts receivable balance to be in default if the balance "is more than 90 days past due unless the Group has reasonable and supportable information to demonstrate that a more lagging default criterion is more appropriate." *E.g.,* Ex. 6 at −1092 (2020 annual report). Certain accounts receivable that are more than 90 days past due are not considered in default because they are owed by "independent customers that have a good payment track record." *E.g.*, Ex. 7 at -1608. These "independent customers" include TTI's largest customer, THD, which is "independent" because it is "[n]ot related to TTI structurally." Helf Tr. at 105:18-20; *see also id.* at 88:14-24. Despite not considering such overdue accounts receivable balances from THD to be in

8

default, TTI applies a reserve to them "based on the expected recovery rate." Helf Tr. at 49:22-50:1. TTI's accounting for its accounts receivable is "in full compliance" with HKFRS. Rubel Rep. ¶ III.45.

### E.    Inventory

There is no genuine dispute that TTI correctly accounts for its inventory. Between 2014 and 2022, TTI's revenue increased from $4.8 billion to $13.2 billion, with its inventories increasing in parallel:



Rubel Rep. Fig. 4; *see also* Ex. 1 at −9276 (2014); Ex. 8 at -1928 (2022). This increased inventory reflected TTI's strategic decisions "to carry a higher level of inventory … in considering [its] high growth momentum, to buffer inflation risk and critical component shortage" (Ex. 7 at-1518), and "to increase safety level of raw materials to protect against shortages and provide maximum production flexibility" (Ex. 8 at -1978). *See also* Helf Tr. at 92:4-7 (COVID era supply chain problems required increased inventories); Ex. 17 at 6 (same). As the global supply chain improved after COVID and TTI's business needs changed, it decreased its inventory levels. Ex. 20 at 8. These inventory level fluctuations reflect "a practical

necessity driven by [TTI's] increasing sales and [are] not indicative of a fraudulent scheme." Rubel Rep. ¶ IV.113.

## F.   Prepayments and Deposits

There is no genuine dispute that TTI correctly accounts for prepayments and deposits. Prepayments and deposits are current payments made for a future benefit. For example, ███████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ Helf Tr. at 114:6-20; Ex. 22 at -3962. Similarly, TTI paid deposits ██████████████████████████████████████ ██████████████████████. Ex. 22 at -3960; Ex. 9 at -11029. These prepayments, which are an ordinary part of TTI's business expansion are "not evidence of a decade-long fraudulent scheme." Rubel Rep. ¶ IV.122.

## G.   Audits and Reviews Confirm the Propriety of TTI's Accounting and Finances

Numerous reviews have confirmed the accuracy and HKFRS-compliance of TTI's accounting and financial reporting. Every year—including after Bonilla published the First Report—Deloitte audits TTI's financial statements and, without fail, pronounces that they "give a true and fair view of the consolidated financial position" of TTI. *E.g.*, Ex. 9 at -10930 (2023); Ex. 8 at -2011 (2022); Ex. 7 at -1556 (2021); Ex. 6 at -1069 (2020); Ex. 5 at -645 (2019); Ex. 4 at -404 (2018); Ex. 3 at -10390 (2017). Deloitte reaches this conclusion after a multi-stage comprehensive analysis of TTI's financial records. *See* Rubel Rep. ¶¶ III.59-74. Deloitte even identified deferred development costs as a "Key Audit Matter," applied extra

scrutiny to TTI's accounting for them, and confirmed that TTI's treatment of them was fair and accurate. *See* Ex. 5 at -645 (2019); Ex. 4 at -405 (2018); Ex. 3 at -10391 (2017); Ex. 2 at -10015 (2016). Specifically in response to the First Report, Deloitte did extensive additional review (*see* Exs. 10-11), and subsequently completed its audit of TTI's 2023 financial statements concluding that those statements were "true and fair." Ex. 9 at -10930.

After the First Report, TTI conducted three separate reviews of the Report's assertions of accounting fraud, all of which concluded that the assertions were false. Helf Tr. At 38:18-39:17. TTI's internal audit team specifically concluded after thorough analysis and testing that the accounting was proper. *See* Ex. 17. TTI's expert accountant also conducted a review of TTI's financial statements, accounting policies and disclosures and concluded they are "in full compliance with ... accounting standards." Rubel Rep. ¶ II.1.

## III.   THE DIRECT TOOLS FACTORY OUTLET BUSINESS

### A.    TTI's Contract With THD Allows It To Sell Excess, Obsolete, and Reconditioned Products

TTI sells certain brands exclusively to THD (Ex. 27, § 4.1), but their Strategic Initiative Agreement specifically allows TTI "reconditioned, obsolete or excess inventory" on its own provided that TTI first allows THD a right of first refusal to purchase those products (*id.* § 7.6); *see also* Ex. 62 ("Stearns Tr.") 10:1-3; 87:13-89:22. When TTI has excess products, it "pitch[es] [them] to [THD] so [it] can sell through the inventory." *Id.* at 90:16-91:2. Only when THD "do[es not] want to take that product" does TTI sell the excess inventory through DTFO. *Id.* TTI's "number

one goal is always for" THD to purchase the product. *Id.* at 53:20-25.

When TTI sells product that THD declined to purchase, it calls such product "factory blemished" in its DTFO stores. "Factory blemished" is a label that TTI applies to "excess, obsolete or slightly damaged product." *Id.* at 47:14-16. "[THD] ... doesn't use the word factory blemished." *Id.* at 17:5-6. It is a consumer-facing label used so consumers "understand that there are two types of product: reconditioned [i.e., repaired] or factory blemished." *Id.* at 49:20-22. "[F]actory blemished is: Excess, obsolete, or slightly damaged," that is, the products that TTI's contract with THD permits it to sell. *Id.* at 67:17-18; Ex. 27, § 7.6.

### B.    DTFO Inventory, Sales and Profit

"The inventory levels that were exposed in [DTFO's website] code that [Bonilla] reviewed ... were not DTFO inventory." Stearns Tr. 77:7-16. Those numbers actually "represent[] all of the inventory that [TTI] ha[s] available." *Id.* In reality, DTFO's total product inventory value was $9.9 million in 2023 (Ex. 23, Col. H), and $10.4 million in 2022 (Ex. 24, Col. H). *See also* Ex. 25, Col. H (2021). DTFO's annual sales were: $106.2 million in 2023 (Ex. 28 at -3445), $91.3 million in 2022 (Ex. 29, at -3426), and $64.9 million in 2021 (*id.*); *see also* Stearns Tr. 23:5-12. The $106.2 million in sales in 2023 was DTFO's highest sales in its history. Stearns Tr. 44:4-10. Nor is DTFO highly profitable for TTI. In 2022, for example, TTI lost $10.6 million on DTFO, and in 2023, it lost $8.7 million. Ex. 28 at -3445.

### C.    THD Does Not Object to DTFO

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ *Id*. She subsequently contacted Randy Davis, TTI's Executive Vice President of Sales, and asked only about the high inventory numbers Bonilla had stated. Stearns Tr. at 36:25-37:24. A THD power tools buyer, made a similar inquiry to Mr. Davis. Ex. 30 at 9-10. After Mr. Davis assured THD that the inventory numbers Bonilla published were false and significantly higher than reality, no one at THD raised any other questions or concerns regarding TTI's DTFO business. *Id*.

## IV.    TTI'S LACK OF MEDIA ENGAGEMENT

TTI is a relatively unknown foreign corporation lacking significant media influence. Its company secretary manages communications to the HKSE, but has no direct reports. Stearns Tr. 93:10-16. A "handful of" employees at the company prepare announcements that are posted on its website. *Id*. at 93:19-94:8.

TTI issues "6 or 7" press releases per year. *Id*. at 94:19-22. The bulk of these press releases announce TTI's twice-annual releases of its financial results. *See* Exs. 31-57. Those press releases comprise matter-of-fact statements of the company's financial metrics. For example, the one-and-a-half page press release announcing the company's 2022 financial results included a description of sales growth, a summary of gross margin and earnings changes, a chart of six top-line financial metrics, and one-sentence statements from the Chairman and CEO. Ex. 56. Press releases announcing the company's interim half-year results followed the

same formula. *See, e.g*., Ex. 55 (first half 2022); Ex. 53 (first half 2021); Ex. 37 (first half 2013). There is no record evidence that TTI ever issued any press releases related to DTFO.

In response to Bonilla's Reports, TTI issued a total of four public statements, all to the HKSE. On the day Bonilla published the First Report, TTI released a one sentence announcement that trading of its shares was being suspended, (Ex. 18), and then a one-and-a-half page statement that the Report was false and announcing the resumption of trading. Ex. 19. On March 1, 2023, TTI released an 11-page explanation of the falsity of the First Report. Ex. 20. After the Second Report, TTI issued a single one-page statement announcing that the Report was false. Ex. 21.

## **LEGAL STANDARD**

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Tonkyro v. Sec'y, Dep't of Veterans Affs*., 2024 WL 2846356, at *4–5 (M.D. Fla. June 5, 2024). "The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact." *Id*. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit. *Id*.

## **ARGUMENT**

A libel claim entails five elements: "(1) publication; (2) falsity; (3) ... knowledge or reckless disregard as to the falsity on a matter concerning a public [figure], or at least negligen[ce] on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). TTI moves for summary judgment with respect to two of these elements: Bonilla's reports were false and TTI is not a public figure. *See Kaether v. Armor Corr. Health Servs., Inc.*, 2018 WL 1981133, at *2 (S.D. Fla. Apr. 26, 2018) (Rule 56(a) allows summary judgments on parts of a claim).

## I.   **BONILLA'S REPORTS ARE FALSE**

In evaluating the truth or falsity of a defamatory statement, the Court considers whether "the 'gist' or the 'sting' of the statement is true." *Kieffer v. Atheists of Fla., Inc.*, 269 So. 3d 656, 659 (Fla. 2d DCA 2019). Here, Bonilla himself plainly states the "sting" of both of his Reports: The First Report asserts that TTI has "been inflating its profits dramatically for over a decade with manipulative accounting" (ECF 69-1 at 1), and that TTI's "Operating Income [Is] Overstated by ~40-70% by Accounting Games" (*id.* at 2). The Second Report asserts that TTI "has been defrauding [THD] on a massive scale for at least four years" (ECF 69-2 at 1), and that this fraud accounts for "One-Third (Or More) of TTI's [Earnings]" (*id.* at 54). The undisputed facts establish that these statements are false.

### A.   **TTI Has Not Inflated Its Profits Using Manipulative Accounting or Accounting Games**

Bonilla asserts that TTI has engaged in "manipulative accounting," that is,

that TTI has engaged in fraud in the preparation and publication of its financial statements. *See, e.g*., 15 U.S.C. § 78j ("manipulative and deceptive device[s]" prohibited as securities fraud); 17 CFR § 240.10b-5 (defining "manipulative" device as fraud). Bonilla's additional assertions confirm that this assertion of accounting fraud is the "sting" of the First Report: His assertion that TTI has "been inflating its profits" necessarily implies fraud. ECF 69-1 at 1; *see In re Bausch & Lomb, Inc. Sec. Litig*., 2003 WL 23101782, at *23-24 (W.D.N.Y. Mar. 28, 2003) (inflating profits constitutes securities fraud). His statement that TTI's operating income is "overstated" likewise includes a claim of falsity and deceit. ECF 69-1 at 2; *see In re Paincare Holdings Sec. Litig*., 541 F. Supp. 2d 1283, 1291 (M.D. Fla. 2008) (allegation of overstating income was allegation of securities fraud). Similarly, Bonilla's calculation of TTI's supposedly "true" earnings by deducting amounts he attributes to the "manipulations" likewise includes an assertion that TTI's stated earnings are false. ECF 69-1 at 2. The undisputed facts establish that these repeated assertions of fraud and deceit are false: TTI's financial statements are accurate and are maintained and published in accordance with accounting policies and practices that align with its stated and required use of HKFRS.

     1.    <u>TTI's Accounting Practices are Fully In Accordance with the Applicable Accounting Standards</u>

Far from engaging in deception or accounting fraud, TTI publishes its financial statements precisely how it says it will. TTI does its accounting and publishes its financial statements in accordance with HKFRS, as it states. *E.g*., Ex. 8 at -2009. It further publishes, every year, dozens of pages of "Material

Accounting Policy Information." *E.g.*, Ex. 9 at -10944 to -10967; Ex. 8 at -2025 to -2045. TTI's internal accounting policies, practices and procedures are consistent with both HKFRS and its published policies. Rubel Rep. ¶¶ 1, 26, 35, 45, 50, 55, 58; Exs. 13, 14, 15, 16. Each year, Deloitte, a highly respected auditor, conducts a comprehensive audit of TTI's books and records and pronounces that TTI's financial statements "give a true and fair view of the consolidated financial position" of TTI. *E.g.*, Ex. 9 at -10930 (2023); Ex. 8 at -2011 (2022); Ex. 7 at -1556 (2021); Ex. 6 at -1069 (2020); Ex. 5 at -645 (2019); Ex. 4 at -404 (2018); Ex. 3 at -10390 (2017). TTI says what it is going to do, does what it says, and then Deloitte confirms that it did so; the undisputed evidence thus establishes that Bonilla's assertion of widespread "accounting manipulations" is false.

Each of the Bonilla's asserted "accounting manipulations" is individually false as well. First, the undisputed evidence belies Bonilla's assertion that TTI engages in "excessive capitalization" of development costs to "massage" its earnings. ECF 69-1 at 11. TTI capitalizes development costs that are probable to generate revenue and can be measured reliably, and amortizes those costs over the useful life of the product, as HKFRS and TTI's policies state. Rubel Rep. ¶ 26; Ex. 13 at -002; Ex. 14 at -0008; Helf Tr. at 56:3-12, 66:1-5; Ex. 4 at -0438, -0452. TTI ensures compliance with these rules through detailed controls and approvals (Ex. 13 at -002; Ex. 14 at -0008), which are subject to scrutiny both internally and by Deloitte (Ex. 5 at -0645; Ex. 4 at -0405; Ex. 3 at -10391; Ex. 2 at -10015). Capitalization that is precisely in line with the applicable accounting rules is, by

17

definition, not "excessive," and complying with those rules—as TTI is required to do—is not "massaging" its earnings.

Second, there is no dispute that TTI does not "stuff nonsense" into its PP&E to "inflate" its earnings "by shifting expenses to later periods." ECF 69-1 at 17. TTI's policies again track HKFRS. Ex. 14 at -0007 to -0008; Ex. 5 at -0655. As an expanding manufacturing company, TTI unsurprisingly invests heavily in its factories and manufacturing. Ex. 5 at -0640. TTI's disposals of PP&E at below book value are not an indicator of fraudulent under-depreciation as Bonilla asserts, but the result of TTI's business imperative not to sell proprietary tooling, which instead forces them to scrap molds and tools rather than selling them on the market. Helf Tr. 69:15-70:5, 122:6-17; Ex. 14 at -0014. These reasonable business measures are not manipulative "accounting games."

Third, TTI does not "ignore" its accounting policies and treat hundreds of millions of dollars of overdue receivables as "money-good." ECF 69-1 at 23-24. Rather, precisely in line with its publicly announced accounting policies, when "reasonable and supportable information [] demonstrate[s] that a more lagging default criterion is more appropriate" (Ex. 6 at −1092; Ex. 7 at -1579), TTI considers its historical experience and entirely reasonably expects THD—a multi-billion dollar company and, for decades, its biggest customer—to pay its bills. Helf Tr. at 105:18-20. Still, contrary to Bonilla's assertion, TTI does not treat these amounts owed as "money-good," but applies a reserve to them that is consistent with its historical collection rate. *Id.* at 49:22-50:1. Reasonably applying stated

accounting policies and applying reserves based on historical experience does not "inflate" TTI's earnings.

Fourth, the undisputed evidence establishes that TTI does not "overproduce" inventory. ECF 69-1 at 27. TTI's inventory growth predictably tracks its revenue growth (Rubel Rep. Fig. 4), and responds to global events such as COVID disruptions (Helf Tr. at 92:4-9; Ex. 17 at 6), and its expanding manufacturing footprint (Ex. 7 at -1518; Ex. 8 at -1978). TTI reasonably adjusting its approach to inventory is indisputably not an "accounting manipulation" to inflate earnings.

Fifth, there is no dispute that TTI does not "allocat[e] current costs into 'prepayments.'" ECF 69-1 at 33-34. The 2022 prepayments that Bonilla asserts are fraudulent were, in reality, ███████████████████████████ ███████████████████████████████████████████████ ██████████████████. Helf Tr. at 114:6-20; Ex. 22 at -3960, -3962. As TTI correctly determined—and Deloitte confirmed—these are indisputably prepayments and deposits, not, as Bonilla asserts, "current costs" fraudulently categorized as such.

The aggregate result of the falsity of each of Bonilla's stated "accounting games" is that his asserted calculation of TTI's "true" earnings, is likewise false. The First Report states that 69% of TTI's 2021 earnings, and 64% of TTI's first-half 2022 earnings were "shortfall" caused by his asserted "accounting manipulations." ECF 69-1 at 2, 9, 14. Because *every one* of those manipulations is indisputably

false, the entirety of that "shortfall" is likewise false. TTI's earnings—calculated and reported in accordance with TTI's policies and HKFRS and confirmed by Deloitte— are not "overstated" and the First Report is, in its "sting" and its entirety, false.

## B.   TTI Has Not Defrauded THD of Hundreds of Millions of Dollars

The Second Report asserts that TTI "has been defrauding [THD] on a massive scale for at least four years." ECF 69-2 at 1. Fraud requires a false statement with "knowledge that the representation is false" and "an intention" to "induce[] another's reliance[.]" *Serefex Corp. v. Hickman Holdings, LP*, 695 F. Supp. 2d 1331, 1342 (M.D. Fla. 2010). The undisputed facts establish that TTI's sale of excess and obsolete products with "factory blemished" stickers involves no deceit of THD, is not fraudulent, and is not "massive" in scale, so the "sting" of the Second Report is false.

### 1.   TTI Has Neither Deceived nor Defrauded THD

First, the undisputed facts show that TTI has no reason to lie to or deceive THD because DTFO is operated entirely consistent with the parties' contract and relationship. TTI is contractually ***allowed*** to sell "reconditioned, obsolete or excess inventory" of THD-exclusive brands. Ex. 27 § 7.6. It offers these products first to THD, and only when THD declines to purchase them does TTI sell them through DTFO. Stearns Tr. 87:13-89:22, 90:16-91:2. The label TTI applies to those excess and obsolete products in selling them through DTFO so that consumers can distinguish those products from reconditioned ones (*id.* at 49:20-22), does not change that TTI is performing precisely as envisaged by the parties' contract.

Indeed, the "factory blemished" label is wholly irrelevant to the relationship because THD "doesn't use" the term "factory blemished." *Id.* at 17:5-6. TTI selling excess product exactly as it is supposed and as it tells THD it is acting is not deceitful or fraudulent.

This is confirmed by THD's continued strategic and prized relationship with TTI and its reaction to the Second Report. *See* Ex. 58 (THD awards to TTI in September 2023). Despite Bonilla writing that THD can "shut down" the asserted fraud "with a phone call" (ECF 69-2 at 65), more than a year later, THD has taken no steps to do so. Quite the opposite: two THD employees made one call each to TTI to inquire about Bonilla's false inventory figures and, satisfied with TTI's response, did nothing further. Ex. 30 at 9-10. ██████████████████

██████████ Sternberg Decl. ¶ 3. In fact, in all of THD's files—which it searched in responding to a subpoena from Bonilla—there was not a single document reflecting any belief that TTI was deceiving or defrauding it (and thus Bonilla declined to even depose THD). Sternberg Decl. ¶ 3. THD reached the correct conclusion: Bonilla's assertions of fraud against THD have no merit and are indisputably false.

### 2. DTFO Is Not Massive In Scale

Lastly, Mr. Bonilla's assertions that DTFO had inventory worth more than $512 million (ECF 69-2 at 29-30, 37), does at least $693 million in sales (*id.* at 58), and accounts for at least $401 million of TTI's gross profit (*id.* at 58), are proven false by the undisputed facts. TTI's undisputed records establish that: DTFO had

inventory worth $10 million in 2023. Ex. 23; Ex. 24; Ex. 25. DTFO's highest sales ever were $108.3 million in 2023. Ex. 28 at -3445; Stearns Tr. 44:4-10. And DTFO has **lost** money every year. *See* Ex. 28 at -3445. Thus, each of the Second Report's asserted quantities is false by, at a minimum, a factor of 7. ███████████

███████████████████████████████████████████████

███████████████████████████ Ex. 60 at 230:25-231:15.

The falsity of Mr. Bonilla's stated size of DTFO alone makes the "sting" of the entire Second Report false. Bonilla's thesis in the report is that TTI's stock is overvalued because "~37% of the operating profit TTI did in 2022" was the result of the asserted fraud. ECF 69-2 at 1, 59. Even if DTFO were fraudulent—which it is not—a fraud that **loses** money would be immaterial to TTI's profits and share price. Bonilla's thesis, and the sting of the Second Report are indisputably false.

## II.    TTI IS NOT A PUBLIC FIGURE

Whether a plaintiff is a public figure "is a question of law." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). "Two 'fundamental' criteria help draw the line between public and private figures: (1) 'public figures usually have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy'; and, more importantly, (2) public figures typically 'voluntarily expose themselves to increased risk of injury from defamatory falsehoods.'" ECF 39 at 10-11 (quoting *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020)). A public figure can be general or limited. *Edwards Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 945

n.9 (11th Cir. 2017). The undisputed facts confirm TTI is neither.

### A.    TTI Is Not a General Purpose Public Figure

A company is a general purpose public figure if it has "[a] role[] of especial prominence in the affairs of society," and occupies a "position[] of such persuasive power and influence." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). General purpose public figures must be "famous." *One for Israel v. Reuven*, 2022 WL 4465389, at *2 (S.D. Fla. Sept. 26, 2022). "[E]ven well-known corporations that sell and advertise common products are not general purpose public figures." *Mitre Sports Int'l Ltd. v. HBO, Inc.*, 22 F. Supp. 3d 240, 250 (S.D.N.Y. 2014).

The evidence confirms that TTI lacks pervasive fame and notoriety so is not a general purpose public figure. Although TTI manufactures well-known brands, the company itself is little-known because "no one really knows who TTI is generally." Stearns Tr. 96:25-26:1. There is no countervailing evidence in the record. Moreover, TTI infrequently accesses channels of public communication typically associated with public figures. These undisputed facts establish that TTI lacks the "pervasive fame or notoriety" required for a general purpose public figure. *Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 535 (E.D. Pa. 1999) (HP not a general purpose public figure despite being "one of the largest and most influential corporations in the world"); *see also Mitre Sports*, 22 F. Supp. 3d at 250 (S.D.N.Y. 2014) (company not a public figure despite "wide availability of [its] goods at major retail outlets across the United States" because it "does not approach the status of being a household name or a celebrity"); *contrast World*

*Wrestling Fed'n Ent., Inc. v. Bozell*, 142 F. Supp. 2d 514, 523 (S.D.N.Y. 2001) (WWF was general purpose public figure "by reason of its fame and popularity.").

## B. TTI Is Not a Limited Purpose Public Figure

A party is a limited purpose public figure where it has "thrust [itself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. If the controversy is public, courts apply "a two-part test." *Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018). "First, the court must determine whether the individual played a central role in the controversy." *Id.* Second, the court must determine whether the alleged defamation was germane to [the plaintiff]'s role in the controversy." *Id.* "The mere fact that a business enterprise is successful is an insufficient reason to deem it a [limited] public figure." *Enigma Software Grp. USA, LLC v. Bleeping Comp. LLC*, 194 F. Supp. 3d 263, 289 (S.D.N.Y. 2016). Limited public figures are those that "invite attention and comment." *Gertz*, 418 U.S. at 345.

Even if the Reports related to a public controversy, TTI played no central role in that controversy. There is no record evidence of any "aggressive marketing strategy by TTI related to its financials or DTFO sales." ECF 39 at 12-13. The undisputed evidence shows the opposite: a company with minimal use of the media. TTI has no crisis management team (Stearns Tr. 94:23-95:3); a company secretary with no direct reports who manages communications with the HKSE (*id.* at 93:10-18); and a "handful" of employees who manage the company's website (*id.* at 93:19-24). TTI's media engagement reflects this minimalist staffing: it issues "6

or 7" press releases per year (*id*. at 94:22), most of which comprise TTI's twice-annual matter-of-fact announcements of its financial results. *See* Exs. 31-57. Regarding the Reports, TTI issued three press releases ***in response*** to the First (Exs. 18-20)—one of which was a six line announcement of the suspension of trading (Ex. 18)—and one less than two page announcement ***in response*** to the Second (Ex. 21). There is no record evidence that TTI was participating in public debates regarding the topic of either Report before publication.

These facts track the allegations in the Complaint, which this Court already ruled established that "TTI has not thrust itself to the forefront of a particular public controversy and that there was no public controversy until Bonilla created one through his statements." ECF 39 at 13. The same holds here, and the Court should rule as a matter of law that TTI is not a public figure.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant TTI's motion.

Dated: October 1, 2024

By: */s/ Jason D. Sternberg*
**QUINN EMANUEL URQUHART
& SULLIVAN LLP**
Jason D. Sternberg (FL Bar 72887)
Tara MacNeill (FL Bar 1028931)
Laura N. Ferguson (FL Bar 1047701)
2601 South Bayshore Drive, 15 Floor
Miami, FL 33133
Telephone: (305) 402-4880
Facsimile: (305) 901-2975
jasonsternberg@quinnemanuel.com
taramacneill@quinnemanuel.com

Kristin Tahler (admitted *pro hac vice*)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
kristintahler@quinnemanuel.com

Nicholas Inns (admitted *pro hac vice*)
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
nicholasinns@quinnemanuel.com

*Attorneys for Techtronic Industries
Company Limited and Techtronic
Industries Factory Outlets, Inc.*