**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Tampa Division**

Techtronic Industries Company
Limited, and Techtronic Industries
Factory Outlets, Inc.

                Plaintiffs,

   – against –

Victor Bonilla,

            Defendant.

Case No. 8:23-cv-01734-CEH-AEP

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................... 1

COUNTER-STATEMENT OF FACTS ..................................................................... 2

I.     BONILLA PUBLISHED FALSE REPORTS TO ENRICH HIMSELF ............ 2

II.    BOTH OF BONILLA'S REPORTS WERE FALSE ...................................... 3

III.   BONILLA ACTED WITH ACTUAL MALICE ................................................ 5

IV.   TTI PROVIDED PRE-SUIT NOTICE ........................................................... 8

ARGUMENT ............................................................................................................... 8

I.     FLORIDA STATUTE 770.01 DOES NOT BAR TTI'S SUIT ........................... 9

II.    BONILLA'S REPORTS ARE ASSERTIONS OF FACT ................................ 12

III.   THE STATEMENTS WERE FALSE AND DEFAMATORY........................... 14

IV.   THERE IS NO EVIDENCE THAT TTI IS A PUBLIC FIGURE.................... 16

V.    ACTUAL MALICE IS, AT A MINIMUM, A MATTER OF DISPUTE.......... 18

VI.   BONILLA'S ANTI-SLAPP ARGUMENT FAILS ......................................... 20

CONCLUSION .......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amira Nature Foods, Ltd. v. Prescience Point, LLC,*
  ECF No. 66 (S.D.N.Y. Oct. 17, 2016).................................................14

*Bayliss v. Cox Radio, Inc.,*
  2010 WL 4023459 (M.D. Fla. Oct. 13, 2010) ......................................9

*Buckley v. Moore,*
  2021 WL 3173185 (S.D. Fla. Jul. 26, 2021)........................................ 11

*Colodny v. Iverson, Yoakum, Papiano & Hatch,*
  936 F. Supp 917 (M.D. Fla. 1996) .....................................................14

*Comins v. Vanvoorhis,*
  135 So.3d 545 (Fla. 5th DCA 2014) ................................................9-11

*Computer Aid, Inc. v. Hewlett-Packard Co.,*
  56 F. Supp. 2d 526 (E.D. Pa. 1999) ...................................................17

*Farmland Partners v. Rota Fortunae,*
  2020 WL 12574993 (D. Colo. May 15, 2023) .............................14, 20

*Ford v. Rowland,*
  562 So. 2d 731 (Fla. 5th DCA 1990) ............................................ 12, 13

*Fortson v. Colangelo,*
  434 F. Supp. 2d 1369 (S. D. Fla. 2006).............................................13

*Gertz v. Robert Welch, Inc.,*
  418 U.S. 323 (1974) ...........................................................................17

*Greenbelt Co-op. Pub. Ass'n v. Bresler,*
  398 U.S. 6 (1970).............................................................................14

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
  491 U.S. 657 (1989) .......................................................................... 20

*Henderson v. GATX Corp.,*
  2012 WL 12905101 (M.D. Fla. Mar. 22, 2012) ...................................9

*In re Paincare Holdings Sec. Litig.*,
    541 F. Supp. 2d 1283 (M.D. Fla. 2008) ................................................ 12

*King v. S. Poverty L. Ctr., Inc.*,
    2023 WL 3061825 (M.D. Ala. Apr. 24, 2023) .................................... 19

*Logue v. Book*,
    297 So.3d 605 (Fla. 4th DCA 2020) ..................................................... 13

*Mancini v. Personalized Air Conditioning & Heating, Inc.*,
    702 So.2d 1376 (4th DCA 1997) .......................................................... 11

*Mazur v. Baraya*,
    275 So.3d 812 (Fla. 2d DCA 2019) ........................................................ 9

*Mile Marker, Inc. v. Petersen Publishing, L.L.C.*,
    811, So.2d 841 (Fla. 4th DCA 2002) .............................................. 18, 20

*Milgram v. Chase Bank USA, N.A.*,
    72 F.4th 1212 (11th Cir. 2023) .......................................................... 8-9

*Mitre Sports Int'l Ltd. v. HBO, Inc.*,
    22 F. Supp. 3d 240 (S.D.N.Y. 2014) .................................................... 17

*Neuros Co., Ltd. v. KTurbo, Inc.*,
    698 F.3d 514 (7th Cir. 2012) ............................................................... 13

*San Juan Prods., Inc. v. River Pools & Spas, Inc.*,
    2023 WL 1994087 (M.D. Fla. Feb. 14, 2023) ..................................... 10

*Silvester v. Am. Broad. Cos., Inc.*,
    839 F.2d 1491 (11th Cir. 1988) ........................................................... 18

*Sirer v. Aksoy*,
    2021 WL 4952610 (S.D. Fla. Oct. 25, 2021) ...................................... 10

*Tobinick v. Novella*,
    2015 WL 1191267 (S.D. Fla. Mar. 16, 2015) ...................................... 11

*Turner v. Wells*,
    879 F.3d 1254 (11th Cir. 2018) ........................................................... 18

*Trujillo v. Banco Central Del Ecuador*,
    17 F. Supp. 2d 1334 (S.D. Fla. 1998) ................................................. 10

## <u>**Other Authorities**</u>

Fed. R. Civ. P. 56.................................................................................................9

Fla. Stat. § 768.295 ........................................................................................ 20

Fla. Stat. § 770.01........................................................................................ 9-10

## **PRELIMINARY STATEMENT**

Victor Bonilla publishes reports to decrease the share price of publicly traded stocks so he can make money. That is precisely what he did here: after two Reports stating that TTI was committing accounting fraud and defrauding The Home Depot ("THD"), TTI lost billions of dollars in value while Bonilla ███████ ███████████. But his reports were not the stuff of free speech; they were indisputably false and defamatory. Now, for the third time in this case, Bonilla tries to cast aside his short-seller role and masquerade as a reporter in an attempt to hide behind laws intended to protect journalists and the media. The Court has rejected this cynical ploy twice and should do so again here: Bonilla is not a media defendant who writes to inform the public, he is a stock trader who writes to boost his own portfolio, and should be held accountable for his profit-driven defamation.

Bonilla argues that he cannot be held liable for his defamatory statements because isolated sentences in his Reports were true. But Bonilla's argument ignores the indisputably false and defamatory theses of the Reports: that TTI was "inflating its profits dramatically for over a decade with manipulative accounting" (i.e. committing accounting fraud) and "defrauding Home Depot on a massive scale for at least for years." As this Court already ruled, these Reports make factual assertions of specific misconduct by TTI that are provably—and now proven—false.

Bonilla arrived at these false statements by recklessly disregarding the truth. The record shows Bonilla was not the careful analyst who reasonably relied on appropriate sources that his motion portrays. The very sources that Bonilla relied

1

on testified that he "manipulated" their words and that his characterization of their statements was "misleading" and "not fair." He ignored sources who provided information that contradicted his desired outcome. Every source denied providing any support for Bonilla's assertions. When one source said he was "100% sure" TTI was not committing the fraud Bonilla asserted, he dismissively wrote that "we aren't so sure." Even Bonilla recognized that his assertions "should not pass the smell test," but he published them anyway. None of Bonilla's arguments avail him. His statements were false. He was reckless. And his motion should be denied.

## COUNTER-STATEMENT OF FACTS

### I.   BONILLA PUBLISHED FALSE REPORTS TO ENRICH HIMSELF

Bonilla admits that he writes reports to decrease stock prices for his profit. Mot. 2-5. These reports serve ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, his own finances, and at times Muddy Waters, his undisclosed co-conspirator. *See* Ex. 1, 3.

On February 22, 2023—a week before Bonilla knew TTI would announce its 2022 results (Ex. 2 ("Bonilla Tr.") 69:5-9)—he published the First Report. The first sentence stated TTI was "inflating its profits dramatically for over a decade with manipulative accounting." ECF 69-1 at 1. It asserted that five specific "accounting manipulations," caused TTI's "Operating Income [to be] Overstated by ~40-70%." *Id.* at 2. Those manipulations included "excessive capitalization" of development costs (*id.* at 11), "stuff[ing] so much nonsense" into property, plant and equipment ("PP&E") (*id.* at 14), improperly treating overdue accounts receivable as "money-good" (*id.* at 23-25), and "allocating current costs into 'prepayments'" (*id.* at 33-

34). Bonilla presented values for what he asserted was TTI's "true" income. *Id.* at 2, 9, 14. He stated that TTI "is literally struggling to pay its bills on time." *Id.* at 4.

On June 5, 2023, Bonilla published the Second Report, which asserts at the outset: "Techtronic has been defrauding Home Depot on a massive scale for at least four years." ECF 69-2 at 1; Bonilla Tr. 162:1-10 ("central thesis" was that TTI defrauding THD). Bonilla stated that TTI's conduct was "outright contractual and product diversion fraud against" THD (ECF 69-2 at 9), that TTI sold between $693 million (which likely "materially underestimate[d] sales") and $2.46 billion in products annually through this channel (*id.* at 56-58), and that this fraud accounted for at least $401 million of TTI's gross profit (*id.*).

Bonilla wrote the Reports so he could profit when TTI's stock fell.



. Exs. 3-4. For the Second Report, Bonilla sold short . Bonilla Tr. 117:1-3; Ex. 5. This earned Bonilla an additional profit of . Exs. 5-6, 7 ("Kopa Rep.").

## II.   BOTH OF BONILLA'S REPORTS WERE FALSE

*First Report.* The claims of "accounting manipulation" are false:

- TTI capitalizes development costs when it can tie them to future economic benefit and measure the costs reliably, as its accounting standards require. *See* Ex 8 ("Rubel Rep.") ¶ III.18, 26 (quoting IAS 38); Ex. 9 at -002; Ex. 10 at -0008; Ex. 11 ("Helf Tr.") 66:1-5.

- TTI capitalized PP&E assets in accordance with its accounting

3

standards, depreciated them in accordance with set schedules, and only wrote them down when items were no longer useful before being fully depreciated. *See* Rubel Rep. ¶¶ III.28, 30, 33, 35; Helf Tr. 69:15-70:5, 78:10-16, 122:6-123:5; Ex. 10 at -0007 to -0014; Ex. 12 at -0655.

- TTI applies reserves to its accounts receivable based on the company's historical experience of collecting debts owed by those customers, in accordance with its accounting policies and standards. *See* Rubel Rep. ¶ III.40, 45; Ex. 13 at -1092; Ex. 14 at -1564, -1608; Ex. 15 at -0021; Ex. 16; Helf Tr. 49:22-50:5, 88:14-24, 105:18-20, 150:20-21.

- TTI's inventory increased with its revenue and reflects the company's expansion and strategies. Rubel Rep. ¶ IV.113, Fig. 4; *see also* Ex. 14 at-1518; Ex. 17 at -1978; Ex. 18 at 6; Ex. 19 at 8; Helf Tr. 92:4-7. These inventory levels did not "lead to poorer financial results." Mot. 6; *see* Ex. 20 at 2 (2023 gross margin increased).

- TTI's prepayments were not "current costs." ECF 69-1 at 33. ██████ ████████████████████████████████. Helf Tr. 114:6-20; Ex. 21 at -3960, -3962; Ex. 20 at -11029; Rubel Rep. ¶ IV.122.

TTI does not "struggl[e] to pay its bills." *See* ECF 69-1 at 4. Except when TTI strategically leverages partnerships with suppliers to time payments to manage its cash, TTI "always pays its bills on time." Helf Tr.. at 75:2-76:13, 104:11-15. TTI's trade payables decreased in 2022 and 2023. Ex. 17 at -2069; Ex. 20 at -10992.

**Second Report.** TTI's contract with THD allows TTI to sell "reconditioned, obsolete or excess inventory." Ex. 23 § 7.6; *see also* Ex. 22 ("Stearns Tr.") 10:1-3; 87:13-89:22. When TTI has excess products, it "pitch[es] [them] to [THD] so [it] can sell through the inventory" because selling to THD is profitable but selling through DTFO is not. *Id.* at 57:13-58:1, 90:16-91:2. DTFO only sells excess inventory when THD "do[es] not] want to take that product." *Id.* When TTI sells excess or obsolete products that THD declined, it calls them "factory blemished" in DTFO stores. *Id.* at 47:14-18. "[THD] … doesn't use the word factory blemished."

*Id.* at 17:5-6. DTFO's inventory was $9.9 million in 2023. Ex. 24, Col. H. DTFO's highest sales ever were $106.2 million in 2023. Ex. 25 at -3445; Stearns Tr. 23:5-12, 44:4-10. TTI lost $8.7 million on DTFO in 2023. Ex. 25 at -3445. █████████

████████████████████████████████████████████████████

████████████████. Ex. 26; Ex. 27 at 9-10; Stearns Tr. 36:25-37:24.

## III. BONILLA ACTED WITH ACTUAL MALICE

Bonilla published the Reports with actual malice. For example, the First Report asserted that TTI was engaged in "accounting manipulation" with no support from the "sources" Bonilla claimed to rely on. *E.g.*, ECF 69-1 at 24-25. One source, Ralph Pisani, told Bonilla that he had "no specific knowledge" of TTI's accounting and did not suggest to Bonilla that TTI was committing accounting fraud. Ex. 28 ("Pisani Tr.") 55:21-56:4, 77:16-19. Another source, former TTI Board member Joel Schleicher denied telling Bonilla of any accounting manipulation and testified that during his time on TTI's Board, there was no "misrepresentation of the financial statements." Ex. 29 ("Schleicher Tr.") 33:25-37:9.

Other sources directly contradicted the Report. ████████████████

████████████████████████████████. Ex. 30. Bonilla omitted this statement, and █████ entirely, from his Report. *See* ECF 69-1. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████ Ex. 31.███████████████████████. *See* ECF 69-1.

Bonilla also mischaracterized TTI's financial statements. For example, he pointed to Deloitte's identification of deferred development costs as a "key audit matter" as purported evidence of TTI's opportunity for accounting manipulation (ECF 69-1 at 10), but omitted reference to specific additional steps Deloitte took in auditing the "key matter" to ensure that no manipulation took place. *See* Ex. 12 at -645 (2019); Ex. 32 at -405 (2018); Ex. 33 at -10391 (2017); Ex. 34 at -10015 (2016).

Bonilla's Second Report sources all testified that he distorted their words. Albert Vita testified that the Report was "misleading," "manipulative," and took his words out of context. Ex. 35 ("Vita Tr.") 35:13-38:22. Vita never told Bonilla that TTI was defrauding THD. *Id.* at 30:2-31:3, 35:13-38:22. Mark Hartman, a former TTI executive, testified that he "was trying to convey [to Bonilla] that I did not think there was deliberate fraud." Ex. 36 ("Hartman Tr.") 45:2-6. Bonilla's statements purportedly based on Hartman were "not fair." *Id.* at 81:1-82:4.

Bonilla wrote that TTI was defrauding THD by selling products in violation of their contract, ████████████████████████. Bonilla Tr. 170:20-171:2. Vita also never saw it. Vita Tr. 77:7-12. Hartman, who worked with DTFO and dealt with THD, told Bonilla that THD "[was] okay with" DTFO's sale of excess and obsolete goods. Hartman Tr. 98:5-7. He told Bonilla he was "100% sure there's never a deliberate strategy" to sell new products through DTFO (*id.* 93:22-94:21), but Bonilla dismissed that, stating he was not "so sure about" it (ECF 69-2 at 26).

Nor did Bonilla accurately quote his sources. For example, the Second Report quotes a former THD executive, Vita, as saying:

> We can't get into the confidential wording of the contract itself, but at a high level, it means you are not selling new items through any other retail channel, whether online or physical store...from a factory outlet perspective, it's very clear: you have a new Ryobi drill, a brand-new drill on sale [at DTFO] that TTI just made too many of, that would be a no-no.

ECF 69-2 at 20. But the recording of Vita's call provides the full response:



Ex. 37 at 6-7. Bonilla similarly mis-quoted numerous other statements by the two sources whose recordings he retained. *Compare, e.g.*, ECF 69-2 at 25-26 *with* Ex. 38 at 6-7 (misquoting Hartman); ECF 69-2 at 27 *with* Ex. 38 at 14, 17-18(same); ECF 69-2 at 21 *with* Ex. 37 at 9, 11-13 (misquoting Vita); ECF 69-2 at 22 *with* Ex. 37 at 14-16 (same). For other sources, Bonilla failed to download or retain available recordings of their conversations. *See, e.g.*, Ex. 39.

Bonilla himself admitted the absurdity of some of his statements, writing in the Second Report that DTFO having "half a billion dollars of retail value of 'Factory Blemished' goods should not pass the smell test," but nevertheless published that statement. ECF 69-2 at 30. Bonilla likewise disregarded that his assertion that DTFO sold up to $2.5 billion in products required that one-half of all non-Milwaukee TTI sales would have had to be through DTFO, an absurd proposition for an outlet. *See* Ex. 17. Bonilla admitted ███████████████ ████████████████████████████████. Bonilla Tr. 238:10-239:18.

## IV.   TTI PROVIDED PRE-SUIT NOTICE

Bonilla published the Reports under the pseudonym "Jehoshaphat Research." *See* ECF 69-1, 69-2. Before identifying Bonilla, TTI issued detailed refutations of both Reports including an eleven-page rebuttal of each aspect of the First Report's assertions of accounting manipulations (Ex. 19), and a rebuttal of the Second Report's statement that TTI was defrauding THD (Ex. 40). Bonilla read these shortly after they were issued. Bonilla Tr. 242:5-9. After TTI identified Bonilla, it served on him a letter referencing these previously issued "prompt, detailed and categorical refutations" and demanding that he retract the Reports. Ex. 41. Bonilla has not removed or modified either Report. Bonilla Tr. 242:5-15.

## ARGUMENT

Bonilla fails to show "that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law"—particularly when reviewing the evidence in the light most favorable to TTI. *See Milgram v. Chase Bank USA,*

*N.A.*, 72 F.4th 1212, 1217 (11th Cir. 2023) (quoting Fed. R. Civ. P. 56(a)).

## I.    FLORIDA STATUTE 770.01 DOES NOT BAR TTI'S SUIT

Florida Statute 770.01 "appl[ies] only to news media, i.e. the press." *Mazur v. Baraya*, 275 So.3d 812, 815 (Fla. 2d DCA 2019). Internet publications only qualify when they are analogous to traditional media and are "operated to further the free dissemination of information or disinterested and neutral commentary or editorializing as to matters of public interest." *Comins v. Vanvoorhis*, 135 So.3d 545, 557 (Fla. 5th DCA 2014). Here, Bonilla's argument that he is entitled to summary judgment based on Section 770.01 fails for three reasons: (1) he presents no evidence to support it; (2) the record evidence confirms that the statute does not apply; and (3) TTI's pre-suit letter provided notice.[1] *First*, "[a] party asserting that a fact cannot be ... disputed must support the assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). Bonilla does not do so, instead asserting facts in support of his argument without supporting evidence. *See* Mot. 11. Even Bonilla's declaration does not touch on these facts. *See* ECF 98-2 ("Decl."). His failure to support his argument with specific evidence is fatal. *See Henderson v. GATX Corp.*, 2012 WL 12905101, at *5 (M.D. Fla. Mar. 22, 2012).

*Second*, the facts Bonilla does offer to support his argument are disputed. He declares his "entire purpose is to provide truthful information and reasoned

---

[1]  This Court has already rejected Mr. Bonilla's analogous argument that he enjoyed journalist privilege. ECF 55. Here, even if Bonilla's argument were persuasive, the remedy for failure to comply with Florida Statute 770.01 is dismissal without prejudice, not the entry of summary judgment. *See Bayliss v. Cox Radio, Inc.*, 2010 WL 4023459, at *4 (M.D. Fla. Oct. 13, 2010).

opinions on a company" and "[n]o ... partner or affiliate ... paid or solicited me to publish information critical of Techtronic." Decl. ¶¶ 8, 12. The record contradicts this: Bonilla publishes reports to profit █████████ (Ex. 1), to decrease TTI's share price to make money (Ex. 5), and ██████████████████████

██████████████ (Exs. 3-4). Bonilla does not publish for an informational purpose and even admits that his writing is not the type "found in news reporting." Mot. 12. Section 770.01 does not apply. *Comins*, 135 So.3d at 559.

Courts addressing similar businesses conclude that Section 770.01 does not apply. In *San Juan Prods., Inc. v. River Pools & Spas, Inc.*, a company was not a media defendant where its blog "was operated ... as a business venture solely to help their ... businesses and make money." 2023 WL 1994087, at *3. (M.D. Fla. Feb. 14, 2023). In *Trujillo v. Banco Central Del Ecuador*, a public relations firm posting press releases on its website was not a media defendant because it did "not impartially disseminate information, ... issue unsolicited, disinterested and neutral commentary as to matters of public interest or editorialize as to matters of public interest without being commissioned to do so." 17 F. Supp. 2d 1334, 1337-39 (S.D. Fla. 1998); *see also Sirer v. Aksoy*, 2021 WL 4952610, at *5 (S.D. Fla. Oct. 25, 2021) (person not media defendant because posts in service of financial interests). Bonilla, who publishes to serve his short-selling business, is not a media defendant.

Bonilla's broader activities confirm this conclusion. Section 770.01 protects media defendants because they are "expected to determine [] facts in a matter of hours or minutes, [so] it is only reasonable to expect that occasional errors will be

made." *Mancini v. Personalized Air Conditioning & Heating, Inc.*, 702 So.2d 1376, 1379-80 (4th DCA 1997). But Bonilla publishes at most a handful of reports per year and published each Report here after months. Ex. 42; Bonilla Tr. 53:3-56:21.

*Comins* is inapposite. There, the court considered whether the author of a blog entitled "Public Intellectual" on which he "publicly comment[ed] on issues of public concern" was a media defendant. 135 So.3d at 548. While expressly noting that "[w]e are not prepared to say that all blogs and all bloggers" are media defendants, the court ruled the specific blog at issue was because it had "primarily an informational purpose." *Id.* at 559. Here, Bonilla's reports do not have "primarily an informational purpose;" unlike the blogs in *Comins*, their primary purpose is far and away profit-seeking. Exs. 3-4, 41.[2]

***Third***, even if the statute applies, TTI's letter provided notice. Before sending the letter, while Bonilla was hiding his identity, TTI published detailed rebuttals, identifying with specificity the false information in each Report. Exs. 19, 40. Bonilla admitted that he read these rebuttals when issued. Bonilla Tr. 242:5-9. TTI incorporated these prior rebuttals by reference into its letter. *See* Ex. 41. Despite this, and despite more than a year of litigation, both Reports remain on Bonilla's website—including material statements of fact that Bonilla admits were false. Sternberg Decl. ¶ 3; Mot. 8. Bonilla's year-delayed claim that he was denied notice of the falsity of his Reports and may have retracted them, should be rejected.

---

[2]  Bonilla's other cases fail as they address informational websites. Mot. 11 n.2; *see Buckley v. Moore*, 2021 WL 3173185 at *6 (S.D. Fla. Jul. 26, 2021) (informational reviews); *Tobinick v. Novella*, 2015 WL 1191267 at *9 (S.D. Fla. Mar. 16, 2015) (medical ethics commentary).

## II.   BONILLA'S REPORTS ARE ASSERTIONS OF FACT

Defamatory statements "must 'convey to a reasonable reader the impression that ... [it] describe[s] actual facts about the plaintiff or activities which [plaintiff] participated in to be actionable.'" ECF 39 ("Order") at 13-14 (quoting *Ford v. Rowland*, 562 So. 2d 731, 735 (Fla. 5th DCA 1990)). Bonilla's Reports do so.

***First***, this Court already rejected Bonilla's argument in denying his Motion to Dismiss: "Bonilla argues that any statement alleged to be false was merely rhetorical hyperbole or opinion. The Court disagrees." Order 14. The Court also rejected the arguments that Bonilla now repeats regarding his specific statements. *Compare* Mot. 14-17 (arguing "overstated by ~40-70% by accounting games," "costs being deceptively managed downward," "struggling to pay its bills on time" are opinions) *with* Order 14 ("'inflating its profits dramatically for over a decade with manipulative accounting;' TTI's operating income is 'overstated by ˜40– 70% by accounting games;' 'costs being deceptively managed downward;' [and] TTI is 'struggling to pay its bills on time'" are factual assertions). This Court should not indulge Bonilla's *sub rosa* effort to have the Court revisit its ruling.

Nor is there any basis to do so. The Reports are filled with factual assertions. For example, Bonilla's statement that TTI's income is "overstated" is factual: "Overstated" income is stated income that is higher than true income. Cases based on overstated corporate income are routine. *See, e.g., In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1287 (M.D. Fla. 2008). Such factual assertions, which "describe actual facts about [TTI] [and] activities which [TTI] participated in", are

grounds for a libel suit. *Ford v. Rowland*, 562 So. 2d 731, 735 (Fla. 5th DCA 1990).[3]

**Second**, Bonilla mischaracterizes the Reports by cherry-picking immaterial lines. He claims "[t]he First Report's key thesis was that in Bonilla's opinion, it was suspicious that [TTI] was reporting increases in its gross margin" and that this "was driven by aggressive accounting." Mot. 4. But the First Report says nothing of "suspicions"; its first line plainly states its thesis: TTI has "been inflating its profits dramatically for over a decade with manipulative accounting." ECF 69-1 at 1. Bonilla states specific dollar amounts for his asserted "disparity ... between 'real' and 'unreal' operating income[.]" *Id*. at 2. With these assertions, the First Report states that TTI is committing accounting fraud, a false factual assertion. *See Neuros Co., Ltd. v. KTurbo, Inc.*, 698 F.3d 514, 519 (7th Cir. 2012) ("It's hard to imagine a more damaging accusation [than fraud] to make against a business.").

**Third**, Bonilla's use of colorful rhetoric is of no import. This Court has ruled that not every phrase in the Reports is factual. *See* Order 14. But Bonilla's inclusion of rhetorical flourishes does not, as he argues (Mot. 12-13), inoculate his Reports from liability for libel. Unlike Bonilla's cited cases, he did not "merely toss[] insults" at TTI (*see* Mot. 13 n.3 (quoting *Logue v. Book,* 297 So.3d 605, 614 (Fla. 4th DCA 2020))), he peppered insults among specific factual statements.[4]

---

[3] Bonilla's provably false statements differ from those in *Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018); *see* Mot. 12-14. There, the court held that calling activity "homophobic taunting" was a "subjective assessment ... not [] capable of being proven true or false." *Turner*, 879 F.3d at 1264.

[4] *Fortson v. Colangelo*, 434 F. Supp. 2d 1369 (S. D. Fla. 2006) does not support Bonilla. *See* Mot. 12-13. There, the challenged words were "not physically possible," which "negate[d] any implication that [the defendant] was actually asserting facts." *Id*. at 1383.

***Fourth***, Bonilla's small-font "opinion" disclaimers do not change the result. *See* Mot. 12. Courts reject arguments that defendants can "avoid liability simply by including a legal disclaimer or sprinkling their reports with words that they believe connote opinion." *Amira Nature Foods, Ltd. V. Prescience Point, LLC*, ECF No. 66 at 59 (S.D.N.Y. Oct. 17, 2016); *see also, e.g.*, *Farmland Partners v. Rota Fortunae*, 2020 WL 12574993, at *12-13 (D. Colo. May 15, 2023) (same).

***Fifth***, Bonilla's argument that his statement that TTI "has been defrauding Home Depot on a massive scale" (ECF 69-2 at 1), is not factual lacks merit. *Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp 917 (M.D. Fla. 1996), did ***not*** hold, as Bonilla claims, that "accusing plaintiff of 'fraud' is protected opinion.'" Mot. 17. Rather, it held that the line "[I am] confident that full disclosure of all the tape recordings ... will expose [a book] as a fraud" was protected opinion because it "cannot be reasonably interpreted as stating actual facts" about the plaintiff. *Colodny*, 936 F. Supp. at 924. Bonilla's statements that TTI "has been defrauding Home Depot" (*e.g.* ECF 69-2 at 1, 58), bear no resemblance to *Colodny* because it conveys a fact without even any need for interpretation.[5]

## III.   THE STATEMENTS WERE FALSE AND DEFAMATORY

Bonilla's argument that his Reports were true rests on inaccurate representations of the Reports and the record and should be rejected.

***First Report***. Bonilla's argument misrepresents both the Report's content

---

5   Nor does *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6 (1970), avail Bonilla. There, the Court ruled that "[n]o reader could have thought that [defendants] were charging [plaintiff] with [] a criminal offense." *Id.* at 14. But Bonilla does charge TTI with a criminal offense.

and the evidence. For example, Bonilla asserts that the Report stated TTI "failed to pay [its] bills in a timely manner" and claims that TTI's representative confirmed this. Mot. 18. Neither is accurate. The Report stated TTI was "literally struggling to pay its bills on time." ECF 69-1 at 4. TTI's deponent testified that other than strategic decisions or disputes, TTI "always pays its bills on time." Helf Tr. at 75:2-76:13, 104:11-15. TTI ended 2023 with more than $1 billion in cash. Ex. 20.

So too with respect to the other statements Bonilla argues were true. He did not state that "there were substantial write-offs of intangible assets" or that TTI's "reporting of the sale of items for scrap constituted a significant accounting irregularity" (Mot. 19); he stated that TTI "stuffed so much nonsense" into its assets and "excessive[ly] capitaliz[ed]" costs to "massage" its earnings (ECF 69-1 at 11-14 17). Nor did the First Report state that TTI had "dangerously aging accounts receivable" (Mot. 18); it stated that TTI improperly treated overdue debts as "money-good" in violation of its accounting policies (ECF 69-1 at 23-25). And contrary to Bonilla's evidence-free claim that TTI's deponent agreed with his statements, she did no such thing, explaining in detail TTI's accounting policies and procedures. *See* Helf Tr. 66:1-5, 69:15-70:7, 78:10-16, 122:3-123:5 (costs properly capitalized and depreciated/amortized); *id.* at 49:22-50:4, 88:14-24, 105:18-20, 150:20-21 (accounts receivable reserved according to policy); *see also, e.g.,* Exs. 12, 9, 10 (capitalized asset policies); Ex. 13 at -1092; Ex. 14 at -1564, -1608; Ex. 15 at -0021; Ex. 16 (accounts receivable policies); Rubel Rep. ¶¶ III.18, 26, 28, 30, 33, 35, 40, 45 (accounting for capitalized costs and receivables proper).

More fundamentally, Bonilla's argument sidesteps the Report's core thesis: that TTI has "been inflating its profits dramatically for over a decade with manipulative accounting." ECF 69-1 at 1. Having offered no evidence—or even argument—that this assertion was true, Bonilla's motion fails.

**_Second Report._** Bonilla's argument that his Second Report was true because TTI supposedly admitted that it was selling products in violation of its contract with THD likewise misrepresents his Report and contradicts the evidence. Mot. 18. The Second Report's thesis was that "Techtronic has been defrauding Home Depot on a massive scale for at least four years." ECF 69-2 at 1; Bonilla Tr. 162:1-10; *see* ECF 69-2 at 56-58 (up to $2.46 billion in annual fraudulent sales). Bonilla offers no argument that the evidence supports this, even admitting that his statements of DTFO's size were false. Mot. 9. Mr. Stearns never testified, as Bonilla claims, "that Home Depot never consented to the sale of 'blemished' goods at" DTFO. Mot. 18. He testified that TTI's contract permitted it to sell these goods and that DTFO only sold them after offering them to THD and THD declining, as the contract required. Stearns Tr. 9:22-10:3; 87:13-89:22, 90:16-91:2; Ex. 23 § 7.6.

Summary judgment should enter for TTI on falsity (*see* ECF 92), but at a minimum, no undisputed facts warrant entry of summary judgment for Bonilla.

## IV.   THERE IS NO EVIDENCE THAT TTI IS A PUBLIC FIGURE

Despite Bonilla's ignoring any of the ramifications of this Court's prior ruling, his argument that TTI is a public figure (Mot. 19-22) remains wrong. Most of the argument is a block quote from the Complaint regarding TTI's size and

business (*id.* at 20-21)—facts this Court ruled did not establish that TTI is a public figure. Order 11-12. As explained in TTI's motion, ECF 92, summary judgment should be granted *for* TTI on this issue.

Bonilla offers no evidence otherwise. He argues that TTI is a general purpose public figure based *only* on it being a large company, selling well-known brands, and having a contract with THD. Mot. 21. Courts regularly reject such arguments. *See, e.g., Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 535 (E.D. Pa. 1999) (HP, "one of the largest and most influential corporations in the world," not general purpose public figure); *Mitre Sports Int'l Ltd. v. HBO, Inc.*, 22 F. Supp. 3d 240, 250 (S.D.N.Y. 2014) ("[E]ven well-known corporations that sell and advertise common products are not general purpose public figures."). There is no evidence TTI has "especial prominence in" society. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). To the contrary, "no one really knows who TTI is[.]" Stearns Tr. 96:25-97:1. TTI is not a general purpose public figure.

Bonilla likewise offers no evidence in support of his argument that TTI is a limited purpose public figure other than the fact that it publishes periodic financial statements as the stock exchange requires. Mot. 21-22. *Turner* does not support such a conclusion. Turner was the head coach of a NFL team, a paradigmatic role of "especial prominence" which caused him, by assuming that position, to "thrust himself into the public limelight inherent in professional sports[.]" 879 F.3d at 1273. He had persistently "chose to put himself in the public arena[,]" including by serving as the focus of a HBO series and offering himself as the subject of numerous

17

exposés. *Id.* at 1272. Not so for TTI: power tool manufacturing is not the NFL, and making twice-annual reports to the stock exchange is not starring in an HBO series.

Bonilla's other cases further support TTI. In *Mile Marker, Inc. v. Petersen Publishing, L.L.C.*, 811, So.2d 841 (Fla. 4th DCA 2002) (*see* Mot. 22 n.6), a winch company was a limited purpose public figure with respect to an article about its winches' performance where it "pursued a marketing strategy that emphasized a comparison of its winches with their electric counterparts … had sought, and obtained, independent product tests and reviews of its product as compared to electric winches, and … originally suggested the" test on which the allegedly defamatory article was based. *Id.* at 846. TTI has done nothing analogous.

Bonilla's argument that TTI retroactively became a public figure by responding to the Reports fails. *See* Mot. 20-21. "There was no public controversy until Bonilla created one[.]" Order 13. No case law supports Bonilla's argument: cases that use media use to rule that a party is a public figure rely on use ***before*** the defamation. *E.g. Silvester v. Am. Broad. Cos., Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988) (defendant that used media "for many years prior" to broadcast public figure). Here, TTI made virtually no use of the media before Bonilla's false Reports, and even its subsequent use was meagre and reactionary; it is not a public figure.

## V.   ACTUAL MALICE IS, AT A MINIMUM, A MATTER OF DISPUTE

Evidence of Bonilla's reckless disregard for the truth pervades the record:

- Bonilla's sources testified that he mischaracterized their statements. Vita Tr. 35:13-38:22 (Bonilla "misleading" and "manipulative"); Hartman Tr. 81:2-82:3 (characterization "not fair").

18

- Bonilla ignored or rejected sources who provided information that contradicted his theses. Ex. 30 (███████████) (███████████); Ex. 31 at (███████████) (███████████); ECF 69-2 at 26 (Bonilla not "so sure" about Hartman's statement that he was "100% sure" TTI was not doing what Bonilla said they were doing); Hartman Tr. 93:22-94:21 (Hartman sure).

- Bonilla selectively quoted TTI's annual reports to create a falsely nefarious narrative. ECF 69-1 at 10 (invoking "key audit matter" as evidence of TTI's wrongdoing but omitting specific steps taken to address that matter); *see, e.g.*, Ex. 12 at -645 (2019 additional steps).

- Bonilla himself wrote that his statements "should not pass the smell test" but wrote them anyway. ECF 69-2 at 30.

- The Second Report is premised on TTI violating its contract with THD, but ███████████████. Bonilla Tr. 170:20-171:2; *see also* Vita Tr. 77:7-12 (Vita also never saw it).

- Bonilla ███████████████, and prevented Hartman from speaking to THD. Bonilla Tr. 238:10-239:18; Hartman Tr. 78:13-17; *King v. S. Poverty L. Ctr., Inc.*, 2023 WL 3061825, at *19 (M.D. Ala. Apr. 24, 2023) (turning a blind eye to facts probative of actual malice).

This evidence, among much more, is more than sufficient to meet any burden TTI may have to prove that Bonilla acted with actual malice.

Bonilla's argument that he "accurately quoted all of his sources" (Mot. 23) misrepresents the record, which shows the opposite. *Compare, e.g.*, ECF 69-2 at 25-26 *with* Ex. 38 at 6-7 (misquoting Hartman); *see supra* at 7. Bonilla's counsel chose to depose sources without using recordings or transcripts of the calls, instead questioning them based on their memory of year-old statements and eliciting incorrect testimony. *See, e.g.*, Vita Tr. 103:4-109:22. Even if Bonilla had accurately quoted sources, that would not inoculate Bonilla from liability for false statements that are not reasonably related to those quotes. Thus, no quote from Pisani, who "knew nothing of [TTI]'s specific processes [or] accounting" (Pisani Tr. 55:21-56:4)

19

could reasonably support Bonilla's statement that TTI was engaged in accounting manipulations. Such claimed reliance manifests a reckless disregard for the truth.[6]

Lastly, the record shows Bonilla's motive: money. He earned ██████████ ████, not based on the truth of his Reports, but on the immediate and severe harm they caused to TTI's stock, further evidencing actual malice. *See* Ex. 3 Ex. 4; Bonilla Tr. 117: 1-3; Ex. 5; Exs. 6-7; *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *Farmland Partners*, 2020 WL 12574993 at *22; *see also* Order 13 n.4 (cavalier tone, profit motive, intent to harm TTI's stock, contradiction of his sources, and absurdity of statements sufficient to show actual malice).

## VI.    BONILLA'S ANTI-SLAPP ARGUMENT FAILS

Bonilla's argument that he is entitled to attorneys' fees under Florida Statute 768.295 should be summarily denied. Bonilla asserts, with no factual support, that TTI sued "to suppress [his] free speech rights." Mot. 24. This Court has already rejected Bonilla's arguments that his Reports comprised First Amendment-protected opinions. Order 13-14. Bonilla has also presented no evidence that this lawsuit is "without merit[.]" Fla. Stat. 768.295(3). Bonilla thus has failed to establish any of the statutory prerequisites for an award of fees.

## CONCLUSION

For the foregoing reasons, the Court should deny Bonilla's motion.

---

[6]    Bonilla's reliance on *Mile Marker* fails. Mot. 23. That court ruled the defendant could reasonably rely on a tester whom defendant "had known ... for years, that he had always known ... to be truthful and accurate in his reporting, and that he had no reason to doubt the veracity of any of the statements in the subject article." 811 So.2d at 847. No such circumstances exist here.

Dated: October 22, 2024

By: */s/ Jason D. Sternberg*
**QUINN EMANUEL URQUHART**
**& SULLIVAN LLP**
Jason D. Sternberg (FL Bar 72887)
Tara MacNeill (FL Bar 1028931)
Laura N. Ferguson (FL Bar 1047701)
2601 South Bayshore Drive, 15 Floor
Miami, FL 33133
Telephone: (305) 402-4880
Facsimile: (305) 901-2975
jasonsternberg@quinnemanuel.com
taramacneill@quinnemanuel.com

Kristin Tahler (admitted *pro hac vice*)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
kristintahler@quinnemanuel.com

Nicholas Inns (admitted *pro hac vice*)
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
nicholasinns@quinnemanuel.com

*Attorneys for Techtronic Industries*
*Company Limited and Techtronic*
*Industries Factory Outlets, Inc.*