Exhibit 36

Page 1

```
 1              UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2                    TAMPA DIVISION
 3     TECHTRONIC INDUSTRIES COMPANY LIMITED
       AND TECHTRONIC INDUSTRIES FACTORY
 4     OUTLETS, INC.,
 5              Plaintiffs,
 6         vs.    CASE NO. 8:23-cv-01734-CEH-AEP
 7     VICTOR BONILLA,
 8              Defendants.
 9
10     VIDEOTAPED VTC
       DEPOSITION OF:   MARK HAROLD HARTMAN
11
       DATE:            July 1, 2024
12
       TIME:            10:05 AM
13
       LOCATION:        COPELAND, STAIR, VALZ & LOVELL
14                      40 Calhoun Street
                        Suite 400
15                      Charleston, SC
16     TAKEN BY:        Counsel for the Plaintiffs
17     REPORTED BY:     MICHAEL DAVID ROBERTS,
                        Court Reporter
18     _____
19
20
21
22
23
24
25
```

Page 45

1  BY MR. INNS:
2       Q.  Did you communicate to anybody that TTI
3  was systematically defrauding Home Depot at all?
4       A.  Not to my recollection.  I -- I'm
5  pretty confident I was trying to convey that I did
6  not think there was deliberate fraud.
7       Q.  So would you say as a person who
8  provided information that you understand was used
9  in this report that the statement -- or I guess the
10 rhetorical question is, here is TTI making hundreds
11 of millions in profit by systematically defrauding
12 Home Depot, is that something a person could fairly
13 write based on what you communicated to them on
14 that phone call?
15      A.  No, not from what --
16          MR. ESPER:  Object as to form.
17          THE WITNESS:  Not from what I
18 communicated could someone calculate that scale.  I
19 think my specifics were volume of two to three
20 hundred million in sales.  That's a far cry from
21 that number that they have here.
22 BY MR. INNS:
23      Q.  Separate from the number, do you think
24 it's fair for a person to write based on what you
25 discussed with them that TTI was, quote,

Page 78

1          MR. ESPER:  Object as to form.
2          THE WITNESS:  I've never had any
3    experience of that nature with any prior calls, and
4    in the up front, it's typically like this is hyper
5    confidential that you will never talk about it and
6    this other group will never talk about it publicly.
7    BY MR. INNS:
8          Q.   When you say in the up front --
9          A.   Yeah --
10         Q.   -- whose --
11         A.   -- in the bylaws that would be in the
12   Guidepoint research thing, a confidentiality
13   agreement to not talk about it.  I even remember at
14   the end of this call them stressing to me to not
15   talk about it specifically with Home Depot, to not
16   share the discovery of the perceived practice with
17   Home Depot at that time.
18         Q.   Okay.  Based on that expectation, what
19   was your reaction when you saw that they did
20   publish a report that used information you --
21         A.   Information.
22         Q.   -- provided in that call?
23         A.   In my initial --
24              MR. ESPER:  Object as to form.
25              THE WITNESS:  Sorry.  Sorry.  Sorry.

Page 81

1  Q. So the -- the second sentence -- or I'm
2 sorry, the third sentence of that bullet states, we
3 believe DTFO was originally created for a
4 legitimate purpose but has evolved to be a dumping
5 ground for TTI products in secret prohibited
6 competition with Home Depot.
7  Did I read that correctly?
8  A. Yes.
9  Q. Is that a fair statement based on the
10 information that you shared with the individuals
11 who you now know were Jehoshaphat?
12  A. No.
13  MR. ESPER: Object as to form.
14  THE WITNESS: Sorry. Sorry. Sorry.
15 Okay. Do you want to do it again?
16 BY MR. INNS:
17  Q. You can just go ahead and answer it.
18  A. Okay. No. My perspective it's not
19 fair. The first part is, but the second part is
20 not.
21  Q. When you say the second part, what are
22 you referring to?
23  A. We believe D -- I'm sorry, the first
24 part if you give me a second, please. I am in
25 agreement with we believe DTFO was originally

Page 82

1  created for a legitimate purpose but and then end
2  there.  The second part but what has evolved to be
3  a dumping ground, I do not agree with that from my
4  interaction with the Guidepoint interview.
5       Q.  Moving down then to the fourth bullet
6  that begins DTFO physical stores.  Do you see that
7  one?  And --
8       A.  Yes.
9       Q.  -- please take a moment to review that
10 bullet point to yourself.  Have you had a chance to
11 review the fourth bullet?
12      A.  Yes.
13      Q.  So the second sentence of this fourth
14 bullets states, web traffic data from Semrush.com
15 cross referenced with public retailers with similar
16 traffic levels implies one to two billion dollars
17 sales in going through DTFO.
18          Do you see that?
19      A.  Yes.
20      Q.  Is that a fair statement based on the
21 information you provided in your phone call with
22 the Jehoshaphat individuals?
23      A.  No, my information --
24          MR. ESPER:  Object as to form.
25          THE WITNESS:  Sorry.  Sorry.  No.  My

Page 93

1     A.    I believe so, yes.
2     Q.    And you're aware that this call was
3  recorded; is that right?
4     A.    Yes.
5     Q.    Do you have any reason to believe other
6  than perhaps where there's ellipses or brackets
7  that this is not an accurate quotation from your
8  conversation?
9     A.    No.
10    Q.    I want to skip to the very end of
11 this -- this block quote, the last exec where it's
12 highlighted in yellow.  Do you see that?
13    A.    Yes.
14    Q.    And in that exchange you're responding
15 to a question about factory blemished stuff, and
16 the quote is, exec, colon, yeah, that's a funny
17 thing.  It's kind of like a wink, wink thing.
18          It's a way to get rid of newish stuff
19 if you know something is not doing well, and you're
20 sitting on some replenishment inventory, you know
21 it's not going to be bought, you basically scratch
22 the box and say oh, it's blemished.  But I'm one
23 hundred percent sure there's never a deliberate
24 strategy to go to DTFO with a new product.
25          Did I read that correctly?

Page 94

1         A.    Yes.
2         Q.    And do you have any reason to believe
3    that's not an accurate quotation from your call
4    with the Jehoshaphat individuals?
5         A.    No.
6         Q.    And then the next sentence, so we're no
7    longer in block quote.  Do you see that?
8         A.    Uh-huh.
9         Q.    Immediately under that there's a
10   bracket that says, we aren't so sure about that
11   last sentence.
12        A.    Uh-huh.
13        Q.    Did I read that correctly?
14        A.    Yes.
15        Q.    Were you sure about that last sentence
16   that you spoke to the Jehoshaphat people?
17        A.    Oh, I'm so sorry.  Give me a second,
18   all right.
19             MR. ESPER:  Object as to form.
20             THE WITNESS:  The one you have
21   highlighted in yellow I am, yes.  The next
22   paragraph that starts with we aren't so sure about
23   that last sentence is what you're asking me about
24   now?
25   BY MR. INNS:

Page 98

1             Is occasion contractual fraud a fair
2     characterization of what you discussed on the phone
3     call with the Jehoshaphat individuals?
4             MR. ESPER:  Object as to form.
5             THE WITNESS:  No, my approach was
6     excess and obsolete was actually helping Home
7     Depot, and they were okay with it.  Selling
8     inventory that was slow and that we were over
9     warehoused on and that Depot was not going to
10    purchase in the future, and we were clearing the
11    pipeline to make way for new inventory that was in
12    high demand.  It's not an uncommon scenario in --
13    in that arena.
14            I think we were -- in the early days we
15    were even very open about what was happening, when
16    it was happening and what kind of volumes we were
17    dealing with.
18    BY MR. INNS:
19        Q.  Moving down on that page -- we're still
20    on page -- excuse me -- we're still on page 27.  I
21    would like to talk to you about the last block
22    quote and the context for it.  So could you read
23    from the bottom -- the second half of that page to
24    yourself, and let me know when you've had a chance
25    to review.