# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
## Tampa Division

Techtronic Industries Company Limited, and Techtronic Industries Factory Outlets, Inc.

Plaintiffs,

– against –

Victor Bonilla,

Defendant.

Case No. 8:23-cv-01734-CEH-AEP

## PLAINTIFFS' OPPOSITION TO DEFENDANT VICTOR BONILLA'S *DAUBERT* MOTION TO STRIKE AND/OR EXCLUDE THE EXPERT TESTIMONY OF AND REPORT OF JEFFREY W. KOPA, CFA

Plaintiffs ("TTI") submit this Response in Opposition to Defendant Victor Bonilla's Motion to Strike and/or Exclude the Expert Testimony and Report of Jeffrey Kopa ("Motion" or "Mot."). Because Mr. Kopa's opinions meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702, Defendant's Motion should be denied.

### INTRODUCTION

The defamatory short-seller reports of Defendant Victor Bonilla ("Mr. Bonilla") wreaked havoc on TTI: They tanked TTI's share price by nearly 20%, and caused TTI to incur significant professional costs to address the reports ███

After extensive discovery, the record is now clear that Mr. Bonilla's reports were false and were the proximate cause of the damages suffered by TTI. In a last-ditch effort to avoid liability, Mr. Bonilla seeks to exclude TTI's damages expert—Jeffrey Kopa—who conducted an event study using a universally accepted methodology and quantified TTI's claimed damages by calculating the present value of the out-of-pocket harms it suffered. The narrow issue before the Court is whether Mr. Kopa's opinions satisfy the *Daubert* standard. As shown below, they unquestionably do.

First, there is no serious dispute that Mr. Kopa is eminently qualified to offer his damage opinions in this case. While Mr. Bonilla argues in one breath that Mr. Kopa is not qualified, he concedes in the next that he "does not doubt" Mr. Kopa's credentials, which include degrees in business, finance, and accounting and twenty years of damages analysis and consulting experience. This concession should put the issue to rest. Mr. Bonilla also argues that Mr. Kopa's opinion is not helpful because he did not do the analysis that Mr. Bonilla wanted him to do. This conflates qualifications with helpfulness, an entirely separate prong of *Daubert*.

Next, Mr. Kopa's opinions and methodology are plainly reliable: like countless damages experts before him, he applies the widely-accepted event study and net present value techniques to calculate TTI's damages based on assumptions grounded in the evidentiary record. Mr. Bonilla argues that Mr. Kopa's methodology is unreliable because he does not isolate the causal impact of specific statements within Mr. Bonilla's reports. But Florida law provides that defamatory

2

statements should be examined in the context of the entire publication when assessing damages—which is exactly the approach taken by Mr. Kopa. Mr. Bonilla also argues that certain parts of Mr. Kopa's opinions should be excluded because they consist of "basic math," but this argument ignores the work that Mr. Kopa actually did to calculate damages (including converting currencies) and the fact that experts are permitted to perform math exercises where helpful to the jury (as is the case here). Further, Mr. Bonilla faults Mr. Kopa for assuming TTI's liability and relying on the sworn testimony in the record ████████████████████

████████████████████████████████████████████████

████████████████████████████. But the law allows an expert to assume liability and causation, especially where, as here, TTI proffered facts and evidence supporting those assumptions. Lastly, despite Mr. Bonilla's arguments to the contrary, Mr. Kopa was entitled to assess causation through event studies, which he used to analyze the impact of Mr. Bonilla's reports on TTI's stock price. Any issues with his event study go to its weight, not admissibility.

Finally, Mr. Bonilla argues Mr. Kopa's testimony is not helpful because he lends the "imprimatur" of an expert to a causal analysis that the jury could do on its own. But no jury is equipped to conduct a statistical analysis to isolate the effects of Mr. Bonilla's reports as Mr. Kopa does. Indeed, "assuming the obvious," as Bonilla seeks to do, would likely result in an assumption that the entire stock price drop on the day of release would be attributed to Mr. Bonilla's reports. In any

event, all of Mr. Bonilla's challenges go to weight or factual issues, all of which the jury is entitled to assess.

The Court should deny Mr. Bonilla's Motion.

## **FACTUAL BACKGROUND**

This case is about two short seller reports published by Mr. Bonilla that falsely accused TTI of committing accounting fraud and defrauding its largest customer. Doc. 68 ("Amended Complaint or "Am. Compl.") ¶ 1. TTI suffered unjustified and significant losses as a direct result of these reports. *Id.* ¶¶ 57-59, 89-92. After the First Report was issued, TTI's share price dropped nearly 20% within hours; this resulted in the suspension of trading of TTI's stock and wiped out billions of TTI's market value. *Id.* ¶ 57. TTI's share price dropped around 5% the day the Second Report was issued. *Id.* ¶ 90. TTI brings two claims against Mr. Bonilla—libel and libel per se—and seeks damages and other forms of relief. *See id.* ¶¶ 95-123.

TTI proffered the opinions of two experts in this case: Chris Rubel (accounting expert) and Jeffrey Kopa (damages expert). Mr. Bonilla's challenge pertains only to Mr. Kopa.

On July 12, 2024, Mr. Kopa issued his first Report in the case (the "Affirmative Report"), opining that, as a result of Mr. Bonilla's reporting, TTI suffered extensive damage. ████████████████████

████████████████████████████████████████

████████████████████████████████████████



Included within, and fundamental to Mr. Kopa's report is his opinion that the immediate declines in TTI's share price following the publication of Mr. Bonilla's reports were in fact caused by the reports themselves, and not other factors. *See id.* ¶¶ 76-88, 94-100. Mr. Kopa evaluated the impact Mr. Bonilla's reports had on TTI's stock by providing a causal framework to evaluate changes in stock prices and costs. Specifically, Mr. Kopa used the standard statistical technique called an "event study."[2] *Id.* ¶¶ 54-62. An event study isolates the impact of the release of previously unknown information into the market on a company's

---

[1] ████████████████████████████████████████
████████████████████████████

[2]   Mr. Kopa cited a number of sources that discussed the scientific community's acceptance of this approach, including (1) A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13 (1997); (2) Kevin L. Gold et al., *Federal Securities Acts and Areas of Expert Analysis, in* Litigation Services Handbook: The Role of the Financial Expert 27.8-27.12, 27.18-27.21 (Roman L. Weil et al., eds., 6th ed. 2017); and (3) Esther Bruegger & Frederick C. Dunbar, *Estimating Financial Fraud Damages with Response Coefficients*, 35 J. Corp. L 11 (2009).

stock. *Id.* ¶ 56. Isolating the impact of company-specific information requires assessing a company's "abnormal return" through the statistical technique of regression analysis to distinguish the impact of company-specific news on the company's stock from impacts caused by broader economic phenomena. *Id.*

Utilizing this technique, Mr. Kopa found that, following Mr. Bonilla's first report, ███████████████████████████████████. Mr. Kopa came to this conclusion by comparing the decline TTI suffered with the decline it should have otherwise expected. *Id.* ¶ 73. This involved Mr. Kopa performing a "loss causation" analysis, in which he conducted an exhaustive search for any potential confounding news that might have impacted the stock price and concluded that ████████████████████████████████ ████████████████████████████████. Mr. Kopa also conducted an event study to evaluate the impact of Mr. Bonilla's second report, ████████████████████████████.

Finally, Mr. Kopa quantified the other damages TTI suffered as a result of Mr. Bonilla's reports. Mr. Kopa evaluated the expenses TTI incurred to address Mr. Bonilla's reports to further determine damages. *Id.* ¶ 109. ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

On August 9, 2024, Mr. Kopa issued a rebuttal report to critique the opinions of Mr. Bonilla's expert Dr. J. Christopher Westland. Ex. 3 ("Rebuttal") ¶¶ 3-4. Dr. Westland, for his part, had opined that TTI's decline in share price was caused by macroeconomic factors—and not Mr. Bonilla's reports. Ex. 4 ("Westland Rep.") at 4. Mr. Kopa explained in his rebuttal report that Dr. Westland's analysis of the impact of Mr. Bonilla's reports on TTI's stock was flawed. Mr. Kopa identified specific issues with Dr. Westland's purported event study—including a lack of support provided for the underlying macroeconomic factors and Dr. Westland's refusal to provide the support for, and calculations underlying, the regression analyses he used—which are (in part) the subject of TTI's motion to exclude Dr. Westland's opinions. Rebuttal ¶¶ 12-16; *see* Doc. 95 at 14-16 (TTI's Motion to Strike and Exclude the Opinions and Reports of Expert J. Christopher Westland).

On August 15, 2024, Mr. Bonilla deposed Mr. Kopa. Among other matters, Mr. Kopa testified that he had prior experience conducting event studies, and explained the methodology of an event study: ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

 He also testified that

he converted some of the invoices from Hong Kong to US dollars. *Id.* 155:10-13.

## **LEGAL STANDARD**

"The rejection of expert testimony is the exception rather than the rule."

*Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) (quoting Fed.

R. Evid. 702 advisory committee's note to 2000 amendments). Courts employ a

three-part test to determine whether expert testimony is admissible: (1) the expert

must be qualified to testify competently regarding the matters he intends to

address; (2) the expert must use a sufficiently reliable methodology; and (3) the

expert's testimony must assist the trier of fact, through the application of scientific,

technical or specialized expertise, to understand the evidence or to determine a

fact in issue. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-

41 (11th Cir. 2003) (citations omitted). In assessing the admissibility of expert

testimony, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Id.* at 1341.

## ARGUMENT

Mr. Bonilla appears to challenge Mr. Kopa's second, fourth, and fifth opinions. Mr. Bonilla does not challenge Mr. Kopa's first opinion (regarding efficiency of the market for TTI's shares at the time of the reports) or third opinion (regarding Mr. Bonilla's profits from the reports). As explained below, Mr. Bonilla's challenges have no merit.

## I.   MR. KOPA IS QUALIFIED TO RENDER DAMAGES OPINIONS

Mr. Bonilla attempts to attack Mr. Kopa's qualifications to render his opinions on damages, but ultimately concedes—as he must—that he "does not doubt [Mr. Kopa's] credentials." Mot. at 8. As explained below, Mr. Kopa is plainly qualified to give his damages opinions, and Mr. Bonilla's makeweight argument to the contrary should be rejected.

*Daubert* requires an expert to testify competently regarding the matters he intends to address. *Quiet Tech.*, 326 F.3d at 1340 (citations omitted). "Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Jarvis v. City of Daytona Beach*, 2024 WL 3717233, at *2 (M.D. Fla. Aug. 8, 2024) (internal quotation marks and citations omitted). "This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility."

*Id.* (alterations and citations omitted). In damages cases, it is sufficient for a damages expert to have a background in estimating damages and relevant educational credentials. *See Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (holding expert was qualified to testify on damages where he held degree in economics and had "substantial background in estimating damages").

As his training and experience show, Mr. Kopa is unquestionably qualified to render damages opinions in this case—a fact that Mr. Bonilla "does not doubt." Mot. at 8. He has been qualified as an expert on damages in state and federal courts around the country on numerous occasions. Rep. App'x A at 2. In the last four years alone, he has acted as an expert witness and provided testimony on eleven occasions, including on statistical analysis. Rep. ¶ 4; Rep. App'x A at 2. Among other things, he has also performed accounting investigations, assessed creditworthiness, and worked to restructure and refinance companies. Rep. ¶ 5. His educational credentials are likewise on point for his expert work: he holds a Bachelor of Business Administration (with High Distinction) with emphasis on finance and accounting, a Masters of Business Administration degree, and a Master of Science degree in Finance. *Id.* ¶ 6. Providing expert testimony on damages is exactly what Mr. Kopa is qualified to do.

Mr. Bonilla also argues that Mr. Kopa's testimony does not "fit[] his qualifications" and "fails to analyze the key areas where an expert might be helpful." Mot. at 8. But Mr. Bonilla does not explain why the "fit" is imperfect, and, more basically, his approach conflates qualifications with helpfulness—two

"distinct concepts that courts and litigants must take care *not* to conflate."
*Edmondson v. Caliente Resorts, LLC*, 2017 WL 10591833, at \*2 (M.D. Fla. Aug. 31,
2017) (quoting *Quiet Tech.*, 326 F.3d at 1341) (emphasis added). Whereas
*Daubert's* qualifications standard is limited to a base evaluation of credentials,
"helpfulness" evaluates whether the expert's opinion is relevant to the pertinent
inquiry. *See Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir.
2016); *Daubert*, 509 U.S. at 591 (noting that question of expert's "fit" is question
of relevance). As discussed below, Mr. Kopa's opinions are indeed helpful.

## II.   MR. KOPA'S METHODOLOGY IS RELIABLE

Reliability requires courts to assess, at minimum, "(1) whether the expert's
theory can be and has been tested; (2) whether the theory has been subjected to
peer review and publication; (3) the known or potential rate of error of the
particular scientific technique; and (4) whether the technique is generally accepted
in the scientific community." *United States v. Abreu*, 406 F.3d 1304, 1306-07 (11th
Cir. 2005) (citation omitted). Courts have "wide latitude" and flexibility in
determining reliability. *Id.* (citing *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S.
137, 142 (1999)); *Maiz*, 253 F.3d at 665 (quoting *Daubert*, 509 U.S. at 580). The
factors identified are "general guidelines" not meant to hamper the trial judge's
"considerable leeway in deciding a particular case." *Edmondson*, 2017 WL
10591833, at \*4 (citations omitted).[3]

---

[3]   When engaging in "the limited 'gatekeeper' role envisioned in *Daubert*," the
Court must not "conflate[] the questions of the admissibility of expert testimony and the

None of Mr. Bonilla's three arguments show that Mr. Kopa's methodology is unreliable.

*First*, Mr. Kopa's event study is reliable and well within the confines of scientific literature. Mr. Kopa properly analyzed the impact of Mr. Bonilla's reporting on TTI's stock using an event study. Mr. Bonilla argues—without citation—that this methodology is unreliable because Mr. Kopa did not analyze the impact from any specific false or defamatory statement.[4] Mot. at 10. But Mr. Kopa's approach reflected the standard and well-accepted legal principle that "[t]o determine whether a statement is defamatory, it must be considered in the context of the publication." *Smith v. Cuban American Nat. Foundation*, 731 So. 2d 702, 705 (Fla. 3d DCA 1999) (finding error in trial court's decision not to show entire documentary to jury when only one interview within documentary was alleged as defamatory); *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) ("[A] publication must be considered in its totality."); *Stanton v. Metro Corp.*, 438 F.3d 119, 125 (1st Cir. 2006) (noting that court must examine statement "in its totality in the context in which it was uttered or published") (citations omitted)); *Desert Sun Publishing Co. v. Superior Court for Riverside Cnty.*, 97 Cal.

---

weight appropriately to be accorded such testimony by a fact finder." *Ambrosini v. Labarraque,* 101 F.3d 129, 141 (D.C. Cir. 1996) (citations omitted).

[4]   In passing, Mr. Bonilla mischaracterizes Mr. Kopa's testimony regarding the impact of factual material on the stock market. Mot. at 3. ███████████████████ ████████████████████████████████████████ ██████████████████████. On this point, Mr. Bonilla's analysis ignores the distinction between factual material already known to the market and new, material information.

App. 49, 52 (1979) (noting allegedly defamatory publication "may not be dissected and judged word for word or phrase by phrase," but rather "[t]he entire publication must be examined").

Indeed, Florida courts have historically considered publications as a whole when assessing defamation. *E.g., Byrd*, 433 So. 2d at 595 ("Articles are to be considered with their illustrations; pictures to be viewed with their captions; stories to be read with their headlines."); *see, e.g., O'Neal v. Tribune Co.*, 176 So. 2d 535, 538 (Fla. 2d DCA 1965) (affirming defamation verdict based on "whole articles . . . including their headlines."). This is because "context [] cannot be irrelevant, because the average viewer would have been watching the entire broadcast, not merely a twenty second clip[.]" *See Smith*, 731 So.2d at 705-06.

Mr. Bonilla's argument ignores this well-established precedent and would turn it on its head. Mr. Bonilla does not cite a single case to support his theory. Nor does he explain how it would be even theoretically possible to isolate the impact of single statements, especially before trial when no factfinder has determined whether the Reports are false in whole or in part.

At best, Mr. Bonilla's argument reflects a preference for a different methodology, but preferring one way of calculating damages over another is no basis to exclude Mr. Kopa's testimony. In *Edmondson*, this court found a damages expert reliable even though the opposing party proposed using a different theory to measure damages. The court recognized that the party's approach was "not the only method for measuring of damages" and the expert witness "was not obliged

to follow" that framework. 2017 WL 10591833, at *5. The opposing party cited no cases holding that a damages expert "must adhere" to its preferred framework. *Id.* Similarly here, Mr. Bonilla cites nothing showing that Mr. Kopa "must adhere" to Mr. Bonilla's preferred framework. Mr. Bonilla can present any questions about purported flaws to the jury.

*Second*, Mr. Bonilla misdescribes Mr. Kopa's methodology in analyzing TTI's legal and accounting bills to assess the resulting damages. Mot. at 10. ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ While Mr. Kopa's analysis did require him to add the cost of invoices after converting currencies, there is no doubt that this math exercise would be helpful to the jury and would prevent any math errors. *See Gibson v. Outokumpu Stainless Steel USA, LLC*, 2023 WL 3510894, at *3-7 (S.D. Ala. May 17, 2023) (allowing expert to testify where calculations "involve[d] basic math, albeit on a scale that that would be difficult to perform without assistance"); *see also E. Coast Brokers & Packers, Inc. v. Seminis Vegetable Seeds, Inc.*, 2008 WL 5093602, at *1 (M.D. Fla. Dec. 2, 2008) (denying motion to strike expert witness though defendant argued expert's testimony consisted solely of "mathematical compilations for which expert testimony is not needed"). Mr. Bonilla also questions whether the bills were the result of work that was "needed,"

14

Mot. at 10-11, but Mr. Kopa did not opine on this issue, and the jury will decide this issue of fact based on the testimony of TTI's fact witnesses. For this reason, this argument—at best—should be considered an unpersuasive challenge to the helpfulness of Mr. Kopa's opinions, not to his methodology.

*Third*, Mr. Bonilla offers a separate criticism of Mr. Kopa's but-for analysis evaluating TTI's damages associated with its LTIP program, but this does not present a basis for exclusion. Mot. at 11-12. Mr. Bonilla criticizes Mr. Kopa's failure to assess causation, but Mr. Kopa was not and has no intention of opining as to causation. Instead, ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████. Such net present value analysis is a mainstay of admissible expert opinion. *See, e.g., Baxter v. Comm'r of Internal Revenue Serv.*, 910 F.3d 150, 158 (4th Cir. 2018).

As to this analysis, Mr. Kopa assumed causation based on the declaration of KC Helf, a Vice President of Group Finance at TTI. Ex. 2. Ms. Helf has extensive knowledge of TTI's financials as she has worked in numerous roles at TTI since 2015, including as Director of Finance. *Id.* ¶ 1. ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

████ Thus, whether the damages TTI suffered were in fact caused by Mr. Bonilla's reporting is a question of fact for the jury. While Mr. Bonilla is free to dispute

causation, that dispute is properly raised by cross-examining TTI's fact witnesses at trial, not by moving to exclude Mr. Kopa. *V.C. v. Evenflo Co., Inc.*, 2021 WL 4948100, at *2 (M.D. Fla. July 12, 2021) (noting that any "objection to the adequacy of a factual predicate for [the expert's] analysis" was proper for trial and not for a preemptive strike); *see also Action Nissan, Inc. v. Hyundai Motor Am.*, 2020 WL 9173027, at *2 (M.D. Fla. Nov. 5, 2020) (admitting expert opinion over objection regarding expert's "failure to account for certain variables" because such "arguments are better addressed through vigorous cross-examination than wholesale exclusion" (citing *Daubert*, 509 U.S. at 596)). After all, questions that are "factual in nature" "must be submitted to the jury." *Ruiz v. Sharkninja Operating LLC*, 2024 WL 2709638, at *4 (M.D. Fla. Feb. 9, 2024) (citation omitted).

## III.   MR. KOPA'S TESTIMONY WOULD BE HELPFUL TO THE JURY

Mr. Kopa's analysis will help the jury understand both the relationship between the drop in TTI's stock price and Mr. Bonilla's reports, and understand ███████████████████████████████. Mr. Kopa provided thorough opinions based on the facts in the case and his opinions would therefore be helpful to the jury's deliberations.  Without his testimony, these concepts would be inaccessible to the jury.

"The helpfulness inquiry is essentially a question of relevance." *Edmondson*, 2017 WL 10591833, at *7 (determining damages expert was helpful when expert's proposed testimony was "crafted to fit the circumstances of the case."). This

depends on whether the testimony "will assist the trier of fact to understand or determine a fact in issue." *Quiet Tech.*, 326 F.2d at 1341 (quoting *Daubert*, 509 U.S. at 592). "In deciding whether the expert testimony will be helpful to the jury, the court must evaluate whether the proposed testimony is 'relevant to the task at hand, . . . i,e, that it logically advances a material aspect of the proposing party's case.'" *Jolly v. Hoegh Autoliners Shipping AS*, 2024 WL 1976954, at *4 (M.D. Fla. Jan. 26, 2024) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312) (11th Cir. 1999)).

Mr. Kopa's testimony is helpful to the jury because it aids in the assessment of a disputed issue that is essential for determining damages: whether and to what extent Mr. Bonilla's reports caused the drop in TTI's stock price. Indeed, Mr. Bonilla has himself offered affirmative expert testimony on this issue—reaching a different conclusion—which belies Mr. Bonilla's claim that "[a] jury can look at a stock market chart and see when the stock price dropped." Mot. at 11; *see generally* Westland Rep. This disputed issue is essential for TTI to prove its case. *See Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (noting damages as element of defamation claim). Moreover, Mr. Kopa's testimony is helpful because

███████████████████████████████████████████████████

███████████████████████████████████████—a distinction that, without his testimony, the jury would not be able to draw on its own. Rep. ¶¶ 75, 73, 89-91; *see also United States v. Fed. Ins. Co.*, 2021 WL 5915833, at *5 (M.D. Fla. Oct. 22,

2021) (finding expert opinion helpful where it "help[ed] distill a large quantity of information" and helped "the jury in understanding the intricacies" of an issue).

Mr. Bonilla's arguments to the contrary are unsupported. Mr. Bonilla misstates Mr. Kopa's analysis as well as the bases on which an expert's testimony may be excluded. As discussed, Mr. Kopa did not simply "look at a stock market chart and see when the stock price dropped," nor "add up legal and accounting invoices" and "apply a but-for test to an executive compensation program." Mot. at 11. Mr. Kopa provided a statistically rigorous causal analysis of the impact of Mr. Bonilla's reports, as well as a calculation of the present value of the costs TTI incurred, all in a manner that made use of his indisputable qualifications and was aligned with the scientific community's standards. Rep. ¶¶ 53-155; Kopa Dep. 155:14-156:5. Mr. Kopa's event study used well-established and regularly accepted factors, which are described in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and used in all event studies of this type. Rep. ¶¶ 25-27. In doing so, he thoroughly analyzed the potentially confounding impact of TTI-specific news by, for example, examining a range of publications. *Id.* ¶¶ 76-81; 92-93. His event study analysis is over 40 pages long. *See generally id.* Mr. Kopa's approach is not controversial or out of sync with the scientific standards.

Moreover, ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██, and, in any event, it is black letter law that damages experts may assume

liability and causation in their damage models, *see, e.g., Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 WL 2295269, at *3 (S.D. Fla. June 8, 2011) (holding that "expert witness . . . may assume liability for purposes of calculating damages"); *N. Palm Motors, LLC v. General Motors LLC*, 2020 WL 6384308, at *1-2 (S.D. Fla. Oct. 30, 2020) (denying motion to exclude damages expert where expert failed to consider facts of causation, but expert was not "a liability or causation expert"); *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. fur Chemische Industrie*, 2015 WL 5459662, at *10 (S.D.N.Y. Sept. 16, 2015) ("[A] damages expert does not need to perform her own causation analysis to offer useful expert testimony."). ███████████

████████████████████████████████████████████

Mr. Bonilla's argument to the contrary assumes issues with Mr. Kopa's methodology—not its helpfulness.

Mr. Bonilla's claimed fear of the alleged "imprimatur" Mr. Kopa's testimony puts on the jury's analysis thus provides no basis to exclude him. Mot. at 11. Indeed, courts have flatly rejected Mr. Bonilla's argument: the entire purpose of Rule 702 and *Daubert* is to ensure that "the jury only hears testimony given the imprimatur of being spoken by an expert, when the testimony is deserving of such a distinction." *United States v. Ware*, 69 F.4th 830, 845 (11th Cir. 2023). Mr. Kopa's testimony meets this standard.

Mr. Bonilla's supposed fear is also not realistic. Mr. Kopa's expert testimony does not take anything from the jury's consideration. Far from inviting the jury "to

not ask the causation questions" █████████████████, for example, Mot. at 11-12, this Court will instruct the jury that it must make the requisite causation findings before they can even turn to his opinions. Mr. Bonilla is welcome to challenge Kopa's methodology and his findings, as well as the causal predicate to which TTI's fact witness will testify, at trial before the jury. But ultimately, the final decision lies with the jury. For this reason, excluding Mr. Kopa's opinions would "supplant the adversary system of the jury," which is expressly not the purpose of *Daubert*. *Quiet Tech.*, 326 F.3d at 1341.

## CONCLUSION

For the foregoing reasons, the Court should deny Mr. Bonilla's Motion.

Dated: October 22, 2024

By: */s/ Jason D. Sternberg*
**QUINN EMANUEL URQUHART
& SULLIVAN LLP**
Jason D. Sternberg (FL Bar 72887)
Laura N. Ferguson (FL Bar 1047701)
Tara MacNeill (FL Bar 1028931)
2601 South Bayshore Drive, 15 Floor
Miami, FL 33133
Telephone: (305) 402-4880
Facsimile: (305) 901-2975
jasonsternberg@quinnemanuel.com
taramacneill@quinnemanuel.com

Kristin Tahler (admitted *pro hac vice*)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
kristintahler@quinnemanuel.com

Nicholas Inns (admitted *pro hac vice*)
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
nicholasinns@quinnemanuel.com

*Attorneys for Techtronic Industries*
*Company Limited and Techtronic*
*Industries Factory Outlets, Inc.*