UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TECHTRONIC INDUSTRIES
COMPANY LIMITED and
TECHTRONIC INDUSTRIES FACTORY
OUTLETS, INC.

       Plaintiffs,

   v.

VICTOR BONILLA,

       Defendant.

Case No. 8:23-cv-01734-CEH-AEP

**OPPOSITION TO MOTION TO STRIKE AND EXCLUDE OPINIONS
AND REPORTS OF EXPERT J. CHRISTOPHER WESTLAND, PhD CPA**

## I.    __INTRODUCTION__

"[T]he rejection of expert testimony is the exception rather than the rule." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) (judgment reversed where district court's application of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) was manifestly erroneous) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments).

Proponents of expert testimony "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." Fed. R. Evid. 702 advisory committee's note to 2000 amendments. "The evidentiary requirement of reliability is lower than the merits standard of correctness." *Id.* (citation and quotations omitted).

In this defamation case, defendant Victor Bonilla ("Bonilla") proffers the expert testimony of one J. Christopher Westland, PhD CPA. "It is difficult to imagine how Dr. [Westland]'s experience could have been more extensive and relevant or contributed more to the reliability of the methodology [he] used." *Adams v. Laboratory Corp. of America*, 760 F.3d 1322, 1330 (11th Cir. 2014) (district court abused discretion in excluding expert testimony).

Dr. Westland is a Professor in the Department of Information & Decision Sciences at the University of Illinois, Chicago. His educational background includes a Bachelor of Arts degree in Statistics, a Master of Business Administration in Accounting from Indiana University and a Doctor of Philosophy

in Computers and Information Systems from the University of Michigan.

Dr. Westland has professional experience in the United States as a certified public accountant and as a consultant in technology law in the U.S., Europe, Latin America and Asia. He is the author of numerous academic papers and at least nine books. He is the Editor-in-Chief of *Electronic Commerce Research* (Springer) and has served on editorial boards of several other information technology journals.

Dr. Westland has taught at a number of domestic and overseas academic institutions, including the Hong Kong University of Science and Technology, Tsinghua University, University of Science and Technology of China, Harbin Institute of Technology and others. In 2012 he received High-Level Foreign Expert status in China under the 1000-Talents Plan and is currently Overseas Chair Professor at Beihang University. https://business.uic.edu/profiles/ westland-james-christopher/.

Plaintiffs Techtronic Industries Company Limited and Techtronic Industries Factory Outlets, Inc. (collectively, "TTI") putatively move to strike and exclude Dr. Westland's opinions and testimony under *Daubert*. Virtually every last one of TTI's attacks on this witness, however, actually go to the relative strength and persuasiveness — *i.e.*, weight — of his conclusions, rather than his expert qualifications or reliability.

"The weight to be given to admissible expert testimony is a matter for the jury." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 990 (11th Cir. 2016) (district court abused discretion by excluding expert) (citing *Quiet Tech. DC-8, Inc.*

*v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (no abuse of discretion in admitting expert testimony) ("it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence").

"[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702 advisory committee's note to 2000 amendments; *see also United States v. Alabama Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (same) (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311–12 (11th Cir.1999)).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595. "[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702 advisory committee's note to 2011 amendments.

Time and time again throughout its motion, TTI aims to undermine Dr. Westland by contradicting and critiquing his expert opinions themselves rather than his extensive professional qualifications or sound methodologies and reasoning. Because all such arguments go to the weight of the expert testimony rather than its reliability or admissibility, TTI's motion necessarily fails. *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, (11th Cir. 2011) ("in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility").

## II.  <u>ARGUMENT</u>

### A.    **Dr. Westland Fully Complied With Rules 26(a) and 37(c)**

Federal Rule of Civil Procedure 26(a) provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present" expert testimony as well as, *inter alia*, "the facts or data considered by the [expert] witness . . . ." Fed. R. Civ. P. 26(a)(2). "If a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Dr. Westland fully complied with the disclosure obligations of Rule 26(a). As set forth in his affirmative expert report dated July 26, 2024 (the "Report"), in forming his opinions he primarily considered (1) TTI's Complaint; (2) the First Report by Jehoshaphat Research of February 22, 2023; (3) the Second Report published by Jehoshaphat Research on June 5, 2023; (4) the Expert Report of Jeffrey W. Kopa, CFA; and (5) the Expert Report of Christopher M. Rubel, CPA/ABV. Report [Ex. 1 to Plaintiff's Motion to Strike] at 1–2; *accord*, Motion to Strike at 13, n.5 ("Westland testified that he reviewed only the pleadings and expert reports"), 19 (same).

Furthermore, Dr. Westland's rebuttal to TTI's expert reports also includes a three-page list of references to more than three dozen external authorities cited therein. Rebuttal at 70–72.

Finally, through counsel for Bonilla, on July 31, 2024 Dr. Westland provided

Excel spreadsheets containing additional backup data that he used in his analysis. Ex. 6 to Plaintiff's Motion to Strike at 1; *see* Fed. R. Civ. P. 26(e)(2) (affording opportunity to subsequently supplement "information included in the [expert] report and . . . information given during the expert's deposition").

TTI argues that Dr. Westland's "production on July 31 is insufficient because it is comprised solely of basic, publicly-available TTI historical equity data and contains no original analyses or supporting calculations of any kind." Motion to Strike at 16, n.6. But that is not what is required. Rule 26(a) plainly mandates disclosure of "the *facts* or *data* considered by the witness in forming" his or her opinions — *not* original analyses or supporting calculations. Fed. R. Civ. P. 26(a)(2)(B)(ii) (emphasis added). Whether those data may be basic or publicly-available is immaterial; Dr. Westland considered them, and so he provided them.

This is nothing like the district court decision upon which TTI relies, in which this Court barred a plaintiff's expert witness from testifying last year pursuant to Rule 37(c) after he completely "failed to timely provide a written expert report" whatsoever. *Parsons v. World Wrestling Entertainment, Inc.*, No. 21-cv-1428-CEH-AEP, 2023 WL 2187507, at *1–2 (M.D. Fla. Feb. 23, 2023). Bonilla timely delivered Dr. Westland's affirmative report on July 26, 2024. Ex. 6 to Plaintiff's Motion to Strike at 2.

Nor does this bear any resemblance to the only other (likewise unpublished and non-binding) case relied upon by TTI, wherein the plaintiff's expert improperly attempted to introduce 11 all-new exhibits during and after the

*Daubert* hearing 17 months after his Rule 26 disclosures. *Mitchell v. Ford Motor Co.*, 318 Fed. Appx. 821, 824–25 (11th Cir. 2009).

    **B.**    **Dr. Westland Is Qualified to Render Opinions About the ████████████ and the HKFRS**

TTI urges that Dr. Westland's opinions relating to the impact of the TTI stock price on its ██████████████████████████ and Hong Kong Financial Reporting Standards (the "HKFRS") should be excluded because he is not qualified to render them.

TTI relies on an erroneous articulation of the applicable law in support of its contention, however. Citing *United States v. Ahmed*, TTI incorrectly asserts that an expert witness "must explain *how* [his or her] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Motion to Strike at 16.

But that legal standard only applies "[w]hen a witness relies *primarily* on experience to form the basis of an expert opinion." *United States v. Ahmed*, 73 F.4th 1363, 1382 (11th Cir. 2023) (emphasis added, citation omitted). "To be sure, there are instances in which a district court may determine the reliability prong under *Daubert* based primarily upon an expert's experience and general knowledge in the field . . . ." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336, (11th Cir. 2010) (citation omitted). This is not such an instance.

Dr. Westland never purported to be opining about the ████████████ or HKFRS based "solely or primarily" on his own personal experience. Fed. R. Evid.

702 advisory committee's note to 2000 amendments. Rather, as Dr. Westland made clear, he arrived at his professional insights into TTI's employee compensation incentives (which the plaintiff never so much as once mentions in its Complaint) largely by reviewing information gleaned from the Expert Report of Jeffrey Kopa and certain publicly-available data TTI filed with the Hong Kong government as well as its annual reports and other online resources. Rebuttal, Aug. 9, 2024 [Ex. 2 to Plaintiff's Motion to Strike] at 51–59, 71–72. He then analyzed that information using such widely-accepted frameworks as the Black-Scholes model. *Id.*

Dr. Westland likewise makes his various points regarding the HKFRS not on his own experiences, but by comparing and contrasting them with Generally Accepted Accounting Principles which (as Dr. Westland points out several times) do not bind TTI, who instead follows HKFRS. Both are sets of objective, readily ascertainable accounting rules unrelated to one's personal experience.

In any event, as a certified public account who actually worked in Hong Kong as a chartered accountant and also having authored a variety of auditing textbooks and papers, Dr. Westland *is* of course thoroughly familiar with both sets of standards as well as others, such as the International Financial Reporting Standards. Deposition of J. Christopher Westland, PhD, Aug. 22, 2024 [Ex. 3 to Plaintiff's Motion to Strike] ("Westland Dep.") at 193:18–195:4; *see United States v. Frazier*, 387 F.3d 1244, 1260–61 (11th Cir. 2004) ("experts may be qualified in various ways. While scientific training or education may provide possible means to

qualify, experience in a field may offer another path to expert status.")

### C. Dr. Westland's Opinions Are Sufficiently Reliable

As an initial matter, TTI claims that Dr. Westland's opinions fail "because the facts he relied on were wrong." Motion to Strike at 19; *but see* Fed. R. Evid. 702 advisory committee's note to 2000 amendments (Rule 702 "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").

Specifically, TTI reiterates that (as discussed above) in forming his expert opinions, Dr. Westland considered the pleadings; Jehoshaphat Research's allegedly libelous First and Second Reports; and the information and conclusions contained in the written reports of TTI's own experts. He also relied (*inter alia*) on the dozens of external references listed in his bibliography. *See* Rebuttal at 70–72.

Although a pleading alone is not evidence, Dr. Westland still of course had to review TTI's complaint in order to understand what is (and is not) "in issue" in this proceeding. Fed. R. Evid. 702(a). And as TTI is only suing Bonilla for defamation, Dr. Westland was also obligated to analyze the First and Second Reports, which TTI attaches thereto. Complaint [Dkt. No. 1], Exs. 1–2.

Finally, Dr. Westland had to thoroughly analyze TTI's expert reports because the scope of his assignment included responding to them. Federal Rule of Evidence 702(b) "requires that expert testimony be based on sufficient underlying 'facts or data.' The term 'data' is intended to encompass the reliable *opinions of other experts*." Fed. R. Evid. 702 advisory committee's note to 2000 amendments

(emphasis added). Insofar as TTI is ready to concede that the written reports by its own expert witnesses "were wrong," Bonilla is of course ready to accept that admission. Motion to Strike at 19.

TTI identifies additional materials that Dr. Westland theoretically could also have read in formulating his expert opinions, such as voluminous discovery documents, other witnesses' testimony and sworn declarations, but that universe of hypotheticals is ultimately infinite, while Dr. Westland's time and scope of work (like those of every expert witness) were and are necessarily limited. *See* Fed. R. Evid. 702 advisory committee's note to 2011 amendments ("if the court finds it more likely than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility").

### 1.   Dr. Westland's Opinions About the Impact of the Two Reports On TTI's Investor Wealth Are Reliable

#### a.   Dr. Westland Does Not Reject the Efficient Market Hypothesis

TTI next attempts to set up a straw man fallacy by incorrectly suggesting that Dr. Westland "rejected decades of established consensus" surrounding the efficient market hypothesis ("EMH") and claimed instead that "new research has allegedly rendered EMH obsolete." Motion to Strike at 3, 20. He did no such thing. To the contrary, Dr. Westland indeed recognized, discussed and applied EMH throughout his analysis, explicitly taking it into account in the suite of event studies that he

conducted. *See*, *e.g.*, Report at 4–5; Rebuttal at 6–7, 35–36, 48–49.

Dr. Westland accurately observes that EMH has been subject to various critiques over the years but clearly does not reject it outright, as TTI unfairly implies. *See*, *e.g.*, Rebuttal at 7, 65 (citing Sanford J. Grossman and Joseph E. Stiglitz,[1] "On the Impossibility of Informationally Efficient Markets," *The American Economic Review*, Vol. 70, No. 3, at 393–408 (June 1980)); Westland Dep. at 225:2–230:4; *but see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendments (Rule "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise").

Rather, as a professional matter, Dr. Westland simply feels that that TTI's expert Jeffrey Kopa "is wrong about" EMH. Westland Dep. at 225:17–18.

### b.    Dr. Westland's Opinions Are Based On Accurate Facts

TTI criticizes Dr. Westland for using an event date of June 5, 2023 (*i.e.*, the date of the Second Report) when it was actually already June 6 in Hong Kong at the time Jehoshaphat Research published it. Dr. Westland acknowledged this discrepancy, but reiterated multiple times that "[i]t made no difference in my opinion or the result of the event study." Westland Dep. at 28:6–8.

"[B]oth with an event date of the 5th and with the event date of the 6th," he testified, "there is no change in either investor wealth or Techtronic's wealth due

---

[1] Professor Stiglitz is a recipient of the Nobel Prize in Economic Sciences.
https://www.nobelprize.org/ prizes/economic-sciences/2001/stiglitz/biographical/.

to the second JR report." *Id.* at 33:3–7. "I'm talking about the stock price movements around that particular date, not on that particular date." *Id.* at 167:22–24. "[W]hen you take this event window, around June 5th, which includes June 6th, and many days after that, . . . basically the stock price movements looked to be random." *Id.* at 168:7–10.

TTI also submits that Dr. Westland made mistakes about TTI's trading volume due to a supposed "misunderstanding" of how share prices worked between the U.S. and Hong Kong markets. Motion to Strike at 21 (citing Westland Dep. at 105:4–106:22) ("It has no impact on my report"). Dr. Westland in fact repeatedly tried during his deposition to explain the structure of American Depositary Receipts ("ADRs"), but counsel for TTI simply cut him off every time and refused to permit it. *See*, *e.g.*, Westland Dep. at 91:13–16, 93:15–19, 95:25–96:8 ("I can't answer the question without explaining ADRs"), 97:23–98:7.

TTI lastly nitpicks one single sentence in Dr. Westland's affirmative expert report: "The week of February 23, 2023 was one of the worst weeks for the stockmarket, as the market reacted to continued monetary tightening at the US Federal Reserve." Report at 4. TTI counters that the return on Standard and Poor's 500 index was lower during 12 out of the 52 weeks immediately preceding the business week ending Friday, February 24, 2023. So be it; even assuming that to be true, it does not disprove Dr. Westland's entirely accurate observation (which mentions neither a specific timeframe nor any particular market index) that the week "was *one of* the worst" (emphasis added).

### c.    Dr. Westland's Opinions Are Complete

Thus far in this litigation, Dr. Westland has already delivered more than 100 pages of painstakingly researched written analysis comprising numerous highly detailed figures and tables as well as a bibliography containing dozens of references. *See* Report; Rebuttal. He delivered exhaustive cross-examined expert testimony in a full-day deposition that lasted well past 7:00 p.m. Westland Dep. And yet, citing just one lone (yet again unpublished, non-binding) district court decision, TTI still faults him for somehow not doing enough work.[2]

The present case is not at all like *Powers v. Lazy Days' R.V. Ctr., Inc.*, where the plaintiffs' expert utterly "failed to show how he arrived at his opinion," which constituted "merely unsupported speculation." No. 8:05-cv-1542-T-17-EAJ., 2007 WL 1064215, at *3 (M.D. Fla. Apr. 4, 2007). He did "not set forth sufficient facts and data to support any conclusion of damages" in a cursory inspection report, "at the time of the deposition had still not formulated or finalized a[n] opinion" and thereafter neglected to file any subsequent opinion with the trial court. *Id.* Dr.

---

[2] TTI grossly misquotes and mischaracterizes Dr. Westland's deposition testimony in this regard, disingenuously claiming that he "admitted that he did not attempt to break down to what extent TTI's stock dipped due to macroeconomic trends on February 23 because it would take 'a lot of work.'" Motion to Strike at 21. What Dr. Westland actually said is, "There was a lot of work involved in the coding here." Westland Dep. at 336:3–5 (referring to core program code of event studies). TTI also falsely represents that Dr. Westland "agreed that he did not undertake the 'big project' of determining whether Bonilla's first report had *any* effect on investors." Motion to Strike at 21–22 (emphasis added). In reality, the witness was instead answering a question by TTI's examining attorney as to "*what percentage* of the price decline on [August] 23rd related to Mr. Bonilla's report, versus the Home Depot news, versus the circumstantial evidential leakage that you've talked about and to the macroeconomic factors." Westland Dep. at 318:18–22 (emphasis added). The witness responded, "I would need to do more research to be certain about any opinion I would render about that . . . . That's a big project." *Id.* at 319:1–12.

Westland, by contrast, carried all of his analyses through to their complete, relevant and useful conclusions.

      2.    **Dr. Westland's Opinions About the Impact of Bonilla's Reports On the ███████████████████ Are Reliable**

Near the end of his written report, TTI's expert Jeffrey Kopa opines that the First and Second Report injured the plaintiff by allegedly causing TTI to (1) █████ ████████████████████████████████████ in response to the First Report and (2) ██████████████████ in response to the Second Report. Expert Report of Jeffrey W. Kopa, CFA, July 12, 2024, at 57–62.

Dr. Westland challenges both points, demonstrating how "Mr. Kopa has cherry-picked both data and an *ad hoc* methodology that improperly prices the impact of stock price" on ██████████████████████. Rebuttal at 5, 51–59. "Sadly," he concludes, "Mr. Kopa's analyses of the ████████████ are oblique and fragmentary, seeming to back into a few tidbits of information from an arbitrary number suggested as the 'damages.'" *Id.* at 59.

TTI chastises Dr. Westland for ███████████████████████████ ████████████████████████ but, as he repeatedly testified, this is a distinction without any meaningful difference; █████████ ██████████ for all intents and purposes. Westland Dep. at 43:13–45:17.

      3.    **Dr. Westland's Opinions About the Accuracy of Bonilla's Reporting Are Reliable**

      a.    **Second Report**

In the Second Report published June 5, 2023, Jehoshaphat Research endeavors to estimate the minimum financial size of Direct Tools Factory Outlet ("DTFO") utilizing a variety of techniques. Complaint [Dkt. No. 1], Ex. 2 at 55–59. One of those various approaches involved analyzing DTFO's World Wide Web traffic and engagement as compared with other online retail sites with similar profiles. *Id.* at 56–57.

After carefully reviewing these various methods, Dr. Westland concludes in his affirmative report that the calculation of revenue for DTFO in the Second Report was "conservative," and that the comparison companies Jehoshaphat Research looked to were "appropriate" under the circumstances. Report at 25.

Although TTI tries to challenge the reliability of his conclusions, Dr. Westland more than adequately substantiates them. He explained that the estimate of DTFO's annual revenue used by Jehoshaphat Research — which was actually the smallest out of various values arrived at using the different methodologies (Complaint, Ex. 2 at 58) — appeared conservative because such "methods are appropriate, and similar methods are regularly used by top online Search Engine Optimization specialists." *Id.* Again, Dr. Westland is a professor of Information and Decision Sciences whose primary scholarly research focus has been data analytics and machine learning for the past three decades. *Id.* at 1.

Specifically, he lists the half dozen other companies whose retail websites were used as comparisons, together with their monthly visitor counts: 1.3 million; 2.5 million; 2.4 million; 946,000; 381,000; and 3.4 million, respectively. *Id.* at 25.

These figures "were pulled from Semrush which [is] generally considered the most reliable source of online marketing data." *Id.*; *accord*, Westland Dep. at 170:5–7 ("if you're in online, if you're in electronic marketing, then it's really the place to go for the statistics. And it looks in terms of not what they're making or what they're selling, but in terms of their web presence and their web volumes.").

"In my opinion," Dr. Westland reasons, "these are appropriate comparison companies to DTFO with 1,200,000 monthly visits." Report at 25; *accord*, Westland Dep. at 170:10–12 ("It looks like these are the best comparables. And he's chosen the right ones."). Contrary to TTI's intimation, Dr. Westland did not just blindly take Bonilla at his word[3] that the methods and comparison companies Bonilla used were appropriate. Motion to Strike at 23.

Dr. Westland arrived at his conclusions as "an expert in this particular area. . . . I'm editor in chief of probably the foremost, Electronic Commerce Journal for research, Electronic Commerce Research, which is Springer Journal. I also teach a class in the area, and I've written a widely used book on the subject." *Id.* at 17–23. Although TTI complains that he "didn't use any scientific methodology" to reach his conclusions, this defamation case does not involve science *per se*, and in fact none of the parties' experts (including Dr. Westland) are scientists. Motion to Strike at 23.

"Some types of expert testimony will be more objectively verifiable, and

---

[3] In fairness, Dr. Westland instead testified that he "took [Bonilla] at his word" that the *monthly visitor counts* were accurately reported from Semrush. Westland Dep. at 175:4–5. "Certainly he's not misreporting the monthly traffic here." *Id.*

subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

### b.     First Report

Turning to the First Report published by Jehoshaphat Research on February 22, 2023, Dr. Westland testified during his deposition that he feels Bonilla's "language is bombastic, but that's the nature of people who put out news like this. We live in a world of shock jocks. And I think his language is intended to incite, to get people excited to read his reports." Westland Dep. at 211:8–12.

Importantly, Dr. Westland did *not* affirmatively express this same opinion in either of his written reports, and provided it only in direct response to a series of provocative questions asked by counsel for TTI. *Id.* at 210:4–7 ("you'd agree with me, would you not, that the . . . overriding thesis of Mr. Bonilla's first report is that TTI is committing financial fraud?"), 210:13 ("Accounting fraud?"), 210:16 ("Cooking the books?"), 210:23 ("Well, how do you describe it?").

TTI now attacks the two sentences of Dr. Westland's testimony quoted above as impermissible speculation regarding others' motives. Motion to Strike 23. If the plaintiff does not wish to elicit such statements at trial, then the solution is readily apparent: Simply do not pose such questions to the witness in the first place.

### 4.    Dr. Westland's Opinion About "Leakage" Is Reliable

Dr. Westland opines that much if not "most of the information content of the first Jehoshaphat Research (JR) report on February 23, 2023 had already leaked into the marketplace by February 20, 2023, three days before the JR report." Rebuttal at 3. In support of his assertion, he demonstrates an actual, documented "rapid decline in Techtronic Industries stock price from February 20, 2023 to February 23, 2023." *Id.* at 10; *see also* Figure 1. "Such information leakage is common, and an active area of research by academics," of which Dr. Westland (a University of Illinois Chicago professor) is one. *Id.*

He then lists and summarizes the leading literature in "this intensely studied field," which "has been an area of significant interest among financial scholars and market observers." *Id.* at 9–10 (citing at least 10 different third-party references, including journal articles). Such peer-reviewed sources support Dr. Westland's conclusion "that there's [a] possibility there could have been some kind of leakage because we expect to see it in these situations." Westland Dep. at 199:8–17.

TTI feigns umbrage at Dr. Westland's "baseless, disparaging accusation that TTI's executives were engaged in illegal trading . . . ." Motion to Strike at 24. But this is just another straw man argument, as he never specifically made such an allegation against TTI in particular.

Dr. Westland just generally explained that, "in event studies, it's typical[] to put a gap between the estimation window and the event window" because "*it's common across **all** shares of stock* for there to be leakage of information from

future earnings reports." Westland Dep. at 197:17–21 (emphasis added); *accord*, Rebuttal at 9 (citing, *e.g.*, Wharton Research Data Services); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("experts might instruct the factfinder . . . on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case").

This observation is extensively supported and illustrated in the body of peer-reviewed literature on leakage upon which Dr. Westland relies.  "[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected. The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–94 (1993) (citations omitted).

### D.   Dr. Westland's Testimony Will Be Helpful to the Factfinder

An expert's testimony should "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see Kilpatrick*, 613 F.3d at 1335 ("the testimony must assist the trier of fact through the application of expertise") (citation omitted).

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation and quotations omitted). "This condition goes primarily to relevance," and the "basic standard of

relevance . . . is a liberal one." *Id.* at 591, 587 (citing Fed. R. Evid. 401) (evidence relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence).

Dr. Westland proffers expert testimony on a number of highly relevant issues that lie at the very heart of this case but well "beyond the ken of the average juror" — at least, one who is not an accountant or a finance expert. *Grayson v. No Labels, Inc.*, 599 F.Supp.3d 1184, 1190 (M.D. Fla. 2022); *see also* Fed. R. Evid. 702 advisory committee's note ("There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute").

Those issues include, for example (and without limitation): (1) GAAP vs HKFRS accounting; (2) the "correct" price of TTI stock; (3) Jehoshaphat Research's Second Report; (4) Receivables accounting; and (5) Capital assets accounting. Report at 2, *passim.*

Cherry picking a handful of lines from the transcript of Dr. Westland's deposition, TTI complains that he offered "narratives as purported basis and advocacy" in testimony that the plaintiff elicited. Motion to Strike at 24–25. Turning to the cited passages, however, it is evident that Dr. Westland did not do so. *See id.* (citing Westland Dep. at 221:6-8, 223:22-25, 67:11-68:9, 211:13-18).

Even if hypothetically Dr. Westland were to improperly offer a narrative

opinion reflecting assumed facts not in evidence at trial, then TTI's remedies would simply be to make a timely, specific objection to the Court and/or move to strike his answer at the appropriate point — but certainly not to completely bar the expert from testifying whatsoever. *See* Fed. R. Evid. 103(a)(1).

## III.   **CONCLUSION**

For the foregoing reasons, the motion to strike and exclude the expert opinions and reports of Dr. J. Christopher Westland should be denied. *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341–42 (11th Cir.2013) (reversing exclusion of portion of expert's testimony).

Dated: October 22, 2024

By: */s/ Dilan A. Esper*
Dilan A. Esper (*pro hac vice*)
desper@harderllp.com
Charles J. Harder (*pro hac vice*)
charder@harderllp.com
Harder Stonerock LLP
6300 Wilshire Boulevard,
Suite 640
Los Angeles, CA 90048
Telephone: (424) 203-1600

Respectfully submitted,

By: */s/ Jonathan R. Weiss*
Jonathan R. Weiss (FBN: 57904)
Jonathan.weiss@squirepb.com
Squire Patton Boggs (US) LLP
200 S. Biscayne Boulevard,
Suite 3400
Miami, Florida 33131
Telephone: (305) 577-7000

Bradley W. Crocker (FBN: 118616)
Bradley.crocker@squirepb.com
Squire Patton Boggs (US) LLP
777 S. Harbour Island,
Suite 420
Tampa, Florida 33602
Telephone: (813) 202-1300

*Attorneys for Defendant Victor Bonilla*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 22, 2024, the foregoing document

was electronically filed with the Clerk of Court using CM/ECF, which will

electronically send a notice of electronic filing to Plaintiff's attorneys of record

| | |
|---|---|
| Jason Sternberg (*pro hac vice*) | Kristin Tahler (*pro hac vice*) |
| Quinn Emanuel Urquhart Sullivan LLP | Quinn Emanuel Urquhart Sullivan LLP |
| 2601 South Bayshore Dr., Ste 1550 | 865 S. Figueroa St., 10th Floor |
| Miami, FL 33133 | Los Angeles, CA 90017 |
| jasonsternberg@quinnemanuel.com | kristintahler@quinnemanuel.com |
| | |
| David A. Nabors | Nicholas Inns (*pro hac vice*) |
| Fla. Bar No. 1024722 | Quinn Emanuel Urquhart Sullivan LLP |
| Quinn Emanuel Urquhart Sullivan LLP | 1300 I Street, NW, Suite 900 |
| 2601 S. Bayshore Drive, Suite 1550 | Washington, D.C. 20005 |
| Miami, FL 33133-5417 | nicholasinns@quinnemanuel.com |

*/s/ Dilan A. Esper*
Attorney