# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

TECHTRONIC INDUSTRIES
COMPANY LIMITED and
TECHTRONIC INDUSTRIES
FACTORY OUTLETS, INC.,

      Plaintiffs,

v.                                                              Case No: 8:23-cv-1734-CEH-AEP

VICTOR BONILLA,

      Defendant.

_____/

## O R D E R

In this defamation action, Plaintiffs Techtronic Industries Company Limited and Techtronic Industries Factory Outlets, Inc. (collectively "TTI" or "Plaintiffs") sue Defendant Victor Bonilla ("Bonilla" or "Defendant") for libel and libel per se following Bonilla's publication of two "research reports" asserting TTI's purported corporate malfeasance. This matter is before the Court on the parties' cross motions for summary judgment (Docs. 92, 101), the responses in opposition (Docs. 107, 105),[1] and the parties' replies (Docs. 114, 115). Additionally, the parties filed a Joint Statement of Stipulated Facts. Doc. 104. The Court heard argument on the motions on July 2 and 3, 2025. Upon due consideration of the parties' arguments and submissions, including deposition transcripts, declarations, memoranda of counsel

---

[1] The unredacted versions of the motions (Docs. 94-26, 102-1) and responses (Docs. 109-1, 111-31) were filed under seal.

and accompanying exhibits, and for the reasons that follow, the Court will grant-in-part and deny-in-part the parties' motions.

## I.    BACKGROUND[2]

### A.    Undisputed Facts[3]

Bonilla publishes reports on publicly traded companies on his website, Jehoshaphat Research. Doc. 104 ¶ 1. Prior to September 2023, Bonilla operated Jehoshaphat Research pseudonymously without identifying himself as the author of the reports published on Jehoshaphat Research's website. *Id.* ¶ 2. Bonilla pseudonymously published a report about Techtronic Industries Co. Ltd. on February 22, 2023. *Id.* ¶ 3. On the day the First Report was published, TTI released a one-sentence announcement that trading of its shares was being halted (Doc. 93-18) and then the next day a one-and-a-half-page statement denying the allegations in the Report (Doc. 93-19). On March 1, 2023, TTI released an 11-page clarification announcement asserting the First Report is one-sided, misleading, and its conclusions are incorrect. Doc. 93-20. Bonilla pseudonymously published a report about TTI dated June 5, 2023.[4] Doc. 104 ¶ 4. On June 6, 2023, TTI issued a clarification statement

---

[2] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' Joint Statement of Stipulated Facts (Doc. 104). For purposes of summary judgment, the Court presents the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

[3] These facts are taken from the parties' Joint Statement of Stipulated Facts (Doc. 104), except where noted otherwise.

[4] Because of the time change, the Second Report was published in Hong Kong on June 6, 2023.

asserting that the Report was grossly inaccurate and misleading. Doc. 93-21. The parties do not dispute that the exhibits (Docs. 1-1, 1-2) are an accurate reflection of the two reports published. Doc. 104 ¶¶ 3, 4.

TTI manufactures brands including Ryobi, Milwaukee, Hoover, Oreck, and Dirt Devil. *Id.* ¶ 8. It is a publicly traded Hong Kong company, whose stock is traded on the Hong Kong Stock Exchange. *Id.* ¶¶ 5, 6. TTI's revenue is more than $13 billion and its market capitalization is nearly $20 billion. *Id.* ¶ 7. TTI sells goods in its factory outlet stores ("DTFO stores") that it labels as "blemished." *Id.* ¶ 14.

TTI entered into a Strategic Initiative Agreement with Home Depot in April 2003, which provided for Home Depot to have exclusive rights to sell certain merchandise in Home Depot stores. Doc. 94-13 ("the Home Depot Agreement"). Relevant to the pending dispute, the Home Depot Agreement included a section labeled "Reconditioned, Obsolete, and Excess Inventory." *Id.* at 11. In sum, this section provided that Home Depot was entitled to notice and the first right of refusal to purchase any reconditioned, obsolete or excess inventory of the exclusive merchandise before it can be sold by TTI to third parties. *Id.* The Home Depot Agreement does not use the term "factory blemished."

TTI publishes its financial results twice per year and prepares its financial statements in accordance with the Hong Kong Financial Reporting Standards ("HKFRS"). *Id.* ¶¶ 9 10. HKFRS defines property, plants, and equipment ("PP&E") to include "tangible items … for use in the production of goods" and allows capitalization of the cost of those items "if and only if it is probable that future

economic benefits associated with the item will flow to the entity, and the cost of the item can be measured reliably." *Id.* ¶ 11. HKFRS provides principles for accounting of accounts receivable, including that a company estimate its credit losses using a "practical expedient" such as a matrix based on the number of days past due or the company's historical credit loss experience. *Id.* ¶ 12. Every year from at least 2008 until 2023, Deloitte audited TTI's financial statements and stated in its audit opinion that the statements "give a true and fair view of the consolidated financial position" of TTI. *Id.* ¶ 13. TTI reported increased gross margin in 19 semiannual accounting periods in a row. *Id.* ¶ 15.

### B.    Procedural History

On June 30, 2023, TTI's counsel sent a letter to Victor Bonilla and Jehoshaphat Research in Tampa, Florida regarding the "malicious campaign of defamation, market manipulation and trade libel" against TTI. Doc. 105-41. The letter indicates that Bonilla's "claims are not only false" but also "reflect[] an utter disregard for truth" in his quest to enrich himself. *Id.* at 2. On August 3, 2023, TTI sued Bonilla and Justin Roberts for libel and libel per se. Doc. 1. On August 23, 2023, TTI dismissed Justin Roberts without prejudice. Doc. 11. On December 11, 2023, the Court denied Bonilla's Motion to Dismiss the two-count complaint (Doc. 39), and Bonilla filed his answer on December 26, 2023 (Doc. 39, 41).

With leave of Court, TTI filed a two-count Amended Complaint on July 1, 2025. In the Amended Complaint, TTI sues Bonilla for libel and libel per se and seeks actual and special damages, punitive damages, costs and attorney's fees, an order

requiring Bonilla to retract all previously published defamatory statements, and any other just and appropriate relief. Doc. 68. Bonilla answered on July 15, 2024, and raised nine affirmative defenses. Doc. 72. The affirmative defenses asserted include that Plaintiffs' claims are barred by the First Amendment; Plaintiffs' damages are the result of its own conduct or the conduct of others beyond Bonilla's control; Plaintiff has failed to mitigate its damages; Bonilla is immune from punitive or non-pecuniary damages; Plaintiffs' delay in asserting its claims prejudiced Bonilla; Plaintiffs' claims are barred by the doctrine of unclean hands; Bonilla's actions are protected by state, federal, and common law privileges; Plaintiffs' lawsuit is a strategic lawsuit against public participation and is barred by Florida law; and Plaintiffs failed to serve timely notice under Fla. Stat. § 770.01 with respect to each report identifying the allegedly defamatory statements. Doc. 72.

On October 1, 2024, Plaintiffs filed a motion for partial summary judgment seeking judgment in their favor on the issues of falsity of Bonilla's statements and that TTI is not a public figure. Doc. 92. Bonilla responded that his statements are true and/or non-actionable opinions and that TTI, which is a multi-billion dollar, publicly-traded company, is a public figure. Doc. 107.

On October 18, 2024, Bonilla filed a motion for summary judgment seeking judgment in his favor on both claims arguing that TTI failed to comply with Florida's statutory notice requirements for suing a media defendant for defamation; his statements are opinions protected by the First Amendment and are not defamatory; because TTI is a public figure, Plaintiffs must show actual malice, which they fail to

do; and even if Plaintiffs are private figures, Bonilla argues he had reliable sources and was not negligent. Doc. 101.

### C.    Defendant's Reports

#### 1.  First Report (Doc. 1-1)

On February 22, 2023, Bonilla published on the internet a "research report" about TTI on the website Jehoshaphat Research ("the First Report"). The First Report included a footnote on the first page that states: "This report consists of <u>our opinions only</u> and is not investment advice. We are short the securities of this company. The Disclaimer at the end of this report is an integral part of this document. We are biased and self-interested, just like you and every other investor." Doc. 1-1 at 2 (emphasis in original); *see also* Doc. 1-1 at 53 ("Disclaimer"). In their Amended Complaint, TTI claims the following statements from the report are false:

- TTI has "been inflating its profits dramatically for over a decade with manipulative accounting."
- TTI's financial reports are a "web of deceit."
- TTI's operating income is "overstated by 40-70% by accounting games"; decade-long success is evidence of accounting trickery
- "TTI's financials are littered with evidence of costs being deceptively managed downward."
- "TTI's balance sheet has become a vast toxic graveyard where the accounting bodies are buried."
- TTI was improperly refusing to write down certain overdue debts despite accountants saying the accounts should be discounted or written off entirely
- TTI is "literally struggling to pay its bills on time" and "failing to pay [its suppliers and vendors] within existing [payment] terms."

Doc. 68 ¶¶ 36, 38, 39, 40, 41. TTI claims each of these statements is false and accuses Bonilla of making wildly speculative and false conclusions using intentionally

inflammatory language. *Id.* ¶¶ 37, 49. On the day the First Report was published, TTI's stock dropped approximately 20%. Doc. 94-19 ¶ 5.  The Hong Kong stock exchange stopped trading on the stock mid-day. Doc. 93-18; Doc. 94-18 at 10.

2.  Second Report (Doc. 1-2)

On June 5, 2023, Bonilla published on Jehoshaphat Research his "Second Report" about TTI in which he asserted that TTI engaged in systematic fraud of TTI's biggest customer, Home Depot. Doc. 1-2. The Second Report included similar disclaimer language. *See* Doc. 1-2 at 2, 68. The Second Report claimed that TTI labels hundreds of thousands of products as "factory blemished" so that it can sell the products at its direct factory outlet stores ("DFTO") instead of to Home Depot to sell.

The Amended Complaint alleges the following assertions from the Second Report are false:

- TTI "was systematically defrauding Home Depot" perpetrating a multi-billion dollar "scam"
- TTI fraudulently labels hundreds of thousands of its products as "factory blemished" so that it can sell them through its DFTO stores.
- "What if TTI's insane profit margins aren't due simply to accounting games, but also to outright contractual and product diversion fraud against its biggest, and rather powerful, customer?"
- "Interviews with former Home Depot & TTI executives confirm it: TTI has successfully deceived Home Depot."
- "Multiple former TTI employees indicate that TTI has used the 'factory Blemished' nomenclature specifically to deceive Home Depot."

Doc. 68 ¶¶ 60, 62, 69. On the day the Second Report was published, TTI's share price dropped 4.7%.  *Id.* ¶ 90.

### D.    The Parties' Filings

In support of their respective motions, the parties filed numerous depositions, declarations and exhibits. Among other documents, TTI filed copies of its annual reports from 2014 to 2023; TTI's management and accounting policies; the "Strategic Initiative Agreement" with Home Depot; information regarding DTFO inventory for 2021, 2022, and 2023; email communications with Home Depot; deposition excerpts of David Stearns and Katherine Helf; a declaration of Helf; TTI press releases; TTI's press release following publication of the Jehoshaphat Reports; expert reports of Jeffrey Kopa and Christopher Rubel; discovery responses; TTI's notice letter of June 30, 2023. Docs. 93, 94, 110, 111. In support of his motion, Bonilla filed the expert report of Christopher Rubel; deposition excerpts of Katherine Helf and David Stearns; the Home Depot agreement. Docs. 102, 109.

## II.    APPLICABLE LAW

### A.    Summary Judgment Legal Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show

the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir.

1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

### B.    Defamation

As a federal court sitting in diversity jurisdiction, the Court applies Florida's substantive law to TTI's defamation claims. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Defamation under Florida law has five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory. *Jews For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Under Florida law, a "communication is 'defamatory' if it tends to harm the reputation of another as to lower him or her in estimation of community or deter third persons from associating or dealing with the defamed party." *McQueen v. Baskin*, 377 So. 3d 170, 176 (Fla. 2d DCA 2023) (quoting *Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002)). Defamation comes in one of two forms: libel (expressed in print) or slander (spoken or oral defamation). *Cooper v. Miami Herald Pub. Co.*, 31 So. 2d 382, 384 (Fla. 1947); *Scott v. Busch*, 907 So. 2d 662, 666 (Fla. 5th DCA 2005). The elements for both forms of defamation are the same.

TTI sues Bonilla for libel and libel per se.[5] "[A] publication is libelous per se, or actionable per se [against a nonmedia defendant], if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *McQueen*, 377 So. 3d at 177 (quoting *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953)).

## III. DISCUSSION

### A. Notice

Bonilla seeks summary judgment on his Ninth Affirmative Defense that TTI failed to comply with the requirements of Fla. Stat. § 770.01 by not providing timely notice with respect to either report and in failing to identify the allegedly defamatory statements. Doc. 72 at 14. Specifically, Florida Statute Section 770.01 provides: "Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory." Fla. Stat. § 770.01.

Bonilla asserts that he is entitled to summary judgment on his defense of inadequate notice under § 770.01 because the letter from TTI's counsel failed to

---

[5] "[L]ibel per se is no longer a viable doctrine where the defendant is a member of the news media and the plaintiff cannot demonstrate 'actual malice' on the part of the defendant." *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981). As discussed in this Order, *see infra,* section III(A), the Court concludes that Bonilla is not a media defendant.

identify the specific statements that TTI claimed were false and defamatory. In response to Bonilla's motion, TTI argues that it provided Bonilla with pre-suit notice. Doc. 105 at 13. After identifying Bonilla as the author of Jehoshaphat Research, counsel for TTI sent a letter to Bonilla demanding retraction of the Reports. *See* Doc. 105-41. Bonilla asserts that the letter falls far short of complying with the notice requirements of § 770.01, because the letter failed to specify the statements alleged to be false and defamatory. Indeed, the Court notes the letter lacks any specificity, instead claiming: "Your lies do not warrant a point-by-point refutation." Doc. 105-41 at 2. However, TTI takes the position that it provided a detailed refutation of Bonilla's claims in its statement to the press following the publication of the Reports, and TTI cites to Bonilla's admission in his deposition that he was aware of and had read TTI's statements. Although the refutations in the press themselves do not satisfy the requirements of § 770.01, the Court need not reach the sufficiency of counsel's notice letter[6] because Bonilla, a non-media defendant, was not entitled to notice in the first instance.

---

[6] TTI filed a notice of supplemental authority (Doc. 166) citing the Eleventh Circuit's unpublished opinion in *Rendón v. Bloomberg L.P.*, No. 19-14046, 2025 WL 1482420 (11th Cir. May 23, 2025), for the proposition that a defamation plaintiff providing notice under section 770.01 need only "specify with particularity" the problematic statements, and no more. *Id.* at * 5–6. The *Rendón* court held that the district court's requirement that the notice letter specify verbatim the quotations objected to is neither required by the statute nor Florida law. *Id.* at *6. *Rendón's* holding does not salvage the deficiencies in TTI's notice letter here, however, because the letter wholly fails to state with particularity the problematic statements in Bonilla's Reports, instead only stating that the claims are "utter falsity."

TTI contends that Fla. Stat. § 770.01 applies only to "news media" defendants, which they urge Bonilla and Jehoshaphat Research are not. The Court agrees. Under Florida's defamation law, a prospective plaintiff is required to give a media defendant five days' notice before initiating a civil action. *See Zelinka v. Americare Healthscan, Inc.*, 763 So. 2d 1173, 1175 (Fla. 4th DCA 2000) ("Every Florida court that has considered the question has concluded that the presuit notice requirement applies only to 'media defendants,' not private individuals.") (collecting cases). Florida courts have interpreted the difference between a non-media and a media defendant as separating "third parties who are not engaged in the dissemination of news and information through the news and broadcast media from those who are so engaged." *Mancini v. Personalized Air Conditioning & Heating, Inc.*, 702 So. 2d 1376, 1380 (Fla. 4th DCA 1997).

In support of his position that he falls within the purview of defendants entitled to notice under § 770.01, Bonilla relies on *Comins v. Vanvoorhis*, 135 So.3d 545 (Fla. 5th DCA 2014), in which that court found a blogger Vanvoorhis' website called "Public Intellectual" was an "other medium" entitled to pre-suit notice under § 770.01. Bonilla urges that his website, Jehoshaphat Research, similarly fits within the statute's "or other medium" language, entitling him to notice. An analysis of the *Vanvoorhis* decision and Florida caselaw suggests otherwise. Significant to finding that Vanvoorhis was a media defendant entitled to notice under § 770.01 was the court's determination that the purpose of his blog was informational, freely disseminating news and providing "disinterested and neutral commentary or editorializing as to

13

matters of public interest." *Vanvoorhis*, 135 So. 3d at 557. Relying on the Florida Supreme Court's opinion in *Ross v. Gore*, 48 So.2d 412 (Fla. 1950), the *Vanvoorhis* court emphasized "[n]ot only . . . the importance of the dissemination of facts, but . . . also . . . the importance of the dissemination of 'fair comment' and 'analytical criticism.'" *Vanvoorhis*, 135 So. 3d at 557.

With this backdrop, recent Florida caselaw finds that in defining the term "media defendant" courts should focus on "whether the defendant engages in the traditional function of the news media, which is to initiate uninhibited, robust, and wide-open debate on public issues." *McQueen*, 377 So. 3d at 180 (citations and internal quotation marks omitted). Thus, "even though the 'other medium' language expanded section 770.01 to cover new technologies used to disseminate the news, such as internet publishers and blogs, it did not expand the reach of the statute beyond the news media." *Id.* "That the internet constitutes a[n] 'other medium' for the purposes of § 770.01 should be well-settled." *Five for Ent. S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1327 (S.D. Fla. 2012). But that is not the issue here. Rather, the issue is whether Bonilla is the type of defendant contemplated under § 770.01 to receive pre-suit notice. That is, are the Jehoshaphat Reports intended to be a vehicle for the "free dissemination of information *or* disinterested and neutral commentary"? *See McQueen*, 377 So. 3d at 179–80 (emphasis in original). Not likely. On the first page of his reports, Bonilla proclaims: "We are biased and self-interested, just like you . . . ." Doc. 1-1 at 2; Doc. 1-2 at 2. The "Disclaimer" at the end of the Reports similarly makes clear that the author is neither disinterested nor neutral. *See, e.g.,* Doc. 1-1 at 53 ("We have a lot

of bias and incentives . . ."; "we may have non-aligned or even directly opposing incentives from yours"). Given his own representations of self-interest and bias in his publications, Bonilla does not qualify as a media defendant as contemplated by the Florida courts for purposes of being entitled to notice under § 770.01.

## B.    Falsity

Having determined that Bonilla was not entitled to notice under § 770.01, the Court next considers whether the elements of TTI's defamation claims have been met. There is no dispute that the first element of a claim for defamation—publication—is satisfied. Thus, the Court turns to the second element—falsity. TTI moves for partial summary judgment as to the falsity of Bonilla's statements in his two reports. In sum, TTI contends that Bonilla falsely stated in the First Report that TTI engaged in manipulative accounting practices for over a decade to inflate profits and in the Second Report that TTI defrauded its biggest customer, Home Depot. Bonilla responds that the statements are colorful rhetoric and non-actionable opinions, and to the extent any statements are factual, he submits he got only one fact wrong.

True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment. *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714–15, 717 (11th Cir. 1985) (applying Florida law). Under Florida law, a defendant publishes a "pure opinion" when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public. *Turner v. Wells,* 879 F.3d 1254 (11th Cir. 2018)

(citing *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52, 57 (Fla. 1st DCA 1981)).

Whether the statement is one of fact or opinion and whether a statement of fact is

susceptible to defamatory interpretation are questions of law for the court. *Keller*, 778

F.2d at 715. The Eleventh Circuit adopted the following framework from the Ninth

Circuit:

> In determining whether an alleged libelous statement is
> pure opinion, the court must construe the statement in its
> totality, examining not merely a particular phrase or
> sentence, but all of the words used in the publication. The
> court must consider the context in which the statement was
> published and accord weight to cautionary terms used by
> the person publishing the statement. All of the
> circumstances surrounding the publication must be
> considered, including the medium by which it was
> disseminated and the audience to which it was published.

*Keller*, 778 F.2d at 717 (quoting *Information Control Corp. v. Genesis One Computer Corp.*,

611 F.2d 781, 783–84 (9th Cir. 1980)). Additionally, "Florida recognizes the

substantial truth doctrine" which notes that "a statement does not have to be perfectly

accurate if the 'gist' or the 'sting' of the statement is true." *Readon v. WPLG, LLC*, 317

So. 3d 1229, 1234 (Fla. 3d DCA 2021) (quoting *Smith v. Cuban Am. Nat'l Found.*, 731

So. 2d 702, 706 (Fla. 3d DCA 1999)).

  a.  First Report

  As a preliminary matter, it is for this Court to decide, as a matter of law, whether

Bonilla's statements are actionable expressions of fact or nonactionable expressions of

rhetorical hyperbole or pure opinion. *Flynn v. Wilson*, 398 So. 3d 1103, 1111 (Fla. 2d

DCA 2024), *rev. denied*, No. SC2025-0065, 2025 WL 1009410 (Fla. Apr. 2, 2025)

16

(citing *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984) ("Whether a statement is one of fact or one of opinion is a question of law."); *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379 (S.D. Fla. 2006) ("It is for the Court to decide, as a matter of law, whether the complained of words are actionable expressions of fact or non-actionable expressions of pure opinion and/or rhetorical hyperbole."). Thus, the Court must look to each statement TTI claims is false and defamatory.[7]

TTI argues that Bonilla's statements are factual and are false. TTI submits that the Court has already rejected Bonilla's arguments to the contrary in ruling on the motion to dismiss. However, in ruling on the motion to dismiss, the Court was required to accept all of TTI's well-pleaded allegations as true. Now, in considering the statements on summary judgment, in their totality and in context as *Keller* instructs, with the benefit of a more fully developed record and oral argument, many of the factual statements that TTI asserted were false are in fact accurate.

TTI argues that Bonilla's First Report accuses TTI of "inflating its profits dramatically over a decade with manipulative accounting." Doc. 92 at 20 (citing Doc. 1-1 at 2). Specifically, Bonilla reported that TTI's "Operating Income [is] Overstated by ~40-70%" and that "TTI's [Earnings] [are] Inflated by ~40-70% Through a Series of Accounting Manipulations." Doc. 92 at 8 (citing Doc. 1-1 at 2, 9). Bonilla's use of

---

[7] As discussed at the hearing, part of the difficulty for the Court in so doing, particularly with respect to the statements in the First Report, is that the statements complained of in the Amended Complaint are not exactly what was argued in TTI's motion. *Compare* Doc. 68 ¶¶ 36–47, 53, *with* Doc. 92 at 7–8. Be that as it may, the statements identified by TTI in the First Report are either not false or are nonactionable opinion.

the terms "manipulative accounting" and "accounting games" are nonactionable opinion or colorful rhetoric. Similarly, Bonilla's statement (referenced in ¶ 30 of the Amended Complaint) that "TTI's balance sheet has become a vast toxic graveyard where the accounting bodies are buried" is the type of hyperbole courts find to be nonactionable.[8] *See Flynn*, 398 So. 3d at 1111 ("The First Amendment protects statements that cannot reasonably [be] interpreted as stating actual facts about an individual.") (internal quotation marks and citations omitted).

In the motion for partial summary judgment, TTI primarily argues five categories of information in Bonilla's First Report from which the purported 40-70% overstatement derives that TTI asserts contain false statements. *See* Doc. 92 at 8. These five topics are raised in TTI's motion and were argued by the parties at the hearing. After careful consideration of the challenged five categories of statements which TTI asserts are false and defamatory, the Court finds the statements made by Bonilla in these five categories are either not false or are opinions derived from facts set forth in the publication. *See Ozyesilpinar v. Reach PLC*, 365 So. 3d 453, 459 (Fla. 3d DCA 2023) (quoting *Skupin v. Hemisphere Media Grp., Inc.*, 314 So. 3d 353, 356 (Fla. 3d DCA 2020) ("A statement is pure opinion when it is 'commentary or opinion based on facts that are set forth in the subject publication or which are otherwise known or available to the reader or listener.'")).

---

[8] Clearly, there is no suggestion or belief that actual bodies of accountants are buried in the balance sheets.

18

First, TTI argues that Bonilla falsely reported TTI overcapitalized development costs to massage its earnings which overstated TTI's income by more than $200 million.[9] In its motion, TTI argues that under the HKFRS, development costs are capitalized if, subject to TTI's internal controls, they meet certain criteria. Doc. 92 at 11. TTI submits its expert report in support. *Id.* In discussing this representation at the hearing, TTI's counsel acknowledges that it was permitted under Hong Kong Financial Reporting Standards to capitalize its development costs. Doc. 172 at 20. Thus, TTI is not challenging the underlying facts but rather the conclusions Bonilla drew from those facts, i.e., that TTI deferred too much in development costs, and his opinions why they did so.

Second, TTI challenges Bonilla's statement that TTI "stuffed nonsense" into property, plant and equipment (PP&E), thereby overvaluing that asset on its financial statements.[10] "Stuffed nonsense" is certainly nonactionable hyperbole. And, again, TTI does not dispute it has large depreciation of PP&E on its balance sheet. Doc. 172 at 22 ("Mr. Bonilla got that right."). Instead, it takes issue with Bonilla's characterization and opinion about the depreciation. But TTI explains that PP&E is

---

[9] The over-capitalization of costs is referenced briefly in the Amended Complaint. *See* Doc. 68 ¶ 39. TTI argues the following claim by Bonilla in the First Report is false: "'TTI's financials are littered with evidence of costs being deceptively managed downward' through capitalization of costs and under-depreciation of capital assets." Doc. 68 ¶ 39. While the First Report includes the first half of that sentence, TTI fills in the second part based on its review and summary of Bonilla's opinions.

[10] The Amended Complaint references Bonilla's comments regarding the alleged under-depreciation" and explains that TTI depreciates its capital assets in accordance with accepted accounting standards. Doc. 68 ¶¶ 39, 44

depreciated according to a set schedule and sold or disposed of when no longer useful. However, because some PP&E contains proprietary tools and molds, TTI cannot sell it on the open market and therefore it must be sold as scrap, which is less than what it was valued on the books as a useful tool. Doc. 92 at 12. Review of Bonilla's discussion of the purported capitalization in the First Report reveals his commentary is filled with rhetorical questions (How could the value of these PP&E assets have been so inflated?), colorful hyperbole ("This struck us as odd, but maybe it was a one-off with a good explanation? It's not. This garbage has been happening every year in a row since 2012"), and even a disclaimer: "We aren't saying that TTI is short simply because it has overvalued assets." Doc. 1-1 at 17–18. These are opinions and nonactionable commentary.

Third, TTI objects to Bonilla's statement that TTI was treating money that was past due as "money good" even though it could have been written off.[11] TTI is not claiming that Bonilla defamed it because they have debt that is over 90 days old. TTI acknowledges this is true. Doc. 172 at 23. Instead, TTI argues that Bonilla's opinions are wrong regarding the carrying of debt that could have been written off because certain accounts receivable that are more than 90 days past due are not considered in default if they are an independent customer with a good payment track record, such

---

[11] In the Amended Complaint, TTI asserts that Bonilla falsely claimed that TTI was improperly refusing to write down certain debts. Doc. 68 ¶ 40. TTI cites to the First Report's statement: "If committing outright financial fraud is the 'hard stuff,' would defying one's accountants be a 'gateway drug?'" *Id.* Such comments are clearly colorful rhetoric that cannot be actionable.

as Home Depot. The underlying facts that TTI is carrying some stale debt (over 90 days) is factually accurate. Bonilla's statements as to what that means for TTI is pure opinion.[12]

The next two categories of statements (labeled fourth and fifth) in TTI's motion raises arguments to statements not challenged as defamatory in the Amended Complaint and therefore cannot be used as a basis for TTI's claims. *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 705 (11th Cir. 2016) (where plaintiff Michel failed to allege in his complaint that the statement at issue was false or misrepresented him, he could not now use his briefing to add new allegations and argue that those new assertions support his cause of action); *see also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [its] complaint through argument in a brief opposing summary judgment."). Because TTI addressed these issues at oral

---

[12] In the Amended Complaint, TTI challenges Bonilla's statement in the First Report that TTI is "literally struggling to pay its bills on time" and "failing to pay [its suppliers and vendors] within existing [payment] terms." Doc. 68 ¶ 41. TTI's motion for partial summary judgment does not raise this statement or argue its falsity. Bonilla's motion points out that whether someone is "struggling" to pay its bills on time is an opinion or judgment and is therefore not actionable. Doc. 101 at 17. TTI responds that Helf testified that TTI always pays its bills on time unless it is a strategic decision or dispute. The First Report states: "Today, TTI is quietly implementing widespread layoffs, something it hasn't resorted to since the Great Recession. It is also literally struggling to pay its bills on time, as evidenced by an explosion in late/missing payments to suppliers – also something it hasn't seen in size since the Great Recession. This is all inconsistent with 'record profits', to say the least." Doc. 1-1 at 5. TTI does not challenge the statement that it implemented layoffs. Nor does it challenge the statement about "record profits." As for the late payments to suppliers, we already saw that Helf testified it may be a strategic decision. Bonilla's statement that TTI is "literally struggling to pay its bills" is colorful rhetoric or commentary when considered in the context of the whole statement. The Court agrees with Bonilla that the statement is nonactionable.

argument, the Court will address why, even if considered, the statements are not actionable.

Fourth, TTI challenged Bonilla's statement that TTI was overproducing inventory to increase profits. Doc. 92 at 8, 14. TTI refutes that it is overproducing inventory (explaining there was a stockpile of inventory during the Covid-19 pandemic), but it does not disagree that its inventory numbers were reported correctly. Doc. 172 at 24. Instead, TTI disagrees with Bonilla's speculation as to the reason the large amount of inventory is carried on TTI's books; such opinions are nonactionable.

Fifth, TTI argues that Bonilla made false statements about prepayments and deposits being included on the financial statements. Doc. 92 at 8, 15 (referring to Doc. 1-1 at 34–35). TTI does not disagree that these payments were properly included on the books, Doc. 172 at 25, but it takes issue with Bonilla's mischaracterization of the payments. TTI claims that the prepayments were explained in discovery. Specifically, TTI bought battery technology from a big company and the other had to do with a merger and acquisition. Again, the underlying facts pulled from the financial statements are not challenged, only Bonilla's opinions regarding the facts.

TTI goes on to argue that it conducted numerous internal reviews and audits to confirm the accuracy of its accounting and financial reporting and that Bonilla cannot point to evidence to the contrary. At issue, however, are Bonilla's statements, not TTI's financial reports. At bottom, TTI does not dispute much of the underlying data in the First Report. Instead, TTI challenges the opinions and conclusions Bonilla reaches based on the data. As stated recently by the Southern District of New York in

the *Grifols v. Yu* opinion, the challenged statements "must be considered in the context of a Report that has the purpose of financial commentary and analysis from a party with a disclosed interest, not factual reporting, and that is aimed at conveying this interested party's particular viewpoint or perspective on [the plaintiff company] based on publicly available financial data." *Grifols, S.A. v. Yu*, No. 24-CV-576 (LJL), 2025 WL 1531713, at *13 (S.D.N.Y. May 29, 2025).[13]

In light of the Court's findings that Bonilla's statements in the First Report are either factually accurate, nonactionable opinions, or colorful rhetoric or hyperbole, and taking into consideration Bonilla's cautionary disclaimers,[14] TTI's motion for partial summary judgment on the issue of falsity of the statements in the First Report is due to be denied. Because TTI cannot establish the element of falsity as to the First Report and "[a] false statement of fact is the *sine qua non* for recovery in a defamation

---

[13] Bonilla filed the *Grifols* opinion as supplemental authority (Doc. 165) and relied heavily at oral argument upon that court's holding to support his position. The facts of *Grifols*, which involved a company's defamation suit against a short seller for negative statements made about the company in a research report published online, are similar to the instant litigation as it relates to TTI's claims arising out of the First Report. *See Grifols*, 2025 WL 1531713, at *13 (The Report "makes clear that its opinions are based on publicly available financial filings."). *Grifols* is inapposite as to the Court's consideration of the Second Report, however, given the falsity of the material facts cited by Bonilla and relied upon in the Second Report.

[14] The Eleventh Circuit recognizes that courts should consider the context in which the statement was published and accord weight to cautionary terms used by the person publishing the statement. *See Keller*, 778 F.2d at 717. Here, the First Report was admittedly a biased short-seller report with the intended purpose of profit and which included multiple disclaimers that the opinions offered were just that. Thus, the disclaimers in the First Report were accorded some weight because the report was premised on facts that TTI does not directly refute. While TTI seeks to explain the data and/or justify its decisions related to the handling or reporting of the data, as evidenced at oral argument, TTI generally does not contest the underlying facts in the First Report. In contrast, the underlying facts in the Second Report were admittedly wrong. Given that context, the disclaimers in the Second Report are due little, if any, weight.

action," *see Hallmark Builders, Inc. v. Gaylord Broad. Co.*, 733 F.2d 1461, 1464 (11th Cir. 1984) (quoting *Byrd v. Hustler Magazine, Inc.*, 433 So.2d 593, 595 (Fla. 4th DCA 1983)), Bonilla is entitled to summary judgment on TTI's libel and libel per se claims arising out of the First Report.

　　　b. Second Report

　　　Regarding the Second Report, TTI alleges Bonilla falsely reported that TTI was defrauding its largest customer, Home Depot, by fraudulently labelling hundreds of thousands of products as "factory-blemished" in order to sell them through TTI's DTFO stores. There are two components to TTI's argument that the Second Report's claim that TTI was defrauding Home Depot was false and defamatory. First, the numbers reported by Bonilla are wrong. Second, Bonilla falsely claimed TTI defrauded its customer Home Depot based on the Home Depot Agreement's terms which Bonilla had never seen.

　　　Regarding the first issue, TTI alleges that Bonilla's premise that TTI was defrauding Home Depot is based on the following erroneous statements in the Second Report: DTFO stores maintained an inventory of more than $500 million of "factory-blemished" products, that its sales at the factory outlets total up to $2 billion per year, and that TTI reaps approximately $400 million in profits from DTFO sales. Doc. 68 ¶ 62. In its motion for partial summary judgment, TTI moves for judgment in its favor as to the falsity of these statements in the Second Report. In support, TTI submits deposition excerpts of David Stearns, TTI's corporate representative, who explains that the inventory levels discussed by Bonilla in the Second Report were not limited to

DTFO inventory. Rather, the numbers represented all of TTI's inventory. Doc. 92 at
17 (citing 94-20 at 19). Additionally, he testified that in 2022 and 2023, DTFO product
inventory was valued at approximately $10 million and inventory sales were
approximately $100 million, which constituted a loss of $10.6 million on DTFO in
2022 and a loss of $8.7 million in 2023. *See* Doc. 92 (citing Docs. 94-9, 94-10, 94-11,
94-14, 94-15). Significantly, Bonilla does not dispute he got these facts wrong: "It is
possible Bonilla made one mistake of substance: there is evidence that shows that the
factory outlet program achieved about $100 million in sales; Bonilla estimated it at
significantly more than that." Doc. 107 at 17. Indeed, the Second Report falsely states
that TTI's DTFO sales represented $1-2 billion (when it was actually about $100,000)
in annual sales. Doc. 1-2 at 2. That factual error undermines the entire premise that
TTI was selling significantly more products from its DTFO stores to Home Depot's
detriment. Rather than making $400 million in profit from DTFO sales, TTI submitted
evidence that it was losing money through the outlet stores. Bonilla provides no
evidence to the contrary. By Bonilla's own concession, the facts contained in the
Second Report regarding factory outlet inventory value, sales, and profits were false,
and therefore, TTI is entitled to partial summary judgment as to the falsity of these
statements. Bonilla responds, however, that such false facts, standing alone, are not
defamatory. But, under Florida law, "a speaker cannot invoke a 'pure opinion'
defense, if the facts underlying the opinion are false or inaccurately presented." *Lipsig
v. Ramlawi*, 760 So. 2d 170, 184 (Fla. 3d DCA 2000). Whether the statements made in
the Second Report that are based on these false facts are defamatory, and what

damages, if any, TTI suffered as a result, are questions of fact that will go to the jury.[15] Further, because the Court concludes below that TTI is a private figure, the issue of whether the statements were made negligently will also be decided by the jury.

The second part of TTI's argument is that TTI was not defrauding Home Depot in any way by selling excess inventory through its DTFO stores. Its exclusive agreement with Home Depot expressly allowed TTI to sell "reconditioned, obsolete or excess inventory" on its own provided that TTI allows Home Depot the first right of refusal. When TTI has excess product, it offers it first to Home Depot. If Home Depot does not want it, the excess inventory is sold through its DTFO stores. Doc. 92 at 16–17. When TTI sells product that Home Depot has declined to purchase, that product is referred to as "factory blemished." According to David Stearns, the term "factory blemished" is used to refer to "excess, obsolete or slightly damaged product." *Id.* at 17 (citing Doc. 94-20 at 13). The Second Report asserts that TTI was involved in a scam of mislabeling Home Depot exclusive brands as factory blemished in order to sell more of them on its own rather than through Home Depot. In support, Bonilla submitted pictures taken at DTFO stores showing inventory in undamaged boxes. But as indicated by Stearns' testimony, DTFO inventory is not necessarily damaged; it may just be excess. Bonilla's statements were buttressed by the false numbers Bonilla

---

[15] TTI did not move for summary judgment on the issue of damages, whether the statements are defamatory, or whether Bonilla was negligent in making the statements. *See* Docs. 92, 94-26. And although Bonilla moved for summary judgment on all of TTI's claims, no argument was made in the motion regarding the issue of damages and only conclusory arguments were made regarding the issue of negligence.

reported for the value, sales, and profits related to DTFO inventory. As referenced above, the numbers reported by Bonilla were wrong—by more than a billion dollars. Bonilla made representations in the Second Report based upon these false numbers and notwithstanding the fact that he had never seen the Home Depot Agreement. TTI contends that after initial inquiry following publication of the Second Report, Home Depot had no concerns about TTI's DTFO's business. Doc. 92 at 18. Bonilla responds that he cannot be held liable for defaming TTI where he was relying upon reliable sources. Such matters are better left for the jury. As discussed above, TTI is entitled to partial summary judgment as to the falsity of the statements made in the Second Report regarding the value, profit and annual sales of the DTFO's stores, which were admittedly wrong. Whether the statements predicated on the false facts were made negligently, whether they were defamatory, and what damages, if any, resulted will be decided by the jury.

### C.    Public Figure versus Private Figure

A defendant may not be held liable for defaming a public figure about a matter of public concern unless he is shown to have "acted with actual malice." *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1493 (11th Cir. 1988). The public figure-private figure distinction is explained in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45 (1974), which held that public figure plaintiffs must show "actual malice" (knowledge of falsity or reckless disregard of the truth) with clear and convincing evidence to recover for defamation. The rationale for *Gertz* was because public figures had the resources and media access to rebut defamatory statements without having to resort to a

defamation suit. "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id.* Bonilla points to the fact that TTI's CEO went on CNBC to rebut the First Report and issued multiple press releases in response to the reports to illustrate the broad access to media that TTI enjoys. Thus, Bonilla argues that even if any of his statements are considered defamatory, TTI's claims nevertheless fail because TTI is a general or limited public figure, and it is unable to show Bonilla acted with malice. For its part, TTI asserts that it is a private figure because it lacks significant media influence and only issues 6 or 7 press releases per year, and it issued only four public statements— all to the HKSE—regarding Bonilla's reports.

An individual may qualify as a public figure either generally—that is one with such fame and notoriety that he will be a public figure in any case—or for only "limited" purposes, where the individual has thrust himself into a particular public controversy and thus must prove actual malice with regard to certain issues. *Turner*, 879 F.3d at 1272. TTI argues it is not a public figure or limited public figure. Rather, it claims status as a private entity who maintains a low-profile and who has not thrust itself into the controversy at issue.

Two "fundamental" criteria separate public and private figures: (1) "public figures usually have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy"; and, more importantly, (2) public figures typically "voluntarily expose themselves to

increased risk of injury from defamatory falsehoods." *Silvester*, 839 F.2d at 1494 (internal quotation marks omitted).  Bonilla argues that, as a large multi-billion-dollar international company who makes some of the most famous tools in the world, who does business with a high-profile client such as Home Depot, and who has ready access to the media, TTI must be a general public figure. In opposition, TTI relies on *Computer Aid v. Hewlett-Packard*, 56 F. Supp. 2d 526, 535 (E.D. Pa. 1990), for the proposition that merely being a large, well-known company does not mean that it enjoys fame and notoriety. As discussed at the hearing, the Court agrees with TTI that it is not a general public figure that enjoys fame and notoriety. While the products it makes are well-known and one of its customers has a household name, TTI or Techtronic is not well known, nor does it have the name recognition to be considered famous. Whether TTI enjoys limited public figure status, however, is a closer call.

The Eleventh Circuit applies a two-part test to determine whether someone is a limited public figure: "First, the court must determine whether the individual played a central role in the controversy. Second, the court must determine whether the alleged defamation was germane to the individual's role in the controversy." *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020) (citing *Turner*, 879 F.3d at 1273).

Bonilla urges that TTI is a limited public figure as to anything contained in their public financial statements. In support, he relies on the Eleventh Circuit's opinion in *Turner*, in which the court held that Coach Turner need not have made any public statements for him to be considered a limited public figure with respect to anything relating to his role as an NFL coach. Simply taking on the task voluntarily injected

him into the public debate. *Id.* at 1273. Bonilla argues this analysis applies to TTI who regularly issues financial statements regarding the condition of its business. The Court finds this argument unpersuasive as such statements are mandated under financial reporting rules. Bonilla also cites to several TTI press releases discussing TTI's exceptional results and profits in an effort to gain public investors. *See* Doc. 109-1 at 20–21 n.18. TTI argues that Defendant's reliance on website hyperlinks contained in a footnote and not part of the evidentiary record is improper. Doc. 114 at 11. The Court agrees. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record[.]"). The articles referenced are not a part of the record, the website links are not authenticated,[16] and at least one of the website links is no longer active.

Bonilla relies on *Mile Marker v. Petersen Publishing*, 811 So. 2d 841 (Fla. 4th DCA 2002), to support his argument that TTI is a limited public figure. In *Mile Marker*, the appellate court found plaintiff winch maker was a limited public figure (rather than a private plaintiff) and thus was required to show actual malice in order to maintain its claim. "Since its entry to the winch market in 1996, Mile Marker had consistently, and rather vocally, asserted that its hydraulic winch was in fact superior to electric winches.

---

[16] Websites are not self-authenticating. *See Sun Prot. Factory, Inc. v. Tender Corp.*, No. 604CV732ORL19KRS, 2005 WL 2484710, at *6 (M.D. Fla. Oct. 7, 2005) (citing *In re Homestore.com, Inc. Sec. Litig.*, 347 F.Supp.2d 769, 782 (C.D. Cal. 2004) ("Printouts from a website do not bear the indicia of reliability demanded for other self-authenticating documents under Fed. R. Evid. 902.")). And private, non-governmental websites are not the proper subject of judicial notice. *See, e.g., Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1274 (11th Cir. 2014) (finding no abuse of discretion in the district court's refusal to take judicial notice of a document from a non-governmental website).

Mile Marker seemed intent on procuring comparison tests of its product and that of its electric winch competitors, requesting numerous truck-related publications to conduct such tests. Mile Marker even went so far as to conduct its own comparison test, which was videotaped, with copies freely distributed to its customer base." *Id.* at 843. In holding that Mile Marker is a limited public figure, the court found "there was a pre-existing public controversy in a segment of the population regarding the merits of hydraulic versus electric winches. Though winch performance may not be a topic on the daily evening news, clearly there is a segment of the population, namely off-road enthusiasts, winch owners, those contemplating winch purchases, and readers of '4 Wheel & Off Road' and similar magazines, who would be impacted by the resolution of the instant dispute." *Id.* at 845. Unlike in *Mile Marker*, there is no evidence in the record that TTI has vocally asserted its superiority in the relevant market. Bonilla has not come forward with any evidence that TTI thrust itself into the public controversy as it relates to its exclusive agreement with Home Depot. To the contrary, there was no controversy until Bonilla published its Second Report. Thus, the Court concludes that TTI is not a limited public figure, but rather, TTI is a private figure. Therefore, TTI need only prove to a jury that Bonilla acted negligently in making the statements in the Second Report.

### D. Florida's Anti-SLAPP Statute

Bonilla moves for an award of attorney's fees under Florida's Anti-SLAPP Statute. Doc. 101 at 25. In relevant part, Section 768.295, Fla. Stat. provides: "A person . . . in this state may not file or cause to be filed, . . . any lawsuit, . . . against

another person or entity without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue . . . protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution." Fla. Stat. § 768.295(3). Under the Anti-SLAPP statute, "free speech in connection with public issues" means "any written or oral statement that is protected under applicable law and is made before a governmental entity in connection with an issue under consideration or review by a governmental entity, or is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." *Id.* § 768.295(2)(a). The statute provides that "[t]he court shall award the prevailing party reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section." *Parekh v. CBS Corp.*, 820 F. App'x 827, 836 (11th Cir. 2020) (quoting Fla. Stat. § 768.295(4)).

Florida's Anti-SLAPP statute is designed to deter meritless lawsuits that suppress constitutional rights. *See Vericker v. Powell*, 406 So.3d 939, 942 (2025). "To prevail on an Anti-SLAPP claim, a defendant must show that the plaintiff's lawsuit is 'without merit' and brought 'primarily because' the defendant exercised protected speech or conduct." *Id.* at 945; *see also* Fla. Stat. § 768.295(4) (awarding prevailing party fees and costs "in connection with a claim that *an action* was filed in violation of this section") (emphasis added). Defendant does not demonstrate that the speech at issue here falls within the "free speech in connection with public issues" that is contemplated by the statute. But even if it is, given the Court's ruling above as it relates to the Second

Report, the Court cannot say that TTI's action is without merit and therefore in violation of Florida's Anti-SLAPP Statute. Accordingly, Bonilla's request for attorney's fees is due to be denied, without prejudice. It is hereby

**ORDERED:**

1.    Plaintiffs' Motion for Partial Summary Judgment (Doc. 92) is **granted in part** as to the falsity of the statements in the Second Report and as to TTI's status as a private figure. In all other respects, the motion (Doc. 92) is **denied**.

2.    Bonilla's Motion for Summary Judgment (Doc. 101) is **granted in part** as to Plaintiff's claims related to statements made in the First Report. In all other respects, Bonilla's motion (Doc. 101) is **denied**.

3.    Bonilla's request for attorney's fees under Florida's Anti-SLAPP Statute is **denied,** without prejudice.

4.    Within fourteen (14) days, the parties shall confer and file with the Court a joint statement of availability for trial, indicating the months between November 2025 and May 2026 that both sides are available for trial and the expected length (number of days) of trial.[17] Upon receipt of the parties' notice, the Court will issue an amended Case Management and Scheduling Order scheduling the pretrial conference and setting the case for jury trial. Additionally, the parties' notice should indicate whether the parties believe referral to mediation would be useful.

---

[17] The Court is aware that the parties previously expected the trial of this case to take 7 to 10 days. Doc. 116 at 3. Given that only issues related to Plaintiffs' claims arising out of the Second Report remain, the parties shall provide an update as to the anticipated number of days the trial will take.

**DONE AND ORDERED** in Tampa, Florida on September 19, 2025.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record
Unrepresented Parties, if any